The State of Louisiana, State of Maryland intervening, *v.* The Executors of John McDonogh and The City of New Orleans.

The will of *John McDonogh* conveys the title, or ownership of the property embraced by the legacies, to the residuary legatees, the cities of New Orleans and Baltimore. (Eustis, C. J.)

Municipal Corporations are expressly authorised to receive legacies by the Louisiana Code: their capacity, in this respect, is recognized by Article 428, and by the whole course of legislation on the subject. (Eustis, C. J.)

By the will the City of New Orleans is a residuary legatee under an universal title. (Eustis, C. J.)

The legacy to the City belongs to a class known to the Civil Law, from the foundation of Christianity, by the name of legacies to pious uses. They are an element in the polity of municipal administrations in all countries which have preserved the features and jurisprudence of Roman civilization. (Eustis, C. J.)

Legacies to pious uses are those which are destined to some work of piety, or object of charity, and have their motive independent of the consideration which the merit of the legatees might procure to them. In this motive consists the distinction between these and ordinary legacies. (Eustis, C. J.)

The term pious uses includes, not only the encouragement and support of pious and charitable institutions, but those in aid of education, and the advancement of science and the arts. (Eustis, C. J.)

They are viewed with double favor by the law, on account of their motives for sacred usages, and their advantage to the public weal. (Eustis, C. J.)

Article 1536 of the Code, which provides for the manner in which acceptances of donations for the benefit of a hospital for the poor of a community, or other establishment of public utility, shall be made, pre-supposes the legality of the donation, and there is no ground for any distinction between the right of holding by donation *inter vivos* and *mortis causa*. Nor does the law make any distinction between a legacy to the poor of a city and a legacy to a city for the poor: in both cases it is a legacy to pious uses, and the City is the recipient. (Eustis, C. J.)

Under the Civil Law it is no objection to the validity of a legacy to pious uses that it is for the benefit of the poor, even without any designation of locality, and it has been held that a will was good in which a testator instituted *the poor* his heirs. (Eustis, C. J.)

The Article 1506 of the Code is not in the ordinary form of a prohibitive law. It is the first of the chapter which treats of dispositions *reprobated* by law in donations *inter vivos* and *mortis causa*. The expression *reprobated—reprouvées*—by the law, implies something even more than prohibition. The terms are plain, general and comprehensive, excluding all exception—and are direct, positive, and unambiguous. The whole tenor, imperatively establishing the law, has for its object the exclusion of the legal existence of impossible conditions in testaments. (Eustis, C. J.)

The Article 1506 of the Code, which provides that impossible conditions, and those contrary to the laws, are reputed not written, is based upon considerations of public policy, and must be carried into effect, however it may conflict with the intention of the testator. (Eustis, C. J.)

The Article 1705, which provides that the intention of the testator must principally be endeavored to be ascertained, is a rule of interpretation only and subordinate to the Article 1506. (Eustis, C. J.)

The right of a man to dispose of his property after his death is derived, exclusively, from the law; and if the law says that, in certain cases, from motives of policy, the vain conceits of testators—*ineptæ voluntatis*—shall be held not written; it cannot be disregarded. (Eustis, C. J.)

The rules of interpretation found in the Code, belong to the doctrinal part of the law, and are not restrictive of the rules for the interpretation of contracts and testaments found in the body of the Civil Law; all are advice given to the Judge—landmarks they may be called—to be applied not so

STATE OF
LOUISIANA, &c.,
*v.*
EXECUTORS OF
McDONOGH.

much *ratione imperii*, as *imperio rationis*, and that while it is his duty not to lose sight of any of them, he must, in every case, exercise his discretion in applying them, ever bearing in mind that the least circumstance, at times, is sufficient to prevent their application. (ROST, J.)

It is true that, in the construction of wills, Courts of Justice ought not to depart, without necessity, from the proper sense of the words used. That necessity seldom occurs in cases ot single dispositions unconnected with others the will may contain. But when the several dispositions of the will are constituent parts of one scheme, each must receive the sense which results from the entire instrument; and the rule has, in that case, reference, not to the terms used in any one disposition, but to the entire contents of the will. In such a case, if there is just reason to believe that the testator has used terms in a sense different from that sanctioned by usage, they must be taken in the sense in which it is believed he understood them. (ROST, J.)

The intention of the testator must prevail over the grammatical meaning of the words which he has used, provided his intention is ascertained by dispositions contained, and words used in the will, and it is manifest that he had another object and another thought than that which the terms used in a particular disposition would otherwise convey. (ROST, J.)

When the sense of a particular disposition, resulting from the entire instrument, has been ascertained, Courts may go further in cases of testaments than in cases of contracts, in disregarding the grammatical meaning of the words used, so far indeed as to supply words omitted, which may be done, whenever the obvious meaning and the other parts of the will restore these words naturally.— (ROST, J.)

The intention of the testator to exclude his heirs at law, at all events, being admitted, the conclusion is inevitable, that if the Cities could not take the legacies, or violate the conditions which the testator had the right to impose, he intended to vest his property in the States of Louisiana and Maryland. (ROST, J.)

The intention of the testator is clear—that if the bequest to the Cities did not take effect, or became forfeited by the violation on their part of the conditions, the States were to take it without conditions, as the next best thing he could do to insure the preservation of his fortune, and the application of it, in his name, to charitable uses. (ROST, J.)

The intention of the testator, and the sense in which he used the word *lapse* being manifest, under the rule already cited, and the additional one "*in conditionibus testamentorum voluntatem potius quam verba considerare oportet,*" that sense should be preferred though not the most correct and usual. (ROST, J.)

That *McDonogh* did not intend, in the event the Cities could *not take the legacies, that the States* should, coupled with the conditions—is apparent from his requesting the Legislatures of the States to carry his intentions into effect as far and in the manner which should appear to them most proper. (ROST, J.)

Under the will the disposition in favor of the City of New Orleans is a bequest to pious uses.— (ROST, J.)

Under the Code the City of New Orleans can accept donations made to the poor, and take by will and by donation *inter vivos*. (ROST, J.)

Under the successive Constitutions of Louisiana, the city of New Orleans and its officers have been made permanent functionaries of government for all purposes of police and good order, and for the punishment of minor crimes and offences. The police and good order of a city include the education of youth, and the care of the poor within its limits. (ROST, J.)

Cities can hold property patrimonially, and the property thus held may be applied by law to any object for which the city is bound to provide: and there is nothing contrary to public policy, or injurious to creditors, in the enforcement of a condition appended to a bequest, and without which the bequest would not have been made, that the property given shall be applied to some of those objects and shall never be alienated. The giving, on such a condition, is a reasonable liberty to bestow, and the bequest, by providing a fund which the city was otherwise bound to supply, enriches it and increases its means to meet its obligations. (ROST, J.)

If the legacy had been made directly to the poor, or the children of the poor, it would have come within the letter of the law; the City would have taken charge of it, and administered it for the beneficiaries. But this is not the only form such a disposition can assume, and the bequest, as made, comes within the spirit and learning of our jurisprudence in the matter of charitable bequests. (ROST, J.)

Donations to a city for pious uses, and for the erection of works of public utility, stand upon the same footing—and in either case the destination affixed to the property by the testator, follows it in the possession of the legatee, who is, notwithstanding, vested with the title. ROST, J.)

Uncertainty seems to be the essence of charitable bequests. Whenever the beneficiary is designated by name, he has a legal right which he can exercise, and his merit is alone to be considered—and the bequest ceases to have the peculiar merit of a charity. Under our law bequests for the poor, or for their benefit, are not void for uncertainty. (ROST, J.)

If the disposition in the will was in favor of what is called in the will, the General Estate, it is invalid. If it establishes a legal and an equitable title in the technical sense of the English law, it is equally invalid. But if it vests in the City a title in full ownership, with a destination to charitable uses, for which the City would otherwise be bound to provide—it is lawful, and may be carried into effect. One of these positions must be taken. It is then impossible to evade or disregard the textual provisions of Article 1706 of the Code, which provides that a testamentary disposition must be understood in the sense in which it can have effect, rather than in that in which it can have none. (Rost, J.)

When, under all the different interpretations of which a will is susceptible, it is lawful and may be executed, the construction should rest upon the words and arguments used by the testator. But where one interpretation will give effect to the will, and the other would not, the decision of the law supercedes the discretion of the Judge, and commands him to assume that the testator intended what was lawful. (Rost, J.)

The condition in the will, not to alienate, is not unlawful in this particular case. A city may, in a case like this, be deprived of the *jus abutendi* over its property for an object of public utility, without its right of property being affected thereby; the Legislature having always the right to remedy the effects of the disposition, whenever the alienation of the property given becomes of public advantage. (Rost, J.)

The distinction between this and *Henderson's* will (5th Annual) is obvious. *Henderson* made no disposition of his property in favor of any one, but simply provided that it should forever form part of his succession and be administered by his executors and commissioners to be named after them to the end of time—while *McDonogh* has made a valid disposition of his property, and the perpetuity of the bequest is merely the consequence of the perpetual existence of the legatee. (Rost, J.)

Under the will of *McDonogh*, the cities of New Orleans and Baltimore are not invested with any title known to the laws of Louisiana. Under our system there can be no ownership stripped forever of the right of possession, use, administration and disposal. Such an estate has no warrant in our Code, nor precedent in our jurisprudence. (Slidell, J, dissenting.)

The law, from wise motives, permits men to exercise a last act of volition over their estate by disposing of its ownership. But when they exercise this just privilege, they must exercise it under the law. They have no right to invent new tenures of property. (Slidell, J, dissenting.)

The ownership is not given to the Cities. The language is not, I give and bequeath to the Cities—but I give and bequeath to the Cities to and for the several intents and purposes hereinafter mentioned. Those intents and purposes are fully expressed in subsequent clauses of the will. Being thus referred to, they must be considered as embodied in the devising clause, and clearly qualify and limit it. (Slidell, J, dissenting.)

The intention of the testator to withhold from the Cities the *ownership* of his estate, in any sense of that term known to our law, admits of no doubt. It is interwoven with the whole theory of the will, and speaks unmistakably through its entire contexts. (Slidell, J, dissenting.)

The real legatee intended and preferred by *McDonogh* was the Ideal Being which he designated as his General Estate. The Cities were intended to be the mere supervisors of the Perpetual Trust which he desired to create, and which, in its turn, was to be the source of the other trusts contemplated by the will. (Slidell, J, dissenting.)

The Ideal Being, contemplated by the will, has no legal existence, and is incapable of taking. And the States of Louisiana and Maryland, by ratifying the institution of the present suit, have clearly disapproved of the scheme of future incorporations contemplated by the will. (Seidell, J, dissenting.)

It is apparent from the will that *McDonogh's* preference, in the disposition of his property, was for the extraordinary scheme which he had so elaborately prepared. He desired it to be carried out in its *entirety*, and forbade the Cities to violate *any* of its provisions. But still an apprehension existed in his mind that the scheme might fail, and from "whatsoever cause" this failure might arise, by "whatsoever means" it might come to pass, his desire was that the States of Louisiana and Maryland should then be the recipients of his fortune, who, by virtue of their sovereign power, could accomplish the substantial execution of such of his wishes as they might consider lawful, and to whose discretion and fidelity he was willing to leave their execution. The great object of the testator was the education of the poor. That paramount object, with other wishes of the testator, so far as they may be deemed practicable and politic, the States can, and no doubt would, in good faith and with a just discretion, endeavor to accomplish; and thus the charitable desire of the testator would be disappointed only as to the preferred mode of its fulfillment, an alternative of his own choice being adopted. (Slidell, J, dissenting.)

It is conceded that *McDonogh* intended to exclude his heirs at law from the inheritance of his property. But it is said that *McDonogh* did not dispose of the title and ownership of the estate. But this view is narrow and technical, and asks from an unprofessional mind the nice accuracy of an expert conveyancer. This is contrary to the received theory of the interpretation of wills. The law is indulgent to testators, who are regarded as *inopes consilii*. It exempts the phraseology

STATE OF
LOUISIANA, &c.,
v.
EXECUTORS OF
McDONOGH.

of wills from technical restraint, and obeys the clear intention of the testator, however informal
the language in which it may be announced. If that intention be even obscured by conflicting
expressions, it seeks the intention, rather in a rational and consistent, than in an irrational and in-
consistent purpose. Of two modes of construction it prefers that which will prevent a total intes-
tacy. (SLIDELL, J, dissenting.)

By the lapse of the legacies to the Cities, the testator meant their failure to take effect from any
cause whatever. By the expression "said legacies wholly, or partially so lapsed shall enure, &c.;"
he evidently meant the property embraced in those legacies. To say that under the clause in
question he simply intended to place the States in the stead of the Cities—their action fettered by
the same restrictions—their title qualified and limited by the same anomalous provisions as to
possession, use and management is to obliterate from the clause its closing words, which commit to
the States respectively a dominion controlled only by their own discretion. (SLIDELL, J, dis-
senting.)

APPEAL from the Fifth District Court of New Orleans, *Buchanan*, J.
WILL OF JOHN McDONOGH.

IN THE NAME OF GOD, AMEN. I, John McDonogh, a native of the City of Balt-
imore, in the State of Maryland, United States of America, now an inhabitant of
the Town of MacDonogh in the State of Louisiana, aware of the uncertainty of this
mortal life, yet of sound mind and memory, for which, and all other blessings,
thanks to Almighty God, do make this, my Olographic Will, as my last Will
and Testament, for the disposal of all my worldly property and effects, of every
kind, of which I may die possessed, in manner and form following ; That is to
say, (First, declaring that I have never been married, and that I have no heirs
living, either in the ascending or descending lines) I will, that immediately after
my death, an inventory shall be made of all my property, and effects, by a
Notary Public, assisted by two or more persons, whom my Executors (herein
after named) shall appoint, the same to be done on oath. I give, will, and be-
queath to the Children of my Sister Jane, the Widow of a Mr. Hamet of Balti-
more, in the State of Maryland, in equal proportions, all that Lot, or parcel of
ground, (with the improvements thereon) laying in Baltimore County and State
of Maryland, Containing ten acres, more or less, which lot of ground I acquired
by purchase, on the twenty seventh day of February in the year of our Lord
Eighteen hundred and nineteen, of John Pogue, of the said City of Baltimore, as
per deed of conveyance to me enregistered on the same day, by William Gib-
son, Clerk of the Baltimore County Court, among its land Records ;—The usu-
fruct, however of the afore mentioned landed property and improvements, I give
and bequeath to my said sister Jane, during her life time.—I give, will, and be-
queath, to my said Sister Jane, Widow Hamet, the sum of *Six thousand dollars*,
recommending to her, my said Sister, to place said Six thousand dollars, on
interest either in Bank Stocks, or otherways, and by economy, to make the in-
terest thereof, support her in her old age.—I will and bequeath, their freedom,
(as a reward for their long and faithful services,) to my old servants, Gabriel,
James Thornton, Tanness or Dennis, Noel, Mark, Old John, John Defage, Old
Harry, Richard, and Longmary, requesting my Executors (herein after named)
to take the necessary steps, in conformity to law, to see this, my will and desire
executed.

It is my will and I direct my executors, (hereinafter named,) immediately
after my death, to correspond with the American Colonization Society, at the
City of Washington, in the District of Columbia, for the purpose of ascertain-
ing, when said Society, intends sending a vessel to Liberia, on the Coast of
Africa, with emigrants, from New Orleans, and by the first vessel, so sailing
from New Orleans, for Liberia, to send all the rest and residue of my black
people, old and young, (with the exception of the ten aforementioned individuals,
to whom I have directed their Freedom to be given, here, in New Orleans,)
men, women and children, (and also, with the exception of the black man Phil-
lip, his wife Fanny and their children, the black woman Jane or Jenny, and her
children, the mulattoe man George, a carpenter by trade, the mulattoe boys
William and Henry, carpenters by trade, the black men Houma, David Crocket
and George Calhoun, the mulattoe or Griff boy Jerry, the black women Sophie
and Dolly, Hagar, and Anna, or Hannah, and their children, all of whom I have
lately purchased, as it is my will, that they, the said Phillip and Fanny his wife,
and their children, Jane and her children, the mulattoe man George, a carpenter

by trade, the mulattoe boys William and Henry, Carpenters by trade, the black men Houma, David Crockot, and George Calhoun, the mulattoe, or griff, boy Jerry, and the black women Sophie, Dolly, Hagar, and Anna, or Hannah, and their Children, with any other black, or colored people, whom I may acquire by purchase subsequent to the date of this, my last Will, and Testament, shall serve those, (by being hired out for wages, or kept employed on my plantations, if thereon so employed at my death,) to whom I have herein after willed the rest, residue and remainder of my Estate, real, and personal, fifteen years from and after my death; when then, after said service of fifteen years, my Executors (hereinafter named) will deliver said black and colored people, up to the American Colonization Society for Colonizing Free people of Color, of the United States, established at the City of Washington, in the District of Columbia, to be also sent to Liberia, on the Coast of Africa.) And to pay a proportionate part of the Charter of said Vessel for transporting them to Africa, furnishing them with provisions, stores, medicines, &c., &c. for the Voyage.—I also direct my Executors (hereinafter named) to lay out and expend for the use of those, my people, who are to go immediately after my death, to Liberia, the sum of *One thousand dollars* in such Articles as ploughs, hoes, spades, axes, nails, common locks, hinges, clothing, garden and other seeds, &c., &c., and divide out those articles among them in equal proportions, and see them put on board the vessel at the time of sailing.—My Executors will also be pleased to give letters of recommendation, to those my people, directed to the inhabitants of that Colony, setting forth their good characters, and the morality of their lives, as a passport to their good opinions, and to purchase and place in the hands of each of said individuals, old and young, at the moment of sailing for Africa, the volume of the Holy Gospels of the Old and New Testament, as the most precious of all the gifts we have it in our power to give or they to receive.—And for the more general diffusion of Knowledge, and consequent well being of Mankind, convinced as I am that I can make no disposition of those Worldly goods which the most High has been pleased so bountifully to place under my Stewardship, that will be so pleasing to him, as that by means of which the poor will be instructed in Wisdom and led into the path of virtue and Holiness,)—I Give, Will and Bequeath, all the rest, residue and remainder of my estate, real and personal, present and future, as well that which is now mine as that which may be acquired by me hereafter, at any time previous to my death, and of which I may die possessed, of whatsoever nature it may be, and wheresoever situate, (subject to the payment of the several annuities or sums of money hereinafter directed and set forth; which said annuities or sums of money, are to be paid by the devisees of this my General Estate, out of the rents of said estate,) Unto the Mayor, Aldermen and inhabitants of New Orleans, (my adopted city) in the State of Louisiana, and the Mayor, Aldermen and inhabitants of Baltimore (my native City) in the State of Maryland, and their Successors, (in equal proportions of one-half to each, of said Cities of New Orleans and Baltimore,) forever. To, and for, the several intents and purposes, hereinafter mentioned, declared and set forth, concerning the same, and especially for the establishment and support of Free Schools in said Cities, and their respective Suburbs, (including the Town of Macdonogh as a Suburb of New Orleans;) wherein the poor, (and the poor only) of both sexes of all Classes and Castes of Color, shall have admittance, free of expense for the purpose of being instructed in the Knowledge of the Lord and in reading, writing, arithmetic, history, geography, &c., &c., under such regulations as the Commissioners (to be appointed as hereinafter directed,) of said Schools shall establish, always understood and provided however, that the Holy Bible of the Old and New Testament, shall be at all times and forever made use of in those Schools, as one, (and the principal one) of the reading or class books, which shall be used by the pupils therein as the first object of every School, and of all teaching of the youth of our Country should be to implant in their minds a Knowledge of their duty to God, and their relation of Men, to their divine Creator; And that Singing classes shall be established and forever supported, and singing taught, as a regular branch of education in said Schools, by which means, every pupil will acquire the rudiments of the Art, and obtain a Knowledge in singing Sacred Music.—As relates to my real estate, that no part thereof shall ever be sold or alienated by the said Mayors, Aldermen and inhabitants of the respective Cities of New Orleans and Baltimore, or their Successors, but the same, shall forever, thereafter be let, from time, to time, to good tenants, the lots

STATE OF
LOUISIANA, &c.,
v.
EXECUTORS OF
MCDONOGH.

of ground improved with houses, laying in the City of New Orleans, its suburbs, Town of Macdonogh, or elsewhere, let by the Month or the year, and the unimproved lots of ground, in the City of New Orleans, its suburbs, Town of MacDonogh or elsewhere, leased for a term not to exceed twenty-five years at any one time (the rent payable monthly or quarterly) and to revert back at the end of said time, with all the improvements thereon, (free of cost, to the lessors,) to be rented thereafter by the month or year. And the lands wherever situate in the different parishes of the State, leased in small tracts, for a term not to exceed one to ten years, revertable back with their improvements, to be re-leased for a shorter time and at higher rates.—My intentions being, (I in consequence instructing my Executors (hereinafter named) to invest my personal effects, (say, money, bonds, notes or stocks on hand, interest accruing thereon, furniture of house in which I reside, and effects about it, as well as the amount of all debts owing to me as fast as they are received,) in real estate, say lots of ground and houses, and lots of ground laying in the City or suburbs of New Orleans, and hand over said real estate, as soon as purchased, with the title deeds thereto, to the Commissioners and Agents of my General Estate, (said Commissioners and Agents of my General Estate to be named by the respective Corporations of said Cities of New Orleans and Baltimore in the manner hereinafter directed.) So that by said means the whole of my estate, real and personal, (excepting only my black people, the legacy bequeathed the Children of my Sister Jane, and that to herself,) will become a permanent fund on interest, as it were, (Viz: a fund in real Estate affording rents,) no part of which fund (of the principal) shall ever be touched, divided, sold, or alienated, but shall forever, remain together, as one Estate, (termed in this, my last will and testament as "My General Estate" or "The General Estate") and be managed as I herein direct. The nett amount of rents which shall be collected annually shall be divided equally, (half and half) between the said two Cities of New Orleans and Baltimore, by the Commissioners and Agents of my General Estate, (to be named in the manner herein after directed) after paying the several annuities, and sums of money, hereinafter provided for, and set forth ; and applied forever to the purposes for which it is hereby intended and destined.—FIRSTLY, I give and bequeath to the American Colonization Society for Colonizing the Free people of Color of the United States, established at the City of Washington in the District of Columbia, for the purposes of its noble and philanthropic institution, an Annuity for the term of Forty Years, Counting from and after the day of my decease, of the one eighth part, (or twelve and a half per cent) of the nett yearly revenue of rents of the whole of the Estate as herein before willed and bequeathed unto the Mayors, Aldermen and inhabitants of the Cities of New Orleans and Baltimore, but which one eighth part of the nett yearly revenue of rents of said Estate, as aforesaid, shall not entitle the said American Colonization Society for colonizing the Free people of Color of the United States, to receive or demand in any one year a larger sum than *Twenty five thousand dollars*, should the one eighth part thereof amount to a larger sum.–Trusting in full confidence that the inhabitants of this free and happy land throughout all its borders, from Maine to Louisiana, will sustain this institution, (one of the greatest glories of our country,) and enable it to accomplish its humane and holy object in its full extent.—And notwithstanding that I look upon and consider the instruction of the poor in the Knowledge of God and the wisdom of Man, as the first, best, and Holiest of all charities (as they are thereby taught their duty to their Creator, and those everlasting principles of virtue which instill self respect and teach men the dignity of their nature, which restrain them from falling into vice, and becoming in consequence inmates of the Penitentiary, or Alms house,) and do not consider the endowment of Asylums and Hospitals as the best mode of permanently serving and doing good to my fellow man, still as it is probable, whilst the present race of men exist, constituted as we are, that some portion thereof, from the various causes to which frail humanity is liable, will fall into error, and of consequence, become helpless and destitute.—SECONDLY, I give and bequeath to the Mayor, Aldermen and inhabitants, of the City of New Orleans, in the State of Louisiana, and their successors, forever, for the express and sole purpose of establishing an *Asylum* for the *poor*, of both Sexes and of all ages, and castes of Color, where they may be sheltered, clothed, fed and taken care of, made useful according to their respective degrees of health, strength and capacity, and mendicity, thereby ban-

STATE OF
LOUISIANA, &c.,
*v.*
EXECUTORS OF
McDONOGH.

ished from the Streets of the city, and its suburbs, (including the Town of Mac-Donogh) an annuity of the one eighth part, (or twelve and a half per cent,) of the nett yearly revenue of the rents of the whole of the General Estate as hereinbefore willed and bequeathed unto the Mayors, Aldermen and inhabitants of the Cities of New Orleans, in the State of Louisiana, and of Baltimore in the State of Maryland, and their successors for ever; the said annuity to be paid yearly, until such time, as the said one eighth part of the said nett yearly revenue of rents shall amount, to the full and entire sum of *Six hundred thousand* dollars, when it shall cease, and be no longer paid.—And for the purpose of carrying this, my desire and intent into effect I request, authorize, and empower the City Councils of the City of New Orleans, on the First Monday of January of every year, to name and appoint one respectable Citizen out of each ward of the City and Suburbs of New Orleans, (including the Town of Macdonogh) but who shall not exceed seven in number, nor be members of the said City Councils at the time, who shall be commissioners therein, which Commissioners so named, shall serve for the term of twelve Months, and until a new election, on the first Monday of January of the following year shall be made by the said City Councils, of Commissioners, to replace those of the preceding year, (none of whom shall be elected for the second year,) and so on from year to year, to the end of time; and said Commissioners shall have the management of said Institution, its funds, and everything in relation to it; (the Mayor and City Councils of the City of New Orleans, having however, the general supervision, and to whom the Commissioners are liable for the faithful performance of their duty herein; and to whom, annually, on going out of office, they must render accounts of their administration, showing particularly its receipts and expenses, state of its funds, its real estate, &c, &c, which accounts will be audited, by the said City Councils, through a Committee, from their body, named for the purpose, and who will publish them yearly, in two of the public newspapers printed in the City of New Orleans.)  The said Commissioners (to be named as aforesaid) will receive annually or semi-annually, the amount of the annuity, until such time as they shall have received, according to this bequest the whole amount of it, say, the sum of six hundred thousand dollars; and as they receive it, they shall invest it in Bank Stocks, or other good securities, on landed estate on interest, so as to augment the amount thereof by the accumulation of interest to the largest possible sum, up to the time when the last of the annuity, shall be received by them; at which time, (when the last of the annuity shall be received,) It is my desire, and I direct, the said Commissioners to take such part of said sum, (not to exceed however the one third of the whole amount of principal and interest which may have accrued thereon,) as may be necessary and invest it in the purchase of such landed Estate, and in the erection of such buildings, as will be appropriate to the object intended and wanting; and in the furnishing of said buildings when completed, in beds, bedding, clothing, and all other necessary articles, and the residue of said sum, whatever it may be, (but which shall be at least the two thirds of the whole amount of principal and interest,)  I direct to be invested in the purchase of real estate, say, lots of ground and houses, and lots of ground, situate in the City, or suburbs of New Orleans, (such lots of ground as will probably greatly augment in value,) which real estate, (when purchased, shall never thereafter be sold or alienated,) for the purpose of deriving therefrom, a permanent revenue, (in rents) for the support of said institution for ever; as no part of the principle sum, or the interest which may accrue thereon, shall ever be taken for the support of the institution; my intention being, that its support and the payment of all the expenses, necessary to its support, shall be supplied exclusively from the revenue in rents, of its real estate, and the revenue, derivable from the labor of the poor, its inmates.—(Which houses, as also the buildings of the institution, I recommend and direct to be kept constantly insured against the risk of fire, so that, if an accident should occur, there would be means to rebuild them,) I recommend to the Commissioners, to select a situation high and healthy, for the establishment of the institution; say a tract of land of three or four acres in front on the river Mississippi, by forty or eighty acres in depth, situate within three, four or six miles of the City of New Orleans, on either bank, above, or below it; and to erect the buildings of brick, in a style of taste and elegance, of great solidity (as they are intended to stand for ages,) airy and of proportionate elevations.—They the Commissioners, (to be named as aforesaid) are permitted, however, at

23

STATE OF
LOUISIANA, &c.,
v.
EXECUTORS OF
MCDONOGH.
any time (when they have money on hand, or stocks of this fund,) when oppor-
tunities offer of making good investments of it, in real Estate, (say, lots of
ground and houses, and lots of ground, situated in the City of New Orleans or
its suburbs, yielding rents, or likely to yield rents,) to invest such parts thereof
as they think proper, (such purchases however to be approved by the Mayor
and City Councils of the City of New Orleans,) in such Real Estate.   And also,
when an opportunity offers of acquiring such a tract of land, as will be wanted
for the Institution, (at a cheap rate,) to purchase it.—And as I believe our cli-
mate and soil, well adapted to the cultivation of the mulberry tree, and the
rearing of the silk worm, such a tract of land as I recommend the purchase of,
if planted with mulberry and the cultivation of silk undertaken, (which is a
very light employment, well suited to the weak and aged,) would, I have no
doubt, yield an annual revenue to the Institution, which would go far towards
paying the expenses for its support ; I therefore earnestly recommend its trial
to the Commissioners.—I also recommend to the Commissioners, to apply to the
Legislature of the State for an Act, to incorporate said Institution ; (subject
always however, be it understood to the conditions herein provided for.)—
THIRDLY, I give and bequeath to the "Society for the relief of destitute Orphan
boys" of the City of New Orleans in the State of Louisiana, (of which institu-
tion Beverly Chew was president on the 28th day of April last, 1838,) for the
express and sole purpose (and of no other) of being invested in the purchase of
Real Estate, (say, lots of ground and houses, and lots of ground,) situate in the
City of New Orleans and its Suburbs, from which a perpetual revenue from the
rents of said Real Estate, may be drawn for the support of said Institution, an
Annuity of one eighth part (or twelve and a half per cent) off the nett yearly
revenue of rents of the whole of the General Estate, as hereinbefore willed and
bequeathed, to the Mayors, Aldermen and inhabitants of the Cities of New Or-
leans, in the State of Louisiana, and of Baltimore, in the State of Maryland, which
Annuity of the One Eighth part of the nett yearly revenue of rents as above
stated, shall be set apart yearly or half yearly by the Commissioners and Agents
of the General Estate, (to be appointed as hereinafter set forth) and deposited
in some one or more of the Banks in the City of New Orleans, (which pay an
interest on money deposited with them,) until such time as said Annuity shall
amount to the sum of FOUR HUNDRED THOUSAND DOLLARS, (exclusive of any in-
terest, which may have accrued on it,) when it shall cease and be no longer
paid.—And as the said Fund of Four hundred thousand dollars, accumulates in
Bank, The Directors of the said "Society, for the relief of destitute Orphan
Boys" assisted by the Mayor and Aldermen, of the City of New Orleans, Who,
(the said Mayor, and Aldermen,) shall approve of the purchases, of real Estate,
and become parties to the deeds, by which it is acquired, may, from time to
time, (as good purchases offer,) Invest it in purchases of Real Estates, (as afore-
stated,) Lots and houses, and lots of ground, laying within the City of New-
Orleans, and its suburbs, yielding rents, or likely to yield rents, and to increase
greatly in value ; which Real Estate, once acquired, shall never, thereafter, be
alienated, or sold, by said Institution, but shall forever be retained, and held,
by it, and remain its property ;—The Title deeds of purchase, by which said
Institution shall acquire said Real Estate, shall set forth, that it is made from
Funds of this Bequest, and that said Real Estate cannot be sold, or alienated,
by said "Society for the relief of destitute Orphan Boys.—The Funds, (when
accumulated,) as wanted, for the payment of the Real Estate, when purchased,
(but for no other purpose,) shall be drawn from Bank, by the Commissioners,
and agents, of the General Estate, and paid over to the Directors of said
"Society for the relief of destitute Orphan Boys, and the Mayor and Aldermen
of the City of New-Orleans.—I recommend to the Directors of the "society for
the relief of destitute Orphan Boys, to keep such houses, as may be purchased,
or built with the funds from this Bequest, regularly insured against all risk by
Fire, by which means, in case of accident, they would have the means to recon-
struct them.—FOURTHLY, I give and bequeath to the Mayor, Aldermen, and In-
habitants of the City of Baltimore, in the State of Maryland, and their suces-
sors, forever, for the express and sole purpose of establishing a *School Farm*,
on an extensive scale, for the destitute, and the *Poorest*, of the *poor*, male child-
ren, and youth, (say, Firstly, of the City of Baltimore, in the state of Mary-
land ; Secondly, of every Town and Village of said State ; and Thirdly, of *all*

the great maritime Cities of the United States; say, New York, New-Orleans, Philadelphia, Boston, Charleston, Savannah, Providence, Salam, &c, &c.) of all castes of color, from the age of Four years, to that of sixteen years, where they shall be sheltered, lodged, clothed, fed, instructed in the christian Religion, and a plain English Education given them, including, reading, writing, arithmetic, History, Geography, &c, &c ; and taught practically, (by making them labor) the art of husbandry, or farming, in all its parts, and details, as well as the science, generally, of agriculture; under such regulations as the Directors, (to be appointed as hereinafter set forth,) of said School Farm, shall establish; always understood, and provided however, that the Volume of the Holy Bible, shall be at all times, and forever, made use of in the School, or schools, of this Institution, as One, (and the principal one,) of the reading or class Books, which shall be used by the pupils therein ; as the first object of every school, and of all teaching of the youth of our Country, should be to implant in their minds, a Knowledge of their duty to God, and the relation of men to their divine Creator ;—and that singing classes shall be established, and for ever supported; and singing taught, as a regular branch of Education, in said schools, by which means, every pupil will acquire the Rudiments of the art, and obtain a knowledge in singing divine Psalmody, or sacred music.—An annuity of the One Eighth part, (or twelve and a half per cent,) of the nett yearly Revenue of rents, of the whole of the General Estate, as hereinbefore willed and bequeathed, unto the Mayors, Aldermen and Inhabitants, of the Cities of New-Orleans, in the State of Louisiana, and Baltimore, in the State of Maryland, and their successors, forever ;—the said annuity to be paid yearly, or half yearly, until such time as the said One Eighth part of the said nett yearly Revenue of rents, of said General Estate, shall amount to the full and entire sum of *Three Millions of Dollars ;* when it shall cease, and be no longer paid ;—But with the declared and well understood condition, (for the purpose of paying off this, the Fourth annuity, in as short as space of time as possible,) that as any one, and all Three, of the first aforementioned annuities are filled, and paid off, or the time expires, (as in the annuity to the American Colonization Society, for colonizing the Free people of Color, of the United States,) during which, said annuity is to be paid, that then, from said periods respectively, (say, the periods from which, the said three foregoing annuities, shall respectively be paid off, or expire,) the proportions of the nett yearly revenue of rents, of the General Estate, which were payable respectively under them, the said annuities, shall go to, and be paid, to this, the Fourth, and last annuity, under this, my Last Will and Testament, Bequeathed to the Mayor, Aldermen, and Inhabitants of the City of Baltimore, in the State of Maryland, and their successors, forever ; for the purpose of establishing a School Farm, (as also, any surplus, should it so occur,) within the Forty years that I have willed an annuity of the One Eighth part, or twelve and a half per cent, of the nett yearly revenue of rents, of the General Estate, to the " American Colonization Society, for colonizing the Free people of Color, of the United States." (above the sum of Twenty five thousand dollars, which said society is authorized to receive, in any one year, and no more ; ) by which means, the said Mayor, Aldermen, and Inhabitants, of the City of Baltimore, In the State of Maryland, and their successors, for the purpose of establishing a School Farm, will, under this, the Fourth annuity, receive, at one period, a proportion of said nett yearly revenue of rents, of the General Estate, of the One Eighth part, or twelve and a half per cent; at another period, of the One Fourth part, or Twenty five per cent, or more; at another period, of the Three Eighth part, or Thirty seven and a' half per cent, or more; and at another period, of the One half part, or Fifty per cent, of said nett yearly revenue of rents, of the General Estate, until they shall have received, under said annuity, the full amount of Three Millions of dollars.—(and the Mayor, Aldermen, and Inhabitants, of the City of New-Orleans, in the State of Louisiana, and the Mayor, Aldermen, and Inhabitants, of the City of Baltimore, in the State of Maryland, for the establishment and support of Free Schools, in said Cities, and their respective suburbs, will receive the One half of the nett yearly revenue of rents, of the General Estate, and no more, until such time as the whole of the Four annuities, as set forth herein, shall be paid off; —from which period, (the time when all four of said annuities shall be paid off,) they, the said two Cities, of New-Orleans, in the State of Louisiana, and Baltimore, in the State of Maryland, will receive, and divide, equally between them, as here-

STATE OF
LOUISIANA, &c.,
v.
EXECUTORS OF
McDONOGH.

in set forth, and for the purposes as aforesaid, the whole of the nett yearly revenue of rents, of the General Estate, to the end of time.—And for the purpose of carrying this, my desire, and intent, into effect, I request, authorize, and empower, the Mayor, and City Council of the City of Baltimore, in the State of Maryland, on the First Monday of January of every year, to elect one respectable Citizen, out of each ward of said City, and its suburbs, but who shall not exceed seven in number, nor be members of the said City Council, at the time, who shall be Directors therein; which Directors, so elected, shall serve for the term of Twelve months, and until a new election, on the First Monday of January, of the following year, shall be made by the said Mayor and City Council, of Directors, to replace those of the preceding year, (none of whom shall be eligible, as Directors, for two consecutive years,) and so on, from year to year, forever;—And said Directors, (elected as aforesaid,) shall have the management of said Institution, its funds, and every thing in relation to it; (The Mayor, and City Council, of the City of Baltimore, having, however, the general supervision thereof, and to whom the Directors are liable for the faithful performance of their duty therein; and to whom, annually, on going out of Office, they must render accounts of their administration, shewing particularly, its receipts, and expenditures, state of its Funds, its Real Estate, and every thing in relation to, and concerning said Institution; which accounts must be audited by the said Mayor, and City Council, through a committee from their body, appointed for the purpose, and who will publish them yearly, in two of the public news papers, printed in the said City of Baltimore.—The said Directors, (to be elected, as aforesaid,) will receive annually, or semi-annnally, the amount of the annuity, until such time as they shall have received, according to this Bequest, the whole amount of it; say, the sum of Three Millions of Dollars;—and as they receive it, they shall invest it in Bank Stocks, or other good securities, on Landed Estate, on interest; so as to augment the amount thereof, by the accumulation of Interest, to the largest possible sum, up to the time when the last of the annuity shall be received by them;—At which time, (when the last of the annuity shall be received,) It is my desire, and I request and instruct said Directors, to take such part of said sum, (not to exceed however, the One sixth part of the whole amount of principal, and interest, which may have accrued thereon,) as may be necessary, and invest it in the purchase of such a Tract, or Tracts, of land, and in the erection of such Buildings, as will be appropriate, to the object intended, and wanting; and in the furnishing of said Building, (when completed,) and Lands, in all necessary furniture, Beds, bedding, animals, plows, harrows, hoes, spades, and other articles;—and the residue of said sum, (the whole of the residue thereof,) whatever it may be, (but which shall be at least, the Five sixths, or five parts, out of six parts, of the whole amount of principal and interest,) I direct to be invested in the purchase of real Estate; say, lots of ground and houses, and Lots of ground, situate in the City, suburbs, and vicinage of Baltimore, in the State of Maryland; or Tracts of Land in its immediate neighborhood; viz, such lots, or Lands (to be all purchased under Fee simple Titles, ' as will probably greatly augment in value; (which Real Estate, when purchased, shall never be sold, or alienated, but shall be held, and remain forever, the property of the Institution,) for the purpose of deriving therefrom a permanent, and perpetual revenue;—(a revenue from rents of Real Estate; not from interest, on money loaned, or stocks,) for the support of said Institution, forever.—As no part of the principal sum, or the interest which may accrue thereon, shall ever be taken for the support of the Institution; my intention being, that its support, and the payment of all the expenses, necessary to its support, shall be supplied exclusively from the revenue, in Rents of its Real Estate, and the Revenue derivable from its Farm. The houses to be leased for no longer a time than twelve months, at any one time; the lots of ground, and Lands, for Five, Ten, Fifteen, Twenty, or Twenty five years, but, in no instance, for a longer time than Twenty five years, at any one time; revertable back, at the end of the time for which they may be leased, with all the Improvements on them, (said Improvements to be Free of cost to the Lessor,) to be re-leased for shorter periods, and at higher rates;—By which means, the Rich, or those who are in easy circumstances, will be made to assist, in some measure, in the support and education of the poor.—They, the Directors, (to be elected as aforesaid,) are permitted however, at any time, (when they have money on hand, or stocks of this fund,) when opportunities offer, of

making good investments of it, in Real Estate, (say, Lots of ground, or houses and lots of ground, situate in the City of Baltimore, its suburbs, or vicinage; or Tracts of land, in its immediate neighborhood, yielding rents, or which may be made to yield rents;) to invest such parts thereof, as they think proper, (such purchases to be approved by the Mayor, and City Council, of the City of Baltimore,) in such Real Estate; and also, when an opportunity or opportunities offers of acquiring such a tract, or tracts of land, as will be wanted for the Institution, (For the establishment of its Farm,) [at cheap rates,] to purchase them. The houses yielding revenue, as also those of the "School Farm," I recommend, and direct, to be kept constantly insured against the risk of Fire, so, that if an accident should occur, there would be means to reconstruct them.—I recommend also to the Directors, (to be elected as aforesaid,) to apply to the Legislature of the State of Maryland, for an act of Incorporation, for said Institution; (subject always, however, be it understood, to the conditions, herein provided for.) And for the purpose of setting forth and explaining, more particularly and fully, (if possible,) my intention and desires, in relation to this institution, I will add, that the object I have in view, (and which occupies my whole soul, my desires, and my affections,) in founding this Institution, *Is the great one, of rescuing from ignorance, and idleness, and of a consequence from Vice, and ignomy, Millions upon Millions of the destitute Youth, of the large Cities of the United States, and the bringing them up, in Knowledge and virtue, to industry and labor, to such an Age as, (their principles, being fixed and stable,) they can be apprenticed out to worthy and honorable men, for the acquirement of the various Mechanical Arts, and by that means, formed to be useful, and Saved to their Country and the World.*—(For that the neglect of education in Early life, (permitting children to live and grow up in idleness and ignorance,) is the most fruitful source of Crime, none will deny; If communities therefor would carefully guard, that no children grow up without education and employment, and provide a home for the Orphan, and offspring of the vicious, and those, who not only neglect to educate their children, but contaminate them by their own bad example, they will do much, very much, towards drying up the fountains of vice, and of lessening Crime;—It is not however the intellectual cultivation of youth, alone, which should be attended to, but their Moral, Physical and Religious cultivation, should, in a superior degree, occupy our especial care.)—In accordance then with this object, it is my desire, and I request the Directors (to be elected as aforesaid,) to purchase a tract or tracts of rich and productive land, (so that its product may assist, at least, to support the Institutution;) In a situation high and healthy for the establishment of the Institution; to contain some Three hundred, Four hundred, Five hundred, a Thousand, Two or Three thousand acres, more or less as may be wanted; laying within one, two, three, five, ten or Twenty miles, (or even, a greater distance,) of the City of Baltimore; (as the Directors may determine,) whereon, (under such regulations, as the Directors, to be elected as aforesaid shall establish;) the said Youth, shall labor in all work appertaining to the cultivation of the earth; Say, In plowing, hoeing, harrowing, Spadeing, Mowing, reaping, gathering, housing, thrashing, Sowing, planting, gardening, Carting, waggoning, making of all Agricultural instruments, rearing, and attending to animals, rearing, and attending to the Silk Worm and the Mulberry Tree, &c. &c. &c. at the same time that they are progressing in their education; until such a period as they attain the proper age, when, (their education completed,) they shall be apprenticed out, for the acquirement of the various Mechanical Trades.—It is my desire, and I request the Directors (to be elected as aforesaid,) to rear up to labor, educate and support in said Institution as great a number of the poor, and destitute Male Children and youths, of the different Maratime Cities of the United States, [which are too generally *hot beds* of vice,] (taking those first, which belong to the City of Baltimore; then, those from the Towns and Villages of the State of Maryland; and Thirdly, those from the different large Cities of the different States of our Happy Union; paying the expenses of their removal from their homes, to the Institution;) as the revenue of rents, arising from the real estate of this bequest, and from the Farm, will support, which I hope will be at least to the number of One to Two thousand; and in time, I hope (with wise management may be made to support Ten thousand.—It is my wish and desire, and I request the Directors, (to be elected as aforesaid) to erect the buildings of the Institution, in Stone, or brick, in a style of taste and elegance, but plain, of

STATE OF
LOUISIANA, &c.
v.
EXECUTORS OF
McDONOGH.

great solidity, (intended to stand for ages.)   Airy and of proportionate Eleva-
tions.—In closing those my explanations and desires in relation to this, the In-
stitution of the "School Farm," It will be permitted me, to express my convic-
tion that this Institution will not long remain the only one, of the kind, in the
vicinity of that Noble, Philanthropic, and high minded City, But that a Sister
one, will be soon made to spring up, by its humane and generous Sons, (an
offering on the Alter of Charity,) destined to rescue from ignorance and vice,
the Female Children and Youth of the Poor, the destitute and vicious of our
Country.

And for the management of the General Estate, or fund, for the education of
the Poor, which I, have herein willed and bequeathed, to the Mayor, Aldermen,
and Inhabitants, of the City of New Orleans, in the State of Louisiana, and the
Mayor, Aldermen and inhabitants of the City of Baltimore, in the State of Mary-
land, and their Successors, forever, I hereby declare, that my intention, is not,
that any part of said General Estate, or revenue from Rents, arising from said
General Estate, shall go into the hands of the Corporations, of said Cities ; But
that they, the said Corporation, shall for ever have a supervision over it;—I
therefore in consequence, request, authorize, and direct, the respective City
Councils of the Three Municipalities of the City of New Orleans, on the First
Monday of January, of each and every year, to elect one respectable Citizen,
out of each of said Municipalities, who shall be a resident therein, (but who shall
not be members of said City Councils at the time,) who shall be Commissioners
of the General Estate ;—Which Three Commissioners, so elected, shall serve for
the term of Twelve Months, and until a New Election, on the first Monday of
January of the following year, shall be made, by the said City Councils, of
Three Commissioners, to replace those of the preceding year, (none of whom
shall be eligible as · Commissioners, for two consecutive years,) and so on, from
year to year, to the end of time ; and the Three Commissioners, so named, in
Conjunction with the Three Agents to be appointed, (as hereinafter directed) by
the Mayor and Aldermen of the City of Baltimore, in the State of Maryland,
(Which Three Agents) so named by said Mayor and Aldermen of the said City
of Baltimore, shall have equal powers, with said Three Commissioners, elected
by the City Councils, of the City of New Orleans, and an equal vote, on all af-
fairs of business, as they will represent an equal interest.)   Shall have the sole
management of said General Estate, the Leasing and renting of all its lands,
lots of ground, houses, &c, &c, the cultivating of its estates, with the black peo-
ple thereon (if any Estates are in cultivation at the time of my death,) the
crops, made on which Estates, when sold shall be considered rent; The collect-
ing of its rents, leases &c. &c. and the giving receipts therefor ; the paying of the
Annuities as herein before ordered and bequeathed, and in fine, doing all acts
necessary to its full and perfect management, as herein pointed out and directed.
For this purpose, they will take an office, in some Fire proof house, in the City
of New Orleans, employ a Confidential Clerk or Secretary, and keep regular
Books, accounts, &c. &c.—They, the said Commissioners, and Agents, of my
General Estate (to be named as hereinbefore and hereinafter provided for,) are
hereby permitted, directed and Authorized by me, (if they should see fit, and
proper so to do,) at such time, as the Fifteen years, are near expiring, during
which the Slaves are to labor for my General Estate, after my death, before being
sent to Africa, to take the nett amount of two or three crops of such Estates, as
they are cultivating, and purchase therewith, an equal number of Slaves, (if
there is still Slaves in our Country for sale.) with those, they are about to send
away ; which Slaves, so purchased, shall labor on the plantations, belonging to
the General Estate, for fifteen years, from the day of their purchase, and after
said Fifteen years of service, be also in their turn, sent to Africa; and their
number may be again renewed by purchase, in the same mode, and manner;
serve also fifteen years, and be sent to Africa ; and so on, as often as the Com-
missioners and Agents of the General Estate, may see fit and proper, and that
there is Slaves to be purchased, by which means, a two fold object, would be
accomplished, Viz : a revenue from the Estates cultivated, greater than what
they would yield, by renting them out; and the returning every Fifteen years,
an additional number of the human race, Christianized and Civilized, to the land
of their forefathers.—)My Executors, (herein after named,) will hand over to
said Commissioners and Agents of the General Estate, of the City of New Or-
leans, and of the City of Baltimore, all the Title deeds of my real Estate, with

all other papers, and documents not necessary to them, the said Executors, to be deposited in said office;—They the Commissioners, of the General Estate of the City of New Orleans, and Agents, of the General Estate of the City of Baltimore, to consider themselves, at once in possession, (as I hereby give them Seisin, and put them in possession,) of all said real Estate, from the day of their nomination; (which nomination I recommend the City Councils of the City of New Orleans, and the Mayor and Aldermen, of the City of Baltimore to make, immediately after my decease.) And on the settlement and winding up, of my Affairs, by them, the Executors, (herein after named,) they will place all my Books of accounts, papers, &c, &c, in the hands of the Commissioners and Agents of the General Estate, to be named by the City Councils of the City of New Orleans, and the Mayor and Aldermen of the City of Baltimore, to be placed in said office, for safe Keeping.—And at the end of each year, (or half year, as may be thought best,) after the payment of the different Annuities and all other attending expenses; the Commissioners appointed by the City Councils, of the City of New Orleans, and the Agents, representing the Mayor, Aldermen and inhabitants of the City of Baltimore, will settle their Accounts, each party dividing, and taking the one half, of the remaining nett revenue of the year, for the intents and purposes, as herein before, and hereinafter ordered and directed.—The Agents representing the City of Baltimore, will remit the amount received by them to the Commissioners, named in Baltimore; and the Commissioners elected by the City of New Orleans, will receive the proportion, accruing to the said City of New Orleans, carry it to the Account of the Public Free Schools Fund, in one of the Banks, in the City of New Orleans, and Keep Separate Books, and Accounts, for said Fund, and of every thing in relation to the Public Free Schools.—(The management of the Public Free Schools, of the City of New Orleans, and its Suburbs, and the Fund belonging to said Schools, the Agents of the City of Baltimore, have no power over, or concern in.)—Certified copies of the accounts of the General Estate Fund, shall be forwarded to the Corporation of the City of Baltimore, annually, to be examined by it and published in Two, of the Newspapers of that City, and the Corporation of the City of Baltimore shall also, publish in two of the Newspapers of said City, annually, a Copy of the Accounts of the Free Schools Fund, its disbursement, and state, with a statement of every thing relative to said Free Schools.—Copies also of the Accounts of the General Estate Fund, shall be delivered to the City Councils of the City of New Orleans, who shall name a Committee from their own Body, to visit the books, examine and Audit the said accounts annually, and at all other times, when they may think proper; (as well, the accounts, of the General Estate, as of the Free Schools Fund,) and keep up and Support, a general Supervision, over the General Estate, its accounts, Funds, management, and real Estate, as also over the Free Schools, and every thing that relates to them.—The annual accounts, as well of the General Estate, as of the Free Schools Fund, shall be published in Two of the Newspapers of the City of New Orleans, with a particular statement of the situation of the Schools, and every thing concerning them.—It is my wish and I direct the Commissioners, for the City of New Orleans, (to be named as herein before and herein after set forth,) to establish as many Schools, as may be necessary and wanted; so that, if possible, every poor child and youth, may receive an education. The Schools should be established in different parts of the City of New Orleans, its Suburbs, Liberties, and outskirts, in such situations, as would be nearest the residences of the poorer Classes, for whom those institutions, are alone intended;—They will invest such part of the Fund, as will annually accrue to the Mayor, Aldermen and inhabitants of the City of New Orleans, from the revenue of rents, of the General Estate, as will be necessary, in the purchase of suitable lots of ground, and the erection of proper and permanent buildings, in Brick, for the Schools, and places of residence, for the Teachers; and the residue of the fund, will be made use of, for the payment of Teachers, for Books, Stationery, and other attendant and necessary expenses.—And I request, Authorize and direct, the respective City Councils of the Three Municipalities of the City of New Orleans, *on the Second Monday of January of each and every year*, to elect, Two (other) respectable Citizens, as Commissioners, out of *each* of said three Municipalities, who shall be resident, in said respective Municipalities, from which they shall be elected, (but who shall not be members of said City Coun-

STATE OF LOUISIANA, &c.,
*v.*
EXECUTORS OF McDONOGH.

cils at the time,) which will be Six Commissioners ; and with the three Commissioners, to be elected by the said respective City Councils, of the three Municipalities of the City of New Orleans, *On the First Monday of January of each and every year*, (as herein before provided for,) will make *nine* Commissioners, in ALL ; who shall be Commissioners, for this purpose ;—which Commissioners so elected, shall serve for the term of twelve Months, and until a new election, *on the Second Monday of January*, of the following year, shall be made by the said City Councils, of the three Municipalities, of the City of New Orleans, of commissioners, to replace those of the preceding year, ( none of whom shall be eligible, as Commissioners, for two consecutive years,) and so on, from year to year, to the end of time.—and the said Six commissioners, (to be named as aforesaid,) shall have equal powers in the management of the Free schools Fund, (which will accrue to the Mayor, Aldermen, and Inhabitants of the City of New Orleans, in the State of Louisiana, annually, from the revenue of rents, of the General Estate,) the Schools established under it, and every thing in relation to it, with the Three commissioners, (to be named, [as herein before provided for,] by the said City Councils, of the Three Municipalities of the City of New Orleans, *On the First Monday of January, of each and every year*,) *But they, the said Six Commissioners*, (to be named as aforesaid, by the said City Councils of the Three Municipalities of the City of New-Orleans, *On the Second Monday of January, of each and every year*,) shall have no power, concern, or management, in the affairs of the General Estate ;—*As the affairs of the said General Estate* are to be managed, transacted, and conducted, *solely and exclusively*, (as herein before, and herein after provided for,) by the Three Commissioners, to be named *On the First Monday of January, of each and every year*, by the City Councils of the Three Municipalities of the City of New Orleans, in the State of Louisiana, and the Three Agents, to be named by the Mayor and Aldermen of the City of Baltimore, in the State of Maryland, and by them only.—And I request, authorize, and direct the Mayor and Aldermen of the City of Baltimore, in the State of Maryland, On the First Monday of January, of each and every year, to elect one Respectable Citizen, out of each Ward of said City, its suburbs, Liberties and outskirts ; but who shall not exceed Nine in number, nor be members of said City Council at the time, who shall be Commissioners for this purpose ; which Commissioners, so elected, shall serve for the term of Twelve months, and until a new election, on the First Monday of January of the following year, shall be made by the said Mayor and Aldermen, of Commissioners, to replace those of the preceding year, (none of whom shall be eligible as Commissioners for two consecutive years,) and·so on, from year to year, to the end of time ; and the said Commissioners, (named as aforesaid,) will take an Office, in some part of the City of Baltimore, employ a confidential Clerk, or Secretary, and keep regular Books and accounts, showing the application, and disbursement of all sums of money, which will come into their hands, from the Agents appointed by the Mayor and Aldermen of the City of Baltimore, (in manner as hereinafter set forth,) to represent their Interests in the City of New-Orleans, and to receive and remit it to them ;—And the said Commissioners, (to be named as hereinbefore provided,) will establish as many schools as may be necessary, and wanted, so that, if possible, every poor child, and youth, may receeive an education.—The schools should be established in different parts of the said City of Baltimore, its suburbs, Liberties, and outskirts, in such situations as will be nearest the residences of the poorer classes, for whom those institutions are alone intended.—They, the said Commissioners, will invest such part of the Fund, as will annually accrue to the Mayor, Aldermen, and Inhabitants of the City of Baltimore, from the Revenue of Rents of the General Estate, as will be necessary, in the purchase of suitable Lots of ground, and the erection of proper, and permanent, buildings, in brick, or stone, for the schools, and places of residence for the Teachers ; and the residue of the Fund will be made use of, (as far as wanted therefor,) for the payment of the Teachers, for Books, stationery, and other attendant and necessary expenses.—The Mayor and Aldermen, of the City of Baltimore, will appoint annually, (or as often as they may see fit and proper,) a committee, from their own Body, to visit the Books, and accounts, kept by said Commissioners of the Free schools fund, to examine and audit said accounts ; and will keep up, and support, a General supervision over the said schools, their management, expenditures, Funds, and every thing that relates to them.—And

for the purpose of managing the affairs of the General Estate, or Fund, in the <span style="float:right">STATE OF<br>LOUISIANA, &c.,</span> State of Louisiana, in which the City of Baltimore is equally interested with the City of New-Orleans; I hereby authorize and direct the Mayor and Alder- men of the City of Baltimore, in the State of Maryland, to elect, appoint, and name, from time to time, as they may see fit and proper, (and to change them and name, elect, and appoint others in their lieu and place, at any time they may see fit and proper,) Three persons, as Agents in the City of New-Orleans, (or whom they may send to said City of New-Orleans,) to represent their in- terest in said General Estate, and to act for them in all respects, and in all things which concern said General Estate;—Which said Three Agents shall jointly, with the Three Commissioners to be appointed by the City Councils of the City of New-Orleans, manage, conduct, and administer, in all respects, said General Estate as herein before, and herein after, provided for and set forth ; and shall have an equal power and an equal vote, (in all affairs which concern said General Estate;) with the said Three Commissioners, to be appointed as herein before provided for by the City Councils of the City of New-Orleans.— I recommend to the Commissioners, to be appointed by the City Councils of the City of New-Orleans, and the Agents, to be appointed by the Mayor and Aldermen of the City of Baltimore, to represent their respective Interest in the General Estate, in the City of New-Orleans, to keep all such houses and build- ings, as belong to the General Estate, or may hereafter belong to it, regularly insured against all risk by Fire, by which means, in case any of said houses, or buildings, should be destroyed by said Element, the means would be ready to reconstruct them;—And to apply to the Legislature of the State of Louisiana, for an Act of Incorporation, (subject always, however, to the conditions pro- vided herein,) of said General Estate.—I also recommend to the Commissioners, (to be elected as hereinbefore provided for,) as well those of the City of New- Orleans as those of the City of Baltimore, charged with the management of the Free Schools, and the Free Schools Fund, of said respective Cities, to apply to the Legislatures of their respective States, for Acts of Incorporation for their respective Free School Institutions, (subject always, however, to the conditions provided herein,) should it be found necessary and desirable to have said Insti- tutions incorporated.—No compromise shall ever take place between the Mayor, Aldermen and Inhabitants of the City of Baltimore, in the State of Maryland, and the Mayor, Aldermen and Inhabitants of the City of New-Orleans, in the State of Louisiana, and their successors, in relation to their respective rights in said General Estate ; nor shall one party receive from the other party, by agree- ment, a certain sum of money, annually, (or otherways) for their respective proportions in said General Estate ;—nor shall either party sell their respective rights, under this Will, in the said General Estate, to one another, or to others; But said General Estate shall for ever remain, and be managed, as I have here- in pointed out, ordered and directed.—And should the Mayor and Aldermen of the City of Baltimore, in the State of Maryland, and the Mayor and Aldermen of the City of New-Orleans, in the State of Louisiana, or their successors in Office, combine together, and Knowingly and willfully violate any of the con- ditions, hereinbefore and herein after directed, for the management of the Gen- eral Estate, and the application of the Revenue arising therefrom ; Then, in that event, I Give and Bequeath the rest, Residue, remainder, and accumulations of my said General Estate, (subject always, however, to the payment of the afore- mentioned annuities,) to the States of Louisiana and of Maryland ; in equal proportions, to each of said States, of half and half, for the purpose of educat- ing the poor of said States, under such a General system of education as their respective Legislatures shall establish by Law.—(Always understood and pro- vided however, that the Real Estate, thus destined by me for said purpose of Education, shall never be sold, or alienated, but shall be kept and managed as they, the said Legislatures of said States, shall establish by Law, as a Fund, yielding rents, for ever ;—The rents only of which General Estate shall be taken and expended for said purpose of educating the poor, of said respective States, and for no other,) and it is furthermore my wish and desire, and I hereby Will, that in case there should be a Lapse of both the Legacies to the Cities of New Orleans, in the State of Louisiana, and Baltimore, in the State of Maryland, or either of them, wholly or in part, by refusal to accept, or any other cause, or means, whatsoever ; Then, both, or either of said Legacies, wholly, or partially so Lapsed, *shall Inure*, as far as it relates to the City of New-Orleans, to the

24

<span style="float:right">EXECUTORS OF<br>McDONOGH.</span>

STATE OF
LOUISIANA, &c.,
*v.*
EXECUTORS OF
McDONOGH.

State of Louisiana, and as far as it relates to the City of Baltimore, to the State of Maryland, that the Legislatures of those States, respectively, may carry my intentions, as expressed and set forth in this my last Will and Testament, into effect, as far, and in the manner, which will appear to them most proper.—(it will be permitted me here to observe, that I am, and long have been, convinced, that the First, most imperative and sacred duty which each and every Government on Earth is bound to perform, (and which Rulers and Legislators cannot avoid the performance of, but under the heaviest responsibilities to Heaven ; ) Is that of providing by Law for the education of every child within the limits of their respective Governments ; —To that effect, Parents, and guardians of youth should be made, under heavy penalties, to send their children to schools, supported, (under a system of general taxation on real estate ; ) at the sole expense of the Government.—) Now, with the view of setting forth, and explaining more fully, and more particularly, (If tis possible,) my desire, and intentions as expressed in the foregoing dispositions of this my Last Will and Testament, in relation to my General Estate, I will add, that the First, principal, and chief object I have at heart, (the object which has actuated and filled my soul from early boyhood, with a desire to acquire fortune ; ) is the education of the poor, (without the cost of a cent to them ; ) in the cities of New-Orleans and Baltimore, and their respective suburbs, in such a manner that every poor child and youth, of every color, in those places, may receive a common English Education ; *(Based however, be it particularly understood, on a moral and religious one ;*—That is, the pupils shall, on particular days, be instructed in morality and Religion ; and school shall be opened and closed, daily, with Prayer.) And in time, when the General Estate will yield the necessary Funds, (for, in time, its revenue will be very large,) over and above what will be necessary, to the education of the poor of those Two cities, and their respective suburbs ;—It is my desire, and I request, that the blessings of education may be extended to the poor throughout every Town, Village and Hamlet in the respective States of Louisiana and Maryland ; and was it possible, through the whole of the United States of America.—For this purpose, and this only, (my desire being, that one dollar shall never be expended to any other purpose ; ) I destine the whole of my General Estate, (excepting only my black people, the legacy bequeathed the children of my sister Jane, and that to herself ; ) to form a Fund, in Real Estate, which shall never be sold, or alienated, but be held, and remain, forever, sacred to it alone.—The nett annual Revenue of Rents of said General Estate, to be equally divided, (one half to each,) between the said Two Cities of New-Orleans and Baltimore, so soon as the annuities are paid off, which I have charged the General Estate, or Fund, to pay ; the last of which annuities will probably be paid off in forty, or fifty years, from and after my death ; from which period, (the time when said annuities will be paid off,) the whole Revenue of Rents, arising from said General Estate or Fund, will be received for the sole purpose of educating the Poor, as I have hereinbefore set forth ;—and in the mean time, (the time between the period of my death and the period when said annuities will be paid off, in totality,) The one half of the revenue of Rents, arising from said General Estate, or Fund, is destined to said purpose.— In the course of my observations, through a long life, having seen almost every bequest or endowment, of the nature of those I have herein made, perverted, after a certain lapse of time, from their intended purposes, and either sold, or so changed, as to serve other and private ends ; I determined therefor, in consequence, by placing one City and its agents, or representatives, as a check over the other, to guard, by that means, the interests of both ;—This arrangement, I hope, will become the means of carrying down to the latest time this bequest, and secure its application forever to the purposes intended by me.— It would have been an easy matter for me to have purchased Real Estate in the City of Baltimore for the one half of the amount of my Estate, but then, had I so done, my object would not have been accomplished ; the danger of its alienation, and having it turned aside from its original intent, would have existed in full force.—To avoid which, I placed the whole of it in one City and State, and made another City and State equally interested in its preservation and correct management, for the mutual benefit and security of both.—I trust the most High will Bless the intention, and render it effectual.—The mode I have thus adopted will also serve, I trust, as a Ligature, (though but a small one,) to bind the different parts of our Country together ; and should it be found, on trial,

to work well, may induce other well wishers of their species, and the Institutions of our Common Country, to do the same, and thereby bind together other Cities and States of our Greatly Blessed and happy Country in Brotherly Affection and love to the latest time.—I have also long seen with regret that a spirit, inimical to the Rich, is felt and entertained by the Poor, nurtured and kept alive in their bosoms, as it is, by designing and bad men for their own wicked purposes;—They are told that the Rich are their natural Enemies, that the God of Nature made all men equal, and that it is sinful for one man to appropriate to himself more of the Riches of this World than his neighbor;—with much more, to the same purport;—Believe it not my Friends;—Be assured that they, who tell you so, are your greatest enemies; the enemies of your peace and happiness.—Those feelings of Jealousy, which the poor entertain of the Rich, are wrong; It is sinful, and contrary to the laws of our Divine Creator, who has shown in his works, (as in his words,) that he did not intend a perfect equality to exist among men,—as he has not made all men equal in strength, in stature, or intellect, neither have his decrees established an equality of fortune. Let man, then, bow with humble resignation to the Divine Will.—The Poor should look on the Rich in the light in which they really and truly stand towards them; that is, as Reservoirs, in which the most High makes to flow the Rich streams of his Beneficence, to be 'laid up and husbanded for his all wise and all seeing purposes; and for seasons of distress and affliction to the poor. Instead, then, of looking on them as their greatest enemies, they should, on the contrary, consider them, as they really are, their best friends.—This is the position all rich men, (whose hearts occupy the right place in their bosoms,) stand in towards the poor.—*Besides*, Let the poorer classes of the World be consoled, assured that the *Labor* loving, Frugal, Industrious, and Virtuous among men, possess joys and happiness, in this life, which the Rich know not, and cannot appreciate,—so well convinced am I, (after a long life and intercourse with my fellow men of all classes,) of the truth, " that the happiness of this life is altogether on the side of the virtuous and industrious Poor."—That, had I children, (which I have not,) and a fortune to leave behind me at death, I would bequeath, (after a virtuous education, to effect which nothing should be spared;) a very small amount to each; merely sufficient to excite them to habits of Industry and frugality, and no more.—As the poor man's friend, then, I recommend to him to honor and respect the virtuous rich, and to lay those observations to their heart, and store them up in their mind;—And to the Rich, I would say, (If they see aught in them corresponding with their own feelings, and worthy of their regard;) " Give them an occasional reflection."—Hoping thereby that the world may advance in happiness, in virtue, and Holiness.— I request my Executors, (hereinafter named,) to see that my funeral is plain, made without parade, and with the least possible Expense.—And, (I was near forgetting that,) I have still one small request to make, one little favor still to ask, and it shall be the last; It is that it may be permitted, annually, to the children of the Free Schools, (situate the nearest to the place of my interment,) to plant and water a few flowers around my grave.—This little act will have a double tendency; it will open their young and susceptible hearts to gratitude and love to their Divine Creator, for having raised up, (as the humble instrument of his bounty to them,) a poor, frail, worm of earth, like me, and teach them, at the same time, " What they are, whither they came, and whence they must return."—And to enable my Executors (hereinafter named,) to execute this my last Will and Testament, I hereby give unto them, Seisin of all my personal Estate, say, Money, Stocks, and Bonds on hand; as well as all debts owing to me by Bills, Notes, Bonds and Mortgages, deeds, or Book accounts; as also the furniture and effects in and about the house in which I reside; cattle, horses, &c., &c., putting them in possession thereof, and authorizing them, my said Executors, (hereinafter named,) to recover and receive the amount of all said Stocks, Bonds, Bills, Notes, Bonds and Mortgages, Deeds, Book Accounts, &c., &c.; with all dividends and interest which may accrue thereon; and to sell said furniture and effects.—And likewise to pay all debts owing by my Estate to others, should there be any debts owing by it.—In the different Acts of incorporation contemplated and mentioned by me, in this my last Will and Testament, to be passed by the Legislatures of the States of Louisiana and Maryland, for the purpose of carrying out the objects I have in view; It is my wish and desire, that there shall be an express provision in each of said acts of

STATE OF
LOUISIANA, &C.,
*v.*
EXECUTORS OF
MCDONOGH.

Incorporation, prohibiting the Administrators, or Officers, of the respective Cor-
porations from ever selling, or alienating, in any manner whatever, the Real
Estate, acquired in any way, either by purchase, (by means of the Funds aris-
ing from and received under this Will and Testament;) or otherways, and
held, and owned by said corporations.——FINALLY, I nominate and appoint
*Christian Roselius, Judah Touro, Abial Daily Crossman, Lewis Philip Pilié,
Jonathan Montgomery, Joseph A. Maybin, William E. Leverich, and François
Bizoton D'Aquin,* (all Eight of the City of New-Orleans, in the State of Louis-
iana,) *Benjamin C. Howard, John P. Kennedy, John Spear Smith, Brantz
Mayer, Henry Didier,* (Merchant,) *and John Gibson,* son of the late William
Gibson, Clerk of the Court, (all six of the City of Baltimore, in the State of
Maryland;) *Henry Clay,* of the State of Kentucky, the present President of
the American Colonization Society of the City of Washington, in the District
of Columbia; *R. R. Gurly,* Secretary of the American Colonization Society of
the City of Washington, in the District of Columbia; and *Walter Lowrie,*
Secretary of the Board of Foreign Missions, of the Presbyterian Church of the
City of New York, State of New York, *Executors* of this my Last Will and
Testament.—(And in the event of the death of *François Bizoton D'Aquin,* pre-
vious to my decease, then I nominate and appoint his Brother, *François Adolph
D'Aquin,* to replace him as an Executor of this my Last Will and Testament,)
and give to said Executors, *Christian Roselius, Judah Touro, Abial Daily
Crossman, Lewis Philip Pilié, Jonathan Montgomery, Joseph A. Maybin,
William E. Leverich, François Bizoton D'Aquin, Benjamin C. Howard, John P.
Kennedy, John Spear Smith, Brantz Mayer, Henry Didier, John Gibson, Henry
Clay, R. R. Gurley, and Walter Lowrie,* full powers, without the interference of
Judicial or extra Judicial Authority, to carry the same into effect, according to the
true intent and meaning thereof.—Authorizing and empowering, as I hereby
do, (in the event of absence from the State, refusal to qualify, resignation, or
death of the other Executors;) any Three of the said aforementioned Execu-
tors to act and carry out my intentions under this my last Will and Testament.
Recommending to them, (my said Executors,) to see that said intentions are, in
all respects, strictly complied with.—And I do hereby revoke and annul all
other Wills heretofore made by me.

In witness whereof, I, the said John McDonogh, have, to this my last Will
and Testament, (the whole written, dated, and signed with my own hand,) con-
tained on Twenty four pages, placed my signature at the foot or Bottom of each
page, and my Seal and signature at the foot or bottom of this my Last Will and
Testament, on the twenty fourth page.—This, my said Last Will and Testa-
ment, executed [from motives of prudence] in duplicate, in my dwelling house,
in the town of Macdonogh, State of Louisiana, on this the twenty ninth day
of December, in the year of Our Lord, Eighteen hundred and thirty Eight.
(1838.)                    [Signed,]     JOHN McDONOGH. [SEAL.]

MEMORANDA OF INSTRUCTIONS *to the Executors of John McDonogh, to
be opened and kept by the Executors.*

MEMORANDA:  Being reflections, opinions and recommendations, addressed
by John McDonogh to the Executors of his Estate, named in his last Will and
Testament, and to the Commissioners and Agents, (to be appointed by the City
Councils of the City of New Orleans, and the Mayor and City Council of the
City of Baltimore,) of his " General Estate," as said Memoranda, recommenda-
tions, &c., &c., may, he hopes, be of service to them, in various ways, in the
winding up of said Estate, and in the management of the General Estate.  He
requests they may be copied into one of the books kept in the office of the
General Estate, for preservation, reference and use.

The inventory of my Estate (as directed by my Will,) to be made out by a
Notary Public, (assisted by my Executors,) must remain on record in the office
of said Notary Public, in his current book of Record, from which my Executors
will be pleased to obtain certified copies, and have them placed, say, one copy
in the archives of the City Councils of the City of New Orleans; one copy in
the City Council of the City of Baltimore; one copy in the office of the Gen-
eral Estate in New Orleans; and another copy in the office of the Free Schools
and the Free School Fund in the City of Baltimore, in the State of Maryland;
all for safe keeping; so that if an accident or accidents should happen to one,

or more copies of said Inventory, other copies thereof would be safe. It will also be copied from those original and certified copies into the books of those Institutions of said offices.

And whereas all the land papers and title deeds of my Real Estate, of every kind and nature, will remain and be placed, for safe keeping, in the office of the General Estate, in the City of New Orleans, under the care of the Commissioners and Agents of said General Estate. I request said Commissioners and Agents, (as it is most important that all said papers, documents, and title deeds, should be carefully preserved; said General Estate being deeply interested in in their preservation and safe keeping,) to have certificate copies taken of each, and every land title paper, (many of them being the original title deeds, of which no record or copy exists, but those in my possession,) and title deed, officially, (that is, Notarial copies of each and every one of them, duly certified by the respective Notaries Public, before whom they were originally executed, and then legalized by the Governor of the State. And to be still more particular and exact, (knowing as I do the great importance of the object,) I mean, a copy of each paper or document, through the whole chain of title, up to the originals, ( and including originals,) from the different Governments of France, Spain, and the United States of America, in each and every title to each separate piece of property,) and said copies or duplicates of each and every land paper, document or title deed, (a complete set of copies of the whole series of documents or title deeds,) to be remitted with the greatest care, by some safe private conveyance, to the Commissioners of the Free Schools, and Free Schools fund, in the City of Baltimore, in the State of Maryland, to be placed in the office of said Institution for preservation and safe keeping. In the event that should an accident take place in either City, and one set of copies be lost by fire or otherways, that they might be immediately after replaced by another series of copies ; so that two sets of copies may, if possible, for ever exist, one set in each City of New Orleans and Baltimore. I request also, that duplicate copies of all plans of land and lots of ground, laid out and divided into lots and squares, may be made out and remitted to Baltimore, with full and complete lists of all the property belonging to the General Estate, with descriptions of its precise situation, measurements, prospects, value, &c., &c.; by which means, each office in each City, will be in possession of all information relative to said General Estate, and of duplicate copies of every document, title deed, plan, &c., &c., appertaining and belonging to said General Estate. And which they, the said offices of said Institutions, (besides having and preserving the original copies,) *will have copied in each office*, in a Book kept for the express purpose, as a still further security to their preservation.

And whereas, in every thing that will concern the management of the General Estate, from the most important of its affairs to the most minute ; from the keeping of its books and documents, to the leasing and renting of its Real Estate ; from the receiving and collection of said rents, to the care and preservation of its Estates, houses, &c., &c., and more especially to the gradual increase of its revenue. Much, very much, will depend on the honor, probity, wisdom, and business talents and habits of the gentleman who will be appointed its Secretary. It will be permitted me then to recommend, that great care and precaution should be at all times used in the making of this appointment, and no one entrusted with it that did not stand high in the estimation of their fellow citizens for all those qualifications. *Besides*, the engagement taken with him (whoever he may be,) should only be during good behaviour, and satisfaction given by him, in all respects, in the fulfilment of the duties of the office. And if it should so happen at any time, that a Gentleman possessing all the necessary qualifications to fill the office, could not be met with, or obtained here, in the City of New Orleans, that then such a one should be sought for in some other parts of the United States, and induced to come here, to act as its Secretary, under a good salary for his services.

As it will be very important to have the Institution of the General Estate incorporated by a law of the Legislature of the State, I recommend in consequence to the Commissioners and Agents of the General Estate, to apply to said body, by memorial at its first Session, after their appointment, for the passage of such a Law. Recommending that said Memorial should be given for presentation to some of the most influential members of said body, and their

STATE OF
LOUISIANA, &c.
v.
EXECUTORS OF
McDONOGH.

support of it, through the respective Houses, requested. Perhaps the Governor of the State, if spoken to, would make mention of it in his annual Message to that body, and recommend the passage of a law for its incorporation ; seeing the object and vast importance of the Institution to the State and the world.

So soon as the law, (by the Legislature of the State,) incorporating the Institution of the General Estate, shall be passed, I recommend to the Commissioners and Agents of said Estate, immediately after, to apply by memorial to said Legislature, (and to every subsequent Legislature, until the demand is accorded,) for a law exempting forever from taxation, *All property, real and personal*, belonging to said General Estate, (or which may hereafter belong to it,) laying within the State of Louisiana; seeing the purposes to which it is destined. I trust that the wise and enlightened members composing the Legislature of the State of Louisiana, will not refuse the passage of such a Law ; seeing that the whole and entire revenue of said Estate goes to Charitable uses in the State, and to the education of its own citizens ; saving thereby to the State itself an immense expenditure, which would otherways have to come out of its coffers.

Similar applications to the last, recommended above, should be made to the different City Councils of the City of New Orleans, praying that the Real Estate laying within the respective limits of the different Municipalities, belonging to said General Estate, should be exempted forever by Law from all taxation, seeing the uses to which its revenue is forever destined.

So soon as the Law (by the Legislature of the State) incorporating the Institution of the General Estate, shall be passed, I recommend the Commissioners and Agents of said Estate, immediately thereafter, to apply by Memorial to said Legislature, (and to every subsequent Legislature until the demand is accorded,) praying that an Act may be passed, providing that no prescription shall ever run against any Real Estate belonging to this Estate, which shall be taken possession of or held by others. The object in such Law would be, that whereas, much land belonging to this Estate, lays in various out parts of this State, persons might, unknowingly to the Commissioners and Agents of the General Estate, seat themselves down on it, and, if permitted to remain thereon for thirty years, (the present law of prescription of the State being such,) would acquire title thereby ; such law would, therefore, protect it forever.

After the passage of the law, (by the Legislature of the State,) incorporating the Institution of the General Estate, I recommend to the Commissioners and Agents of said Estate, to apply by Memorial to said Legislature, (and to every subsequent Legislature, until the demand is accorded,) praying that an Act may be passed *appointing* the Secretary of the General Estate, (for the time being, whoever he may be,) an *Auctioneer*, for the purpose of leasing at public auction the lots of ground and other Real Estate, belonging to said General Estate. The object of this would be that the General Estate might have its own confidential Auctioneer to transact its business, (as all its leases should be publicly made at auction after due notice, by advertisement in the public newspapers of the City,) and by that means, save also much expense in commissions, which would otherways have to be paid to auctioneers.

And whereas, Mr. Andrew Durnford, a free man of color, of the Parish of Plaquemines, of this State, is at this time indebted to me in a large sum of money, by mortgage on his sugar estate, situate in said parish ; now, should it so happen, that at the time of my death, said debt still remains unliquidated and owing to me, I in that case request my Executors, (he being a worthy and an honest man, and my friend,) to wait the payment of said debt with him, Andrew Durnford, and to give him time to pay it off, on his paying an interest thereon of six per cent. per annum, for such time as they shall wait with him the payment thereof. Well understood, however, that the amount of the crop which he will make on his plantation, he will annually pay over to them on account of the principal and interest of said debt, until the whole amount thereof is liquidated and paid off.

And whereas, in my last Will and Testament, I did not, in relation to my old servants, (whose freedom I willed to be given them here, in New Orleans,) provide any support, (as I did not wish to add more writing than I could help, or add to its length,) I will now add a request to my Executors, that should any of them, from age or weakness, (as they are now all hearty and strong,) stand in need of support, that fifty cents a week may be paid to such of them as be-

come so situated, and that such be permitted to occupy one of the houses they have been accustomed to live in with me, until their decease.

I beg leave to recommend that when lots of ground are leased on long leases, the lessees should be bound to erect buildings of certain descriptions thereon, with foundations and walls of certain proportions, to raise and fill up the lots with earth, pay all taxes thereon during the term of the lease; comply with and fulfill all Municipal requirements; keep all houses and improvements placed thereon insured against risk by fire, &c., &c.; (which buildings, with all other improvements placed thereon, once erected, shall not be pulled down by the lessees, but shall revert back at the end of the lease, with the lot or lots of ground, to the lessors, free of cost or expense to them the lessors;) Said houses and lots of ground, after reverting back at the expiration of the first lease, improved as they will be, should be rented out on short leases, (the rent payable monthly,) at higher rates. By which means a large revenue will accrue to the Estate in a short lapse of time, which must greatly and yearly increase.

The mode and manner of leasing should be at public auction, putting up a lot to be bid off at the highest price offered for it, on such and such conditions, (say, those of filling up with earth, paying all taxes, complying with all Municipal requirements; building of certain descriptions and proportions, Insurance against fire, to insure the means of rebuilding in case of accident, &c., &c.;) under a lease of one year, five, ten, fifteen, twenty, or twenty-five years, as the case may be, paying an interest, (quarterly or quarter-yearly,) at the rate of six, seven, or eight per cent. per annum, as the case may be, on the price of the lot or lots of ground adjudicated.

Public sales should be made of lots of ground on lease in the City of New Orleans, as also in the rear of the City, say, on Poydras, Hevia, Perdido, Girond, Freret, St. Mary, St. Mark, and other rear streets; as well as in the rear of the Suburbs Livaudais and Washington, above and below the City, as in Macdonogh, according to the wants of the public and the demand for them. No large quantity of Lots should be thrown into the market at any one time, but the public should be supplied as space was wanted to build on. Say, a public sale of one hundred, two hundred or three hundred lots, (lots of thirty feet in front each,) every two, three, or five years, as wanted, and the prices high; that is to say, fair. However, on reflection, it would be well, perhaps, to lease out many of the rear lots, even at low prices, as the lessees would be improving, filling them up, and giving additional value to them.

And whereas, the Titles, under which I claim and hold certain lands, (laying principally in the State of Louisiana, some small part thereof laying on the Pearl river, in the State of Mississippi, and called the Florida grants,) which lands are the 15-16th parts, or fifteen parts out of sixteen parts, of (120,000 arpens) one hundred and twenty thousand arpens; original grantee Geronimo La Chiapella;—the (2-3rds) two thirds parts of (90,000 arpens) ninety thousand arpens; original grantees, Louis and Alexander Declouet;—and the (1-3d) one third part of (40,000 arpens) forty thousand arpens; original grantee, Vallery John De Lassise;— are as yet unconfirmed by the Government of the United States, (although good and valid.) To assure, therefore, their confirmation, I request the two Cities of New Orleans and Baltimore, as also the two States of Louisiana and Maryland, through their respective Legislatures, to memoralize the General Government, praying it to confirm the titles to said lands; (seeing that they are the property of the poor of those two Cities, a Fund for their education, that they are in reality destined to do and accomplish that which is the Duty, the First and most sacred Duties of the General Government itself to perform and see performed, namely : to educate its citizens;) or otherways to give them (my General Estate) their choice of other public Lands laying in the State of Louisiana, in exchange for them or in their lieu and place, acre for acre; (seeing that the General Government have sold a great many of the Lands laying within my Surveys.) Which I trust and doubt not the General Government will do; (viewing the justice of the claim and the validity of the Titles; Indeed I consider those Titles already *virtually confirmed* by the Supreme Court of the United States, in their decisions in the suits of *Foster and Elam* v. *Neilson ; Aredando* (1 believe) v. *the United States ; Perchman* ( I believe) v. *the United States,* and others ; (See also various reports of Committees, and Bills reported in Congress at various times ; memor-

ials from the Legislature of Louisiana; and especially an able report from the late Edward Livingston, when Secretary of State of the United States, when called on by a Resolution of Congress for information on the subject of those claims.) Those decisions of the Supreme Court of the United States are to the effect, that the Government of the United States are bound, under the Treaty with Spain of 1819, to confirm said titles. The Supreme Court not being competent to come to the relief of the claimants, it requiring the action of the General Government in the first place; it being a political question as to limits.) The citizens of Louisiana have cause to complain of the injustice of the General Government on the subject of our Land claims and Titles; (the Great, the crying injustice,) and none more than myself. From the Treaty of Paris of 1803, by which the United States acquired the Province of Louisiana, down to the present day, now thirty six years, our Land Titles remain unsettled and unadjusted. Had Congress passed a Law within a week after the ratification of said Treaty, as they were bound to do both by its letter and spirit, confirming every title to land within the limits of the Province ceded, which was a valid title under the governments of France and Spain, (which had preceded that of the United States in its occupancy and sovereignty,) the whole of the claims would have been adjusted at once, now thirty six years since. Instead of which, thirty six years on the contrary have passed away, and the claimants appear no nearer the termination of this state of uncertainty and ruin to them, than they were on the day of the ratification of said Treaty in 1803. Let justice then, (though late, when I am in the Grave and after a long life of supplication,) be done us at last. The General Government, in my claims at least, can have no objection to pass a law confirming them at once, (seeing that the Revenue to be derived from them is destined for the purpose of educating her own citizens, the children and youth of the two States of Louisiana and Maryland,) and in the case of the after claimants, passing a law permitting them to go into the Courts of the country for decision on their validity; under the condition that they, the claimants, shall take other Public Lands, acre for acre, for such part of their claims, (if confirmed by the Courts,) as have been confirmed by the United States to others, by right of settlement, or have been sold by the United States. Such were the provisions of a Bill which passed the Senate of the United States in Congress, at three different sessions of the last years, but was not acted on by the House of Representatives from the lateness of the session when sent from the Senate, as said Bill was not reached in its order previous to the breaking up of Congress. The Titles by which I claim those Lands are perfect in every respect; they are not simple grants or donations by the Ancient Government, but purchases from it for valuable considerations. They are not only stamped with every form required of the Local Government of Louisiana, Surveys, Plots, Patents, &c., &c., but were sent to Madrid, in Spain, and were ratified by the King in Council. Those Lands cost me large sums of money, acquired with God's blessing, by honest industry, and the sweat of my brow, Now thirty four and thirty five years since; and I have been deprived of their use and kept out of my property, rightfully and justly acquired, by a Government which styles itself honorable and just, a Government of the People; which Government for a long series of years has refused even to pass a law permitting the claimants to go before the Courts of the Country for a decision on their validity or invalidity of their claims; has cut us off, in short, from all means of obtaining justice in any way. Let it be permitted me now to ask, (an American by birth, an old man, one devoted to his country and its institutions, and whose father waded with the Father of his Country through the hottest battles of its revolutionary struggle for Liberty and Equal Laws,) would the most despotic Governments of Europe, (under a plighted faith, the faith of a Treaty,) have so acted? and to answer the question and say, they would not. Not one on the long list would have so acted—could have so acted. Justice would have been meted out to their subjects similarly situated within a month from the date of the Treaty Obligation. Besides on the score of interest, have the Government gained anything by so acting? No, but lost—immensely lost in various ways, (saying nothing of the loss of honor.) In addition to doing great injury to the State of Louisiana, by keeping the Land unsettled on, and waste, for upwards of thirty years, and her population sparse, when otherways she would have been filled up and compact. The whole quantity claimed by individuals, besides, is trifling, both in quantity

and value, and of no consideration, a drop in the bucket, as it were, to the General Government. The Florida claims (on those located between the Mississippi and Perdido Rivers) not exceeding in the whole (900,000) nine hundred thousand arpens, (french,) about 700,000 acres, "seven hundred thousand English acres," and the residue of the large claims of Louisiana, say Bastrop's, Maison Rouge, &c., &c., not exceeding 1⅓ millions of French arpens, about 1,100,000 English acres.

For the base of a permanent revenue, (to stand through all time with the blessing of the Most High,) I have preferred the earth, "a part of the solid Globe." One thing is certain, it will not take wings, and fly away, as Silver and Gold, Government and Bank Stocks often do. It is the only thing in this world of ours which approaches to anything like permanency; or in which, at least, there is less mutation than in things of man's invention. The little riches of this world, therefore, which the Most High has placed in my hands, and over which he has been pleased to place and make me his Steward, I have invested therein, that it may yield (its fruits) an annual Revenue, to the purposes I have destined it forever.

Whereas, eight or ten more bricklayers, carpenters, painters, &c., &c., will be constantly wanted to attend to, and keep in repair and good order, the houses, buildings, fences, &c., &c., belonging to the General Estate, I recommend in consequence to the Commissioners and Agents of said General Estate, to employ Black mechanics, which shall belong and be owned by said General Estate, (so long as there are slaves in the country,) for said purposes, (letting them go out Free to Africa every fifteen years, and replacing them by others, whom they will purchase,) as a means of great economy, as otherways such repairs would be a source of great expence to the estate. In some of the vacant lots of ground, belonging to the Estate, they can have their workshops, for their mechanics, deposits of lumber, brick, stone, lime, sand, carts, animals, &c., &c. By all which means much expense may be avoided, and money saved to the Estate. And if buildings are to be put up on lots of ground in the City, or on the estates in cultivation in the country, owned by the General Estate, their own mechanics can erect and build them up.

The plan which my mind formed, (influenced, I trust, by the Divine Spirit,) and has pursued for near forty years, to accumulate and get together a large estate, in lands, lots of ground, in and near the City, houses, &c., &c., for the Education of the Poor, will in time, I doubt not, yield a revenue sufficient to educate all the Poor of the two States of Louisiana and Maryland, and perhaps the poor of many other States of our happy Union. To effect and secure that, I have laid its foundations deep and broad in and all around the City of New Orleans in every direction, so that for centuries to come, (if managed in wisdom,) its revenue must and will go on increasing in amount with the growth and extension of the City, (which is destined to be one of the greatest, in extent and population, the world has ever seen,) until its rents shall amount to some millions of dollars annually. If, therefore, those who will come after me, and will have the management of this store, (which I have strove to amass and pile up,) will labor to increase and render it productive with the same fidelity which I have husbanded it, and striven to make it a great one; then, indeed, it will become in time a huge mountain of wealth, and will yield its increase to the honor of God, and the benefit of generations yet unborn, through all ages of the world.

In relation to man's happiness, constituted as he is, I have always been convinced that the intellectual cultivation of the youth of our country, alone, without moral and religious cultivation, cannot secure it, or give permanency to the Free Institutions of the country, as they now exist. Education, separated from Religion, yields no security to morality and freedom.

I will now speak a few words of myself, (having often seen and felt that my conduct, views, and object, were not understood by my fellow man,) constrained as I feel myself to be, and bound so to do and to declare, that my soul has, all my life, burned with an ardent desire to do good, much good, to my fellowman, (as it was chiefly by that means, and through that channel, that I could bend, greatly bend, to the honor and glory of my Lord and Master, which was my soul's first, great, chief object and interest.) I trust, I pray, that the mode I have adopted to effectuate it, will receive the Divine blessing. I have notwithstanding much, very much, to complain of the world, rich as well as poor.

25

STATE OF
LOUISIANA, &c.,
v.
EXECUTORS OF
McDONOGH.

It has harrassed me in a thousand different ways. Suits at law, of great injustice, have been instituted and carried on against me, to deprive and take from me property, honestly acquired, (for I have none, nor even would have any that was not acquired by honest industry and the sweat of my brow,) and when obliged to seek justice through Courts of Law, (after waiting years and years with those who were indebted to me, and refused payment,) it has often and often been refused me. Many and many times have Juries of my fellow-men given me a stone when I asked them for bread. As one instance, (out of great numbers I could mention,) in a suit at Law instituted by me against a rich widow and orphans, (a succession estate,) for notes to a large amount, which I had endorsed for her husband in his life time, to serve him, (without any interest on my part, but through friendship,) and had to pay said notes, and against which there were no offsetts, the lawyers for the defence, having nothing that they could urge or say, in addressing a jury of my fellow-men, why a verdict should not be given in my favor for the whole amount claimed, with interest and costs, confined themselves to repeating over and over, "Hold in mind, Gentlemen of the Jury, we pray, you, that John McDonogh is a rich man and the defendants are a poor widow and orphan children;" "Hold in mind, Gentlemen of Jury, that John McDonogh is a man of unbounded wealth, who does not stand in need, or want the amount of those notes, and our clients are a poor widow and orphans who are ruined if you give him a verdict for the amount." And what, (will it be believed or credited,) was the verdict of this jury of my fellow-men? Why, that I should receive about the one-tenth part of the amount of the notes I had paid of the defendants, without interest or costs, and capped the climax by saying, "It was as much as the widow, they thought, could conveniently pay, and that I was rich and did not stand in need of it, could afford to lose it." On the same claim I applied for a new trial, which was granted me, and on its taking place before another, but a different jury, the same pleadings being made by the counsel for the defendants, viz: "Remember, Gentlemen, John McDonogh is a rich man—our clients are a poor widow and orphans." I obtained a verdict in my favor for the whole amount of my claim with interest and costs of Court. (Now, feeling those things, as I always have, most keenly, what is, let me ask, the duty of a juror, of a man? Is it to dispense that sacred attribute of the Divinity, Justice, equally to all men, or is it to consult the faces of men?) Of Judges, and their judgments, I have also much, very much, to complain—but I refrain. What care does it not become Governors and Legislators to use in their appointments to such offices; to secure high minded, honest, honorable and pure men. As I have said above, I again repeat, that I have much to complain of the world, of men in general. They said of me—he is rich, old, without wife or child, let us take from him, then, what he has. Infatuated men! they know not that that was an attempt to take from themselves, for I was laboring, and had labored all my life, not for myself, but for them and their children. Their attempts, however, made me not to swerve either to the right hand or the left, (although to see and feel so sorely their injustice and ingratitude, made me often to lament the frailty, the perversity, and sinfulness of our fallen nature.) I preserved an onward course, determined, (as the Steward and the Servant of my Master,) to do them good, whether they would have it, or whether they would not have it. And I have so strove, so labored to the last; the result is in the hands of Him who fixes and determines all results; he will do therewith as seemeth good unto himself.

Whereas, from infancy up, it has been the wish of my heart that my ashes should repose and mix in death with those of my earthly Parents; (as in this life there was nothing so loved by me, so dear to me, as my father and my mother,) and as they are interred in different graves, in some of the ancient places of burial of the City of Baltimore, (known to my sisters and their families, who reside there,) it is my wish, and I pray the Executors named in my last Will and Testament, (should it not be permitted me by the Most High to go on there before my death, and attend to and have it done myself, as I am very anxious and hope to do,) to take measures, (those gentlemen will excuse and pardon the great trouble I occasion and put them to,) and have a Family Vault, of lasting materials and great solidity, erected in some one of the new Burial places of said city of Baltimore;—to have the remains of my parents raised and placed therein, and my body sent on there, that it may be placed

alongside of theirs, in said vault, to crumble and mix with theirs, to await the resurrection at the last day.

I will now, with the view of communicating to the Commissioners and Agents of the General Estate my opinion in relation to certain parts and parcels of said Estate, throw a few notes together, and then close those memoranda.

The eleven entire squares of lots of ground (which contain upwards of three hundred lots) laying at the lower end of Poydras street, on both sides of said street, in the Second Municipality of the City of New Orleans, are very valuable. They should be laid out and divided into lots of 26 or 28 feet in front, by about 90 or 100 feet deep. A general plan should be made of each square, (as each square can be divided into upwards of thirty lots,) and said lots sold out on revertible leases of twenty-five years, (say 2 or 3 squares one year; in 2 or 3 years thereafter, 2 or 3 other squares, sold out and so on,) under certain conditions of raising them with earth, building on them, paying taxes, and all other expenses, fulfilling all Municipal requirements, &c., &c.

The two thousand lots of ground, and upwards, (of thirty feet front each lot,) (which I estimate there is still remaining unsold by me, belonging to this estate, and which there will be and will remain the property of this estate at my death, as I do not intend to sell or dispose of any more of them,) within the present limits of Macdonogh, (as per my original plan of division,) with many houses, buildings, &c., &c., on them, are very valuable and becoming more so every day :—should be sold out in revertible leases of twenty-five years—say 100 or 200 lots, (of thirty feet front,) every two or three years, as wanted for building on, under certain conditions. Some of the squares laying in the rear of said town, might be leased by the square for the purpose of gardening, &c., &c. The trees standing on most of those squares are valuable, and should be sold for cord wood.

The land in the rear of Macdonogh and adjoining it, bounded by the side line of land belonging to John S. David above, and Toussaint Mossy below, and F. Verret in the rear, containing between three and four hundred superficial or square acres, will have to be, in a few years, (when the demand for more lots shall arise,) laid off by the surveyor into squares and lots of ground, by the continuation of the streets of Macdonogh, which run from the river towards the rear, further back, through said land, and laying off other new streets, running parallel with, or up and down the river to intersect and cross those which will run back from the river, and a plan made of it. This body of land is sufficiently extensive to form out of it between two and three thousand lots of thirty feet in front, each lot, and will be in time of great value. In the mean time, (until laid out into squares and lots) it might be leased in small parcels or tracts by the year, or for four or five years at a time, to be cultivated in garden for the supply of the City with vegetables. I am cultivating at this moment, a part of it, in a very valuable garden. The greater part of it is covered with wood, which is valuable, and should be sold, to be taken off.

The small tract of land, laying at the upper end of Macdonogh, having a front of one hundred and fifty eight feet, French measure, on the river Mississippi, adjoining land of J. S. David above, running back about forty acres, more or less, until it intersects in the rear the line of the land of F. Verret, and fronting in its whole depth, on the lower side, Hamilton street, in Macdonogh, is very valuable, and should be laid out into lots fronting on said Hamilton street, (thirty feet front each lot,) with depths, running across the tract, 158 feet deep, by which means 200 to 300 lots can be made out of it There is a large convenient house, and other improvements on it. In time, when the neighbor above shall lay out his land into lots, it will be much to his interest to obtain the privilege to communicate his streets, across this tract of land, with the streets of Macdonogh, which he might be permitted to do on giving other lots of ground of an equal number of square feet, (well situated,) in the suburb he will lay off, to the General Estate, to indemnify it for the loss of ground it would sustain by the opening of the streets.

The four thousand (4,000) acres of land and upwards, (being in the rear of what is called the Caselar Estate,) laying forty arpens in the rear, on from the river Mississippi, (except twenty feet in front which lays fronting on the Mississippi, and runs back forty arpens to the rear land,) and running back on in the rear to the Bayou Villars, on River Ouacha, purchased by me on the 28th March, 1837, of Emile Sainet, before Felix De Armas, Notary Public, as also

two other tracts adjoining said tract below, fronting on said Bayou Villars, purchased by me, say, one of them on the 9th June, 1837, the other on the 1st July, 1837, of Sosthene Roman, Syndic of the creditors of John B. Degray, before F. Seghers, Notary Public, containing (the two tracts) about eleven hundred acres, making, in the three tracts, upwards of five thousand acres of land, MUST become in time of immense value; (though it may be fifty or one hundred years first or before it will be wanted.) It lays within *one mile* on a straight line of Macdonogh. The plan, or determination, which I had formed in my mind in relation to this valuable body of land, in connection with the town of Macdonogh, is this: The land laying in between Macdonogh and those five thousand acres of land, belong to or are owned by two persons, say, Furcy Verret, and the heirs or children of Prosper Marigney. I had therefore determined whenever those two tracts were brought into the market for sale, (as it must and will be, no doubt, before long, as one body, that of Mr. Verret, is a partnership concern owned by different persons in undivided interests; the other body belongs to minors, the children of the late Prosper Marigny, to whom it cannot be worth a dollar for use, (as it is low ground, and they own only the low land prairie and swamp, after forty arpens from the river,) and who no doubt will be very desirous to sell it when arrived at the age of majority,) to purchase them. By which means, the whole body, together with Macdonogh, (which is the point or outlet on the river Mississippi,) and the land laying in the rear touching Macdonogh, now owned by me, would form a body of land of ten thousand acres, laying opposite and in front of the City of New Orleans. Which property, alone and itself, would become, in time, a mine of wealth, such as no individual would possess in the United States. In the event of my acquiring those two intervening bodies of land, which separate now Macdonogh from my five thousand acre tract, my further plan is, to extend the streets, walks and avenues of McDonogh, on (by degrees as wanted) through the whole body, as it will all in time be wanted for the immense population which is to inhabit New Orleans. In furtherance then of this plan, and the interest of the General Estate, I recommend to the Executors named in my last Will and Testament, (should I not succeed in making those purchases myself personally before my decease,) to purchase, if possible, the whole of the tract belonging to Mr. Verret, from the bank of the river Mississippi back to the bayou Villars on Ouacha, and that of the minors Marigny as now owned by them, say, the rear of their late father's tract from a point distant forty arpens from the river Mississippi back to said bayou Villars. (As it is only that part which is owned by them, the whole of the front on the Mississippi, forty arpens in depth, having been sold out by their late father, previous to his death.) To effect which purchases they could sell the bonds, (or such a part thereof as would be necessary and wanting,) of the First Municipality of the City of New Orleans, left by me, a part of my Estate, and pay the purchase money with the proceeds. To effect the purchase, however, this request and their intentions in relation to it should be kept secret, as success in all transactions of business, must in a great measure depend on secrecy. The wood standing on this five thousand acres of land is very valuable, and must become more and more so every day, not only from the increase of value of the article, but its increase from its yearly growth.

The one hundred and ninety squares, or parts of squares of ground, containing three thousand, six hundred and ninety three lots, (3,693 lots,) laying in the Suburb Washington, in the Third Municipality of the City of New Orleans, purchased by me on the 5th and 26th of April, 1839, of L. B. Macarty and Madame L. Lalaurie, will become in time of immense value, but I estimate that fifty to one hundred years, or more, must pass away before that will take place; (except, indeed, that means shall be sooner taken to drain and improve the ground, when thirty or forty years, in that event, might bring them into use and occasion a demand for them.) But that those lots of ground must become in time of great value, nothing is more certain. From various causes, say, from the washing of the ground in front towards the river, by the rains, carrying earth into the rear, and the natural decomposition of vegetable substances on them, the surface of the ground is becoming every year higher and higher. When a demand will arise for those lots of ground, 200 or 300 of them should be brought into market, and leased out every two or three years. The wood on this land, (Cypress and other timber,) is valuable, and may be sold at public

STATE OF
LOUISIANA, &c.,
v.
EXECUTORS OF
McDONOGH.

auction, to be cut down and removed from off the land by a certain day, so that another crop may push and grow up, as it is a fact that the lands of this country, the low lands of the Mississippi, produce trees of large size, in fifteen years from the root of the old tree, which had been cut down.

The land laying in the rear of the Suburb Livaudais, adjoining the Second Municipality of the City of New Orleans, bounded by Saint George Street, (the last and furthest street in the rear of said suburb,) and thence running back; (See my notes on said property in my list of property owned by me in book,) containing about five hundred (500) square acres, purchased by me on the 10th of February, 1836, from Mathew Morgan, J. S. Peters, L. Pierce and Wm. H. Chase, as per deed before Felix Grima, Notary Public; must and will become in time of immense value, but it may be fifty or one hundred years first. This body of land should be laid off into farm lots, and a plan made of it, under the name of New Suburb Livaudais. The streets of Suburb Livaudais leading from the River bank should be extended through it, and intersected by other cross streets, forming it into squares. And when a demand shall arise for the lots for building on, which will take place in time, two or three hundred of them should be brought into market, and leased out every two or three years. I estimate that there is a sufficiency of land (after deducting for streets) in this tract to form at least four thousand lots, of thirty feet in front each lot. (And it may be, if my title is decided under my purchase, to extend beyond the eighty arpens, from the River in the rear, that then there will be land enough to form six thousand lots.) The wood on this land (cypress and other timber) is valuable, and should be sold to be taken off, and removed by a certain time, under the condition that everything not removed by a certain day, should be forfeited and revert of right, back to the vendor. It is a fact known to the old inhabitants of the State, (whatever the cause or causes may be) that all the swamps, low lands and prairies, both on and off the River, (even 50 or 100 miles off the River) is yearly raising and becoming higher. Prairies, which fifty years since were what is called "Shaking and Trembling Prairies," and were generally covered with one or two feet of water, are now high, dry, and in a great many instances cultivated in sugar cane, cotton, &c.

The forty-one or forty-two squares or parts of squares of lots of ground, containing about nine hundred (900) lots, laying in the Suburb Washington, in the Third Municipality of the City of New Orleans, purchased by me at public auction, as per deed of sale, of the syndic of L. C. Pascal, on the 26th September, 1838, before Joseph Cúvillier, Notary Public, (with the exception of three squares purchased of the syndic of Rousseau, February 13th, 1839, and of the Sheriff, syndic of Aubert;) will become in time of great value, but fifty or one hundred years must probably first pass away, before they will be wanted for the uses of the City. When a demand for them shall arise, they should be brought into market and sold out on lease by degrees, to meet it. The wood on them, (cypress and other timber) is valuable, and can be sold every fifteen and twenty years, as a new growth of timber immediately spings up, as the old one is cut down.

The four thousand four hundred and ninety-eight acres and 20-100ths of an acre of land, (4,498 20-100ths) laying in the rear of the Suburb Washington, and adjoining to it, in the Third Municipality of the City of New Orleans, in township number 12, of range number 12, East, on the East side of the Mississippi River : for which body of land I hold seventy-five certificates of the Receiver of Public Money of the United States, (and must receive *patents* from the General Land Office of the U. States, it having been sold as public land by the Government of the U. States, so soon as said patents can be issued.) All which said certificates are in my own name with the exception of twenty-five of them, which are in the name of Mr. Charles Derbigny, but transferred to me, having purchased them of him, " see his deed of sale to me for the quantity of land said certificates call for," executed before L. T. Caire, Notary Public;— must and will become in time of immense value, as it is a property of great extent of surface. So great, indeed, must its value in time be, (say in one or two hundred years,) that no man of the present day, I am convinced, can estimate it. Every foot of it will be wanted in time by the population of the City of New Orleans for building lots, as it lays within two, three or four miles of the centre of the City. When the time shall arrive that the lots will be wanted, (I estimate that this body of land will form at least forty thousand lots, (40,000 lots,)

each lot fronting thirty feet on a street, and having one hundred and twenty feet in depth, exclusive of the streets which I allow for in my estimate,) it should then be laid out under a general plan by an able and correct engineer and draftsman, the streets made to correspond with those of the City of New Orleans, and brought into market by degrees, by leasing out every few years a certain proportion of said lots. In the meantime said land will be filling up, raising and becoming every year higher and dryer. The wood standing on it may be sold every fifteen years, (as much of it is wooded, and much more prairie, but which will be wooded in time,) divided in ten pieces of ten acres each, and the wood standing on said ten acre pieces sold and taken away, ready for a new growth. And other parts of it may be leased in small farms and cultivated for the supply of the New Orleans market with vegetables, until the time shall arrive when it will be wanted for town lots.

! . I have already in those memoranda said something on the subject of my large land titles, comprising (the proportion of them owned by me) nearly two hundred thousand arpens, (200,000 arpens) laying in the State of Louisiana, (in what is called the Florida District,) which are as yet unconfirmed by the Government of the United States. As it is probable, however, in the settlement of those claims, that the General Government, (in accordance with the Bill which passed the Senate of the United States, at three different Sessions of Congress,) will insist that the claimants shall take other lands (acre for acre) laying within the State of Louisiana, for those they claim, (seeing that the General Government have either sold or confirmed by law, to the settlers who are settled on them, the greater part of the lands, for which the titles of the claimants call.) In that case, lands of great value, or lands which in time (and that time not very distant) will become of great value, may be secured to the general estate; for those claims of mine, if the proper care and attention is given to the subject of their location, by the Commissioners and Agents of the general estate. The most valuable lands in the world may be taken on both sides of the Mississippi River, laying on and fronting the River, below the Fort of Plaquemine, (which have already been offered for sale by the General Government, but were not sold,) at this present time not very valuable, but from the annual overflow of the River and other causes, will in a few years become of immense value. The same may be said of the lands on both sides of the Bayou Lafourche, low down on it.— The lands in the Parish of Iberville, in the rear of and adjoining those I already possess there, laying about five leagues above the Bayou Lafourche, on the Mississippi, a league or two in the rear of the River, and from thence back to, and laying to, and laying on the Atchafalaya River, are also very valuable; and much land may be taken on both sides of the River Mississippi, in the Parish of Plaquemine, commencing five or six leagues below the City of New Orleans, and from thence running down six or eight leagues further, laying and beginning in the rear of the River, forty arpens from its bank, (called the second depths or conceptions,) which in time will be very valuable. In the rear of Terre du Bœuf, below the City of New Orleans, there is a valuable body of land, as there is also in various places and situations in the rear and off the River, on the western side of the Mississippi and the Bayous which lay in the neighborhood and communicate with the Bayou Lafourche low down, say the Cazaus, Grand and Petite Bayou Black, Bayou Grand, &c. &c. The General Government will, I hope, so shape the law, as to permit the whole of the claims to be laid over again on other land, as it would be the height of injustice for her to insist on our keeping in the Florida District, such parts of the claims as were not taken from us by the settlers, or sold by her, the General Government, which of course can only be the part of the land the least valuable; as it is a natural thing to suppose that the parts of our land taken up by the settlers, and those parts of it which have been sold by the General Government, must be the choice parts of our claims. However, (as the case may be) whatever land may be obtained or remain to the general estate under those claims, should be laid off into small tracts on or off Rivers or Bayous, and leased out to small planters or farmers, for use and cultivation.

The seventy or eighty thousand acres of land laying in the rear of the River Mississippi, on the East side, sixteen leagues above the City of New Orleans, back of the sugar estates of Madame Fontin, and Rezin D. Shepherd, and the plantations of Henry Fonteneau, (for a description of which and my opinion of it, I refer to a list of my property in my account book or ledger, pages fo. 21,

22 and 24.) A part of it lays within forty arpens from the River Mississippi, the residue eighty arpens from the River, and extends from thence (as per plan) to Lake Maurepas and the Amite River, a depth of eighteen or nineteen miles. This body of land is now at the present time of great value, and in time will become of immense value. Its soil is amongst the richest that the sun shines on, and every inch of it will be cultivated in time, as very small levees would keep out the back waters, and make every part of it cultivable. It must become in time a perfect garden. The timber on it alone (which is of every kind,) is a fortune. Cypress stands on it in sufficient quantities (and of immense growth) to supply twenty steam saw mills for twenty years. This body of land is intersected by several large streams or rivers, (the Arcadian Bayou or New River is one which runs through the centre of the whole tract, and approaches near to the Mississippi, falling into Lake Maurepas,) which are navigable for brigs and schooners of large size. If capitalists from New England would come out, with their industry and perseverance, and put up saw mills on this tract of land, paying certain prices to the general estate for each square foot of timber cut and sawed up, they would (at the price at which our sawed cypress lumber sells at here,) soon make fortunes. The whole tract should be accurately surveyed, a general plan made of it, and the whole divided off into small tracts, and in time leased out to small farmers, for use and cultivation.

STATE OF<br>LOUISIANA, &c.,<br>v.<br>EXECUTORS OF<br>McDONOGH.

The four thousand five hundred and ninety-six acres and 6-100ths of an acre (4,596 6-100ths acres) of land, laying sixteen leagues above the City of New Orleans, on the East side of the River Mississippi, and adjoining the last above mentioned body of land, (of 70 or 60,000 acres,) above or on its upper side, is situate in township No. 11, of range No. 5, East, on the East side of the Mississippi River, and lays, some part of it, forty arpens from the River, adjoining Mr. Shepherd's sugar plantation, and other parts of it at eighty arpens from the River, are held by me in virtue of thirty-nine certificates of the Receiver of Public Moneys of the United States, (being lands purchased by me at the Government sale, for which *patents* must issue to me from the General Land Office;) and is not surpassed in quality by any land in the State. It is of great value; every foot of it is believed to be cultivable; and is heavily timbered with the most valuable kinds of wood. A general plan should be made of it, and the whole laid out immediately in small tracts of fifty acres each, and leased out to small farmers.

The six or seven thousand arpens of lands, more or less, (being seven tracts which were purchased by me from seven different persons,) laying all in one body on the Bayou Des Familles and Bayou Villars, on River Ouacha, within four leagues by land, along a fine road, of the City of New Orleans, (a very easy 1½ or 2 hours ride,) is of great value. There is nothing superior to it in quality in Louisiana, and nearly every foot of it is cultivable. It is sufficiently extensive to form four large sugar estates, is heavily wooded with timber of every kind, and sufficiently near to the City to supply its market with vegetables of every kind for its daily use. Though its value is great now, (for it cost me a large sum of money,) it must become immensely more valuable in time. It lays nearly opposite the lands belonging to me on the opposite side of the Bayou Villars, on Ouacha, in the rear of Macdonough, from which town was there a railroad, (which there will be ere long) the distance would be on a straight line but little over three miles. My intentions are, if spared and permitted so to do, to establish this body of valuable land in sugar estates, and put black people on them to cultivate and work them. If that is not done, they should be divided into small farms, fronting on the different Bayous, say an acre front by a certain depth, and then farms in the rear of those. A general plan made of the whole body, and leased out.

The four different tracts of land laying on and fronting the right bank of the River Mississippi, at about twenty leagues below the City of New Orleans, and which contain, say, one of said tracts eighty or eighty-four arpens in front on the River; another eight arpens in front; another forty arpens in front; and the other ten arpens in front; making in all about one hundred and forty arpens in front on the River bank, all of them by forty arpens in depth. All of which tracts of land lay adjoining each other, and in one solid body; are of great value, and would make three large sugar estates. It is the finest body of land in that region of country, and possesses a noble body of timber. (The timber alone, from its situation, is worth much money.) If I am spared and permitted,

I intend to establish those lands in sugar. If that is not done, it should be laid out in small farms of one or two acres in front on the River, by forty acres deep, and leased out.

A short distance above the last mentioned tracts of land fronting on the River Mississippi, I own two other tracts of most valuable land, (the most valuable in that District,) containing together, the two tracts, (though they do not lay together, there being a small tract between them,) four hundred and thirty-eight acres and 26-100ths of an acre, (438 26-100ths acres.) One of said tracts has, I think, a front on the River of about thirty acres; the other, I think, a front of eight or nine acres. See township plot. Said land was purchased by me at a sale made by the Government of the United States, and for which I hold two certificates of the Receiver of Public Moneys of the United States, and must receive Government *patents* for it. It lays in the township number 19, in the range number 28, East, on the West side of the Mississippi River. It should also be leased out in small farms.

The thirty-one thousand eight hundred and sixteen arpens (31,816 arpens) of land, (forming a part of what is known as the Vacherie Dugué,) laying at forty arpens in the rear of the left bank of the Bayou Lafourche, in the Parish of Lafourche Interior; fronts in its whole extent on the Bayou Des Allemans, and the Petite Lake des Allemans, as per plan; (for which see a copy in my Book of Plans.) Said body of land lays at about fifteen or eighteen leagues of the City of New Orleans, by the route of the Barataria Canal, and the Lakes in rear, and must become in time of very great value, from its situation and proximity to the City of New Orleans and the Sea, and the richness of the soil. A considerable part of it is heavily timbered, which, the timber, is spreading and extending yearly more and more. A part of this land is now high, and fit to cultivate the sugar cane on, and all of it would make fine rice plantations. It should be laid out in the course of a few years, (as soon as a demand shall arise for it,) into small tracts of forty or fifty square acres each, and leased to small farmers.

The three thousand three hundred or two hundred (3,200 arpens) square arpens of land laying in the Parish of Iberville, on the right side of the River Mississippi, thirty leagues above the City of New Orleans, and about three miles in the rear of the River, being a part of the estate of the late Pierre Belly, is among the finest and most valuable lands in the world; none can exceed them in richness and fertility, and every foot of it is high and cultivable, covered with timber of every description, and immense cane brakes. The cypress timber on it alone, (the high land cypress, which are of immense growth and size, and as thick as trees can stand on the ground,) is worth a fortune. I have been frequently applied to by persons who wished to establish steam saw mills thereon, to sell them cypress, and permit them to establish mills on this land, but always refused; not having time to go and attend to it myself, and without that I might have had my timber destroyed without receiving payment for the one-twentieth part what would be taken and sawed up. But a plan may be fallen on and adopted by calculating the square feet of timber in each tree, and its consequent value, and then ascertaining how many trees stand on an acre of land; the value of the cypress timber on each acre of land would be known with precision; by which means sales could be made of the cypress timber standing on ten acres of land, on twenty, thirty or fifty acres, which should then be surveyed, and accurately marked and bounded, and the purchaser of the timber obligated by contract to have the cypress cut and taken away by a certain time, (say in one year, two years, or a longer time as might be,) under a forfeiture of whatever might remain uncut and unremoved by said day, to the vendor of it.— Some plan of this nature should be adopted, and the cypress sold. If it can be preserved, however, from depredators on it, it will become more and more valuable every year. As soon as the cypress is sold and taken off the land, (there should be however, on further reflection, a certain number of large cypress trees reserved from sale on each small farm, into which said tract will be divided for the uses, (buildings, fences, &c. &c.) of those who will establish and settle said small farms.) The land should be divided off into small farms of 50 or 100 square acres each, and leased out. I have reserved a road, (a private road of my own through the front estate, when I sold off the front estate,) back to those lands from the river. A general plan should be made of the whole of this body of land, shewing the subdivisions of it into small farms, the roads through it, and everything else in relation to it.

STATE OF
LOUISIANA, &c.,
*v.*
EXECUTORS OF
McDONOGH.

Adjoining to those last mentioned lands in the Parish of Iberville, (or close by them) I also own two thousand one hundred and eighty-eight and 70-100ths (2,188 70-100ths acres) square acres of the finest land in the world, (of same quality as that last mentioned above,) laying in the township number 11, of the range number 13, purchased by me at the sale of public land made by the Government of the United States, and for which I hold fifteen certificates of the Receiver of Public Money of the United States, and must receive Government *patents* for them, as soon as issued from the General Land Office. It is also covered with the high land cypress, and should be managed as I recommend for the last tract above, and leased out. A general plan with the tract last above, should be made, shewing their relative position, &c. &c. The 5,400 or 5,500 acres of land in this and the last above described tract, I again observe, are of great and immense value.

The high and extensive body of land called the "Grand Cheniere," lays at about thirteen leagues below the City of New Orleans, on the right side of the River Mississippi, and about two or two and a half miles in the rear of the River. It lays on each side of a Bayou of that name, (which Bayou commences at Lake Hermitage,) fronting on Lake Hermitage on each side of said Bayou, and runs with said Bayou twenty-four miles and upwards, toward the Sea, and to the Sea, having a depth of six arpens *on each side* of said Bayou. It is a noble, rich and most valuable body of land, and should be laid off into small farms of four or five acres front on the Bayou, with its depth, and leased out. There is a large quantity of valuable live oak timber on it, besides timber of every other description. It is one of the richest soils in the State, and there is now several persons living on it, to whom I have given short leases of small tracts, for the purpose of having the timber (live oak) taken care of, and not depredated on. A general plan should be made of it.

The Island laying on and formed by the Grand Lake Barataria; the little or small Lake Barataria; and the two Bayous or Rivers, called, one of them Bayou Saint Dennis, the other Bayou Cabbanaze, or Grand Bayou, which Bayous run out of Little Lake Barataria into Big Lake Barataria, lays in the Parish of Jefferson, at a distance of eighteen leagues from the City of New Orleans, and is believed to contain fifty or sixty thousand square acres of land, or more.— Some small part of it is high land; there is a considerable quantity of live oak and other timber on it, and it is fast becoming timbered. The whole of it, (being a soil of the richest kind,) is believed to be highly adapted to the culture of rice, as by means of small levees, the rice plantations could be overflowed with water at pleasure. It will in time no doubt become very valuable.

The tract of land adjoining and laying on the lower side of the town of Baton Rouge, (forty leagues above the City of New Orleans,) having a front on the River Mississippi of fourteen arpents, is an immensely valuable body of land.— Its position and situation is most beautiful and advantageous, and it possesses one of the richest soils, covered with the finest timber. It will in time (and that time not far distant) become a part of the town of Baton Rouge, and be wanted for town lots; when a plan will have to be made of it, dividing it into squares and lots, by means of streets, to be leased out. In the meantime it should be laid out into small farms of one acre each, fronting the River, by 20 or 30 acres deep, or running back to a road which crosses it in the rear at about that distance from the River; and then other small farms, fronting on said road in the rear, and running back to the back or rear limit of the tract.

The two thousand and sixty-five acres and 45-100ths of an acre (2,065 45-100ths acres) of land, laying on the River Au Chene, in township number 15, in range No. 12 East, on the East side of the Mississippi River, was purchased by me at a sale of public land made by the Government of the United States, for which I hold six certificates of the Receiver of Public Money of the U. States, and have to receive Government *patents* for it, as soon as issued by the General Land Commissioner,—is of great value. The Au Chene which lays about 1½ miles in the rear of the River Mississippi, heads about five leagues below the City of New Orleans, on the left side of the Mississippi, near to Terre au Bœuf, and runs down towards the Sea, keeping about the same distance in its whole course from the River Mississippi. This body of land begins about six leagues from the City of New Orleans, and has a front of about three miles on each side of said River Au Chene; said River Au Chene running through the centre of it in its whole length. The land is of the first and richest quality, covered with

26

STATE OF
LOUISIANA, &c.,
v.
EXECUTORS OF
McDONOGH.

timber of every kind, and has on it a large body of most valuable live oak. It should be laid out in small farms of two or three acres, in front on the River, (farms on each side of the River,) with all its depth, and leased out, reserving all the live oak from being touched or cut down; not permitting a live oak tree on any part of the whole tract to be cut down, as that timber is very valuable, and becoming very scarce.

The tract of land of twenty-four acres in front and forty acres deep, laying on the Canal of the Bayou Lafourche, which leads to the Attakapas, is very valuable. The front on the Canal for a few acres in depth, I am told, is low, but after that there is one of the finest and richest bodies of high land in the world. It should be laid off in small farms of one or two acres in front on the Canal, by forty deep, and leased out. It is heavily timbered, and is an almost impenetrable canebrake.

The eleven hundred and fifty-nine acres 90-100ths of an acre (1,159 90-100ths) of land, laying in the townships numbers 13 and 14, in the range number 14, was purchased by me at a sale of public land made by the Government of the United States, for which I hold fourteen certificates of the Receiver of Public Money of the U. States, and have to receive Government *patents* for it. It is a most valuable body of land, none richer or superior to it. It is covered with an immense growth of timber, is an impenetrable canebrake, and lays, I believe, adjoining to the last above mentioned tract, or at any rate in its immediate vicinity. Should be laid out in small farms of 50 or 100 acres each, and leased out.

The tract of land, containing ten acres in front on the River Mississippi, and eighty acres in depth, situate eleven leagues below the City of New Orleans, on the right bank of the River, adjoining the sugar estate of Mr. Andrew Dunford, is a most valuable tract of the best land of the country. It should be divided off into small farms, of one arpent in front on the River, by a certain depth; and then farms laid off in the rear from a high ridge of land which lays there, also of one arpent in front on a road along said ridge of high land, by the residue of the depth of the tract, and leased out.

The tract of land containing six hundred and forty-acres, (640 acres) laying on the left bank of the Amite River, near Lake Maurepas, being the first bluff or tract of high land on the River in going up it, (on which I formerly had a steam saw mill,) is a very valuable body of land, in every light in which it can be viewed, as to soil, (being of the first quality,) elevation, situation, &c. &c. It must be the landing and place of deposit for the shipment of the produce of a large extent of back country, and in time will be wanted (a part of it at least) for town lots, when it should be divided and laid off into squares, lots and streets for a village. In the meantime it should be divided into small tracts for farms, and leased out.

The tract of land containing three thousand two hundred arpens, (3,200 arpens, ) laying in the Parish of Opelousas, fronting forty arpens on each side of the Bayou "Ney Pegué," and forty arpens in depth on each side; it is well timbered, and of middling quality. It should be laid out into small farms of one or two arpens in front on the Bayou, by forty arpens deep, and leased out.

For many other valuable tracts of land and other pieces of property, laying in the City of New Orleans, its different suburbs, and the country around, on which I have no particular remarks to make, or information to communicate to the gentlemen, who will see carried into execution my last Will and Testament, or to those gentlemen who will receive the appointments of Commissioners and Agents to the general estate, I refer them to a list of my real estate kept in my book of accounts. Said book is marked or labelled out side, "Ledger," "J. McDonogh."

I recommend to the Commissioners and Agents of the general estate, to have plans made out by their Secretary, and copied into the book kept for the purpose, showing the division into lots, of each particular piece or portion of a piece of property, which shall be divided: its measurements, &c. &c. with a general plan or plans, showing the particular situation of each piece of property, in relation to that which surrounds it, or which is in its neighborhood. As also lists of every piece of property or real estate either in the country, in the cities, towns or villages, belonging to and owned by the general estate; its measurements, place, situation, how disposed of, whether leased or not, to whom leased or rented, for what length of time leased, conditions on which leased, &c. &c. Besides opening

an account on the books of the General Estate for every person with whom it has affairs of business.

As my object in recommending to those Gentlemen who will have the execution of my last Will and Testament, and the Gentlemen who will be named Commissioners and Agents of the General Estate, to take up lands low down on the river Mississippi, on the bayou Lafourche, and various swamp and lowlands in other parts of the State ; if misunderstood by them may occasion their surprise, I will observe that the great object I have in view, (as may plainly be seen,) is the gradual augmentation in value of the Real Estate, which will belong to and be owned by the General Estate for centuries to come—by investing at this time small sums of money in large and extensive properties, now at this moment of little value, but which Time, (who is unceasingly at work, and whilst men sleep is actively employed,) will make of immense value. (For Time is never for an instant idle, but is constantly and for ever employed, setting unto man therein a speaking example which says :  "Labor, oh man ! is the honor of thy being !  Labor, and fulfill the intent of thy creation ! " )  So that the revenue arising therefrom, (which alone is to be taken and expended,) will go on increasing with the increase of the country and its population for centuries to come, and produce means in time, sufficient to educate yearly, thousands upon thousands of the poor of our country, which God will, I pray in his infinite mercy and goodness, grant.

It will be well to say here in whom I place my hopes, trust, belief, and faith, and in the tenets of what church of Christ I have walked.  My hopes, trust, belief and faith, is in salvation through the perfect, the all sufficient and accepted atonement of our blessed lord and master, Jesus Christ.  And I have walked a Presbyterian of the " Presbyterian Church," so called, or that church the ecclesiastical government of which is conducted and ruled by Presbyters.

I request that a copy of these memoranda, recommendations, &c., may be made out and forwarded to the Commissioners of the Free Schools and Free Schools Fund in the city of Baltimore, in the State of Maryland, to be by them copied into a book in their office for safe keeping, as also a copy of my last Will and Testament, also to be copied by them into a book.

[ Signed ]      JOHN McDONOGH.

The slaves mentioned in my last Will and Testament, to be sent to Africa, are already sent and gone there.

The slaves James Thornton, Noel, John Defage and Long Mary, ( being old and faithful servants,) are to be set free here.

I recommend that Insurance on some of the buildings, laying in New Orleans and Macdonogh, be effected in other cities of the United States, (or Europe,) besides New Orleans ; because if the whole city of New Orleans should be burned down, the Insurance offices would be ruined and rendered unable to pay the loss.

I request that a copy of my will, a copy of these notes and memoranda, with a copy of the inventory of my Estate, may be forwarded to the Governor of the State of Maryland, to be placed in the Archives of that State, for the purpose of knowing its rights under my Will through all future time.  So that, if it should be attempted hereafter to violate my Will and intentions in any way, that she (the State of Maryland) may know and put it right, or other ways seek her just interest under it.  And that the same may be done (for the same purpose and intent) and delivered to the Governor of the State of Louisiana, to be placed in the Archives of this State.

Should I be cultivating any estates at my death, on which I have slaves, I recommend to the Commissioners and Agents of the General Estate, to purchase other slaves, (every fifteen years as they are authorized to do by my Will,) to cultivate said estates, (whether profitable or not, as by so doing said slaves will obtain their freedom in Africa fifteen years ; which circumstance with the spread of the Gospel and civilization consequent thereon, will be a good far exceeding all pecuniary profits and advantages of this world,)—and replace those who will have served fifteen years, and have been sent to Africa, and so on every fifteen years, (so long as there shall be slaves remaining in our country,) purchasing a sufficient number for the cultivation of the estates, and delivering up to the Colonization Society all such slaves as have served fifteen years to be sent to Africa.

STATE OF
LOUISIANA, &c.,
v.
EXECUTORS OF
McDONOGH.

I recommend that great care be taken in selecting proper men as overseers and managers for the estates—that they are pious and christian men, who will strive to lead the black people to the Most High, at the same time that they make them and teach them to do good work, to be faithful, industrious and indefatigable in their labors.

That application be made to the Legislature of the State for permission to educate the black people on the different estates, (a good English education,) as they are to be sent to Africa.

If permitted by law, get teachers and have them educated, and specially in the knowledge of God.

See that the overseers, every morning and evening, assemble the people in prayer before going to work in the morning, and after work at night.

See that the overseers have them taught, old and young, (little children and all,) the Ten Commandments, the Lord's prayer, and the Creed, and (if permitted by law,) hold Sunday Schools.

As soon as they know how to read, give each one a copy of the Holy Bible.

And on going to Africa, see that a copy of that holy book, (the Bible,) is put into the hands of each, to be taken with them.

If permitted by law, let Sunday Schools be constantly held for the whole of them, old and young, and they made to attend it the whole day.

Let there be a house erected on each plantation for a Church, and divine service performed therein on the Sabbath day, forenoon and afternoon constantly.

On such estates as I may be cultivating at my death, and which the Agents and Commissioners of the General Estate may continue to cultivate after my decease, the slaves and cattle, (immaterial what the culture carried on may be, sugar or other,) shall not be permitted to labor on the Sabbath day, but shall cease work at sundown on Saturday evening and commence again their labor at sundown on Sabbath evening.

I recommend that the estate laying in the Bayou St. John and the Metarie Road, be laid off into acre lots, fronting the Metarie Road, running across said tract of land, (eighteen acres deep,) and leased out for gardens. And in time, (when the lots will be wanted for city lots,) that a plan be made of it, dividing it into squares and lots, as the streets of the city of New Orleans, continued back will run through it, and then it may be leased out in small city lots. The revenue arising from this body of land will, in time, be very great.

I recommend that the Secretary of the General Estate be made to reside in the house which I now occupy in Macdonogh, by which means the black people, mechanics and others, will be kept out of the contaminating influence of the city of New Orleans, and be the more easily managed. Bricks made, lime burned, and other materials kept in store, and laid up for use.

Having been the friend of the black and colored man through the whole period of my long life, I will now (when near its close) give to them, (the free black and colored man, wherever he may be throughout our widely extended country,) a parting counsel and advice, in the interest of themselves and their posterity. The counsel I offer them, in all the sincerity of my soul, is that they separate themselves from the white man. That they take their wives, their children and their substance and depart to the land of their fathers, that great and ancient land, where they and their posterity, through all their generations, may be safe—may be happy—living under their own fig tree and vine, having none to make them afraid.

If my mind has been virtuously disposed in life, I am indebted for it, under the Most High, to the education bestowed upon me by virtuous and pious parents, (blessed be their memory,) and especially to the care they took in instructing me and having me instructed in music. At a time when there was no other teachers in the city of Baltimore but a singing school for youth, held at night, my beloved father would take his sons and daughters by the hand and lead them there nightly, staying there with them, taking a part in their singing and exercises, and then would lead them home. That love for singing and music, given me in my youth, has been the delight and charm of my existence, throughout all its subsequent periods, notwithstanding from the multitudinous occupations of my life, I have been able to give it but little of my time; still its love and charm pervaded my existence, and gilded my path to comparative happiness here, and as I say above, led me, as I firmly believe (under the Most High) to what little virtue I have practiced.

[Signed]      JOHN McDONOGH.

*Johnson*, Attorney General, *Alfred Hennen, Taylor,* and *Elmore & King,*
for the States of Louisiana and Maryland. *R. Hunt, Graihle, Preaux, Pierce*
and *Roselius,* for the City of New Orleans.

Counsel for plaintiffs argued in substance as follows:

What estate, or title, is vested in the cities? The restrictions in the Will are
inconsistent with ownership. Code, 475, 476, 481, 483. They are forbidden
to enjoy the property, and hence are not usufructuaries; and cannot be usu-
fructuaries, because, if they be, the title is not vested anywhere. Code, 525.

The title, under the Will, to the Cities is a naked trusteeship without any
beneficiary interest in the Corporations.

The Will provides for the perpetuation of the Estate, or its inalienability,
and these are forbidden by public policy. *Henderson* v. *Rost,* 5 A, 441; *Ma-
thurin* v. *Livaudais,* 5 N. S, 302; *Ducloslange* v. *Ross,* 3 A, 432; *Harper* v.
*Stanborough,* 2 A, 381; *Arnaud* v. *Tarbe,* 4 L. R, 504; *Farrar* v. *McCutcheon,*
4 N. S, 45; *Cloutier* v. *Lecompte,* 3 M. R, 485. From motives of public policy
substitutions were abolished in France. 5 Toullier, No. 20, p. 18. Same policy
in England, 2 Blacks. Com. 174. The law abhors perpetuities, 4 Ibid. 108, 2
Ibid, 268 et seq.; 4 Kent, 131.

The "accumulations," contemplated by the Will, are against public policy.
They would, in a comparatively limited time, absorb the whole personal and
real estate of the world.

The bequest to the Cities of New Orleans and Baltimore is null, because it is
a substitution and a *fidei commissum,* prohibited by law. Code, 1507; *Duclos-
lange* v. *Ross,* 3 A. 433; *Arnaud* v. *Tarbe,* 4 L. R, 506; Toullier, No. 37.

The illegal conditions cannot be regarded as not written.

*Toullier,* in speaking of the circumstances under which the prohibition to
alienate may be regarded as not written, lays down the following rules:

"Au reste, nous n'ajouterons rien à ce que nous avons dit dans le même
volume, p. 253 et suiv., sur les conditions contraires aux lois ou aux bonnes
mœurs. 6 Toullier, No. 487.

"Nous insisterons seulement sur un principe sans lequel les décisions retom-
bent nécessairement dans l'arbitraire; c'est qu'il faut un texte positif ou les
raisons les plus fortes pour annuler une condition. Si l'on éprouve du doute ou
de la difficulté pour expliquer comment et pourquoi telle condition est contraire
aux lois ou aux bonnes mœurs, n'est-ce pas un motif pour décider qu'elle ne
doit pas être annulée? Prenons, par exemple, la condition de ne point aliéner,
insérée dans une disposition de dernière volonté, ou bien dans un contrat à titre
gratuit, ou même onéreux. Est-elle contraire aux lois? Nous avons dit, tom.
V, p. 70, No. 51, *que c'est une condition nulle et réputée non écrite;* mais cette
proposition mérite explication. La condition de ne point aliéner, ou la défense
d'aliéner, n'était regardée comme contraire aux lois, ni dans le droit romain, ni
dans l'ancien droit français; elle était considérée comme renfermant une sub-
stitution tacite lorsqu'il paraissait que la condition de défense était insérée en
faveur d'une tierce personne. Voy. Pothier, Traité des Substitutions, sec. 2,
art. 2, et sect. 3, art. 3, § 1; Ricard, *Traité de Substitutions,* No. 329.

Sous l'empire du Code qui n'admet point de substitutions tacites, la condition
de ne point aliéner ne serait pas jugée renfermer une substitution, *à* moins qu'on
n'y eût ajouté la charge de conserver les biens et de les rendre à des personnes
désignées. Hors ce cas, la condition ou la défense d'aliéner n'est qu'un conseil
ou un précepte non obligatoire. (Leg. 114, § 11, ff. de legat., 1; leg. 38, § 4;
leg. 93, de legat., 3,) lorsque la condition est pure et simple, parce que celui qui
l'a imposée n'a aucun intérêt à en réclamer l'exécution.

"Mais si la condition ou la défense d'aliéner n'est pas pure et simple, si, par
exemple, on y avait ajouté une peine en cas d'infraction, si j'avais stipulé que
vous me donnerez 600 fr. à moi ou à Titus, si vous aliénez le fonds cornélien
que je vous ai donné ou vendu, la peine serait encourue de plein droit, par
l'aliénation que vous auriez faite, et cette peine ne pourrait, dans les principes
du Code, être modérée par les juges (1152, 1231), Voy. ce que nous disons
*infrà,* sect. 6, sur les Obligations avec clauses pénales.

"Si j'avais stipulé que la vente ou la donation sera résolue en cas d'aliéna-
tion des biens vendus ou donnés, j'aurais le droit de poursuivre la résolution
contre les tiers acquéreurs, et de rentrer dans la propriété des biens, et cette
résolution, s'opérant *ex causâ primœvâ et antiquâ,* anéantirait toutes les hypo-
thèques et charges créées dans le temps intermédiaire, (voyez Vourjon, Droit

commun de la France, tom. II, p. 126, édit. de 1747,) quand le droit de retour milite contre des tiers.

"Mais l'effet de la condition portant que la vente ou la donation sera résolue en cas d'aliénation, faite par le vendeur ou par le donataire, ne passe point à ses héritiers, parce que cette résolution a l'effet d'un droit de retour, qui ne peut, suivant l'art. 951, être stipulé qu'au profit du donateur seul, et par identité de raison, au profit du vendeur seul.

"Ce n'est donc que dans les cas où la condition de ne point aliéner est pure et simple, dans les cas où elle n'a pas pour objet un droit stipulé en ma faveur ou en faveur d'un tiers, qu'elle n'est qu'un conseil, un précepte non obligatoire, qui n'empêche pas que l'aliénation faite au mépris de la condition ne produise son effet et ne transmette la propriété; c'est alors qu'elle est nulle et comme non écrite, soit dans les testamens, soit dans les contrats." 6 Toullier, 488.

*Merlin.* "La simple prohibition d'aliéner emporte-t-elle fidéicommis?

"La loi 114, § 14, D. *de legatis*, 1o, et la loi 38, § 4, D. *de legatis*, 3o., décident que non, parceque, disent-elle, cette prohibition ne forme qu'un *précepte nu* qui ne lie point et ne donne action à personne.

"Mais, suivant le § 1 de la seconde des lois citées, et la loi 69, § 3, D. *de legatis*, 2o, il y a fidéicommis quand le testateur a défendu d'aliéner hors de son agnation ou de sa famille, parcequ'alors il y a désignation suffisante de la personne en faveur de qui cette défense a été faite.

"La raison veut sans doute qu'on applique à la défense de tester, les mêmes principes qu'a la prohibition d'aliéner, et consequemment qu'on n'en fasse résulter de fidéicommis que dans le cas où il se trouve quelque indication d'une personne substituée.

"Cependant il y a une loi qui semble décider en général que la défense de tester emporte une Substitution fidéicommissaire. C'est la 74e, D. *ad Trebellianum*, 'Un particulier (dit elle) qui avait un fils et une fille, a fait son testament, et s'est ainsi expliqué sur sa fille : *Je vous ordonne de ne point tester*, *tant que vous n'aurez point d'enfans.* L'empereur a dédidé que cette disposition valait fidéicommis, comme si le défunt, et défendant à sa fille de tester, lui eût enjoint de nommer son frère pour son héritier.'

"Mais, comme le remarquent les meilleurs interprètes, deux circonstances particulières ont motivé cette décision. 1o. La prohibition de tester n'était pas pure et simple : le testateur avait défendu à sa fille de tester *jusqu'à ce qu'elle eût des enfans;* et cela indiquait assez qu'en faisant cette prohibition, il avait eu en vue son fils, frère et co-héritier de sa fille, et avait pensé, à le faire succéder aux biens que celle-ci recueillit, en cas qu'elle n'eût pas d'enfans. 2o. Le testateur avait institué son fils et sa fille *conjointement;* du moins on doit le supposer d'après les termes de la loi; ainsi, le fils se trouvait nommé dans le testament même qui contenait la défense de tester." 32 Merlin, Y. Bis. p. 152.

*Mode.* "Ce mot se prend, en droit, pour une clause qui modifie un acte d'après un événement incertain; et l'on appelle ainsi toute disposition par laquelle un donataire ou testateur charge un donataire ou légataire de faire ou de donner quelque chose en considération de la libéralité dont il le gratifie.

"1. On confond quelquefois le Mode avec la condition; il y a même des textes du droit romain, qui donnent à l'un le nom de l'autre; telles sont la loi 8, § 7, D. *de conditionibus institutionum;* la loi 21, § 3, D. *de annuis legatis;* la loi 71. § 1, D. *de conditionibus et demonstrationibus;* la loi 2, § dernier, et la loi 3, D. *de donationibus.*

"Il y a cependant une différence entre le Mode et la condition, et elle consiste tant dans la manière de les exprimer, que dans les effets qui en résultent respectivement.

"La loi 8o, D. *de conditionibus et demonstrationibus*, nous apprend en quoi la formule caractéristique de la condition diffère de celle qui désigne le Mode : *Nec enim*, dit elle, *parem dicimus eum cui ita datum est, SI monumentum fecerit*, c'est la condition; *et eum cui datum est UT monumentum faciat*, c'est le Mode. On voit par-là que la particule *si* forme la condition, et que les mots *pour, afin, que, à la charge*, caractérisent le Mode.

"Mais, pour que ces mots forment une disposition vraiment modale, il faut qu'ils ne se rapportent pas uniquement à l'intérêt du donataire ou légataire. Ainsi, dans le legs fait à quelqu'un *pour* étudier, *pour* se mettre en métier, ou pour aider à se marier, il n'y a point de Mode, mais seulement une cause impulsive, dont le défaut d'accomplissement n'empêche pas le légataire de recueillir

la libéralité du testateur, à moins que celui-ci n'ait manifesté une intention contraire. La loi 71, D. *de conditionibus, et demonstrationibus,* porte que, ' s'il a été légué à Titus cent écus pour s'acheter un fonds de terre, on ne droit pas lui demander caution pour l'exéeution de cette clause, parcequ'elle ne concerne que son intérêt.'

" Il en est tout autrement lorsque les particules *pour* ou *afin que* déterminent une disposition qui a pour but, soit l'intérêt d'un tiers, soit quelque autre considération que le testateur a eue en vue, indépendamment du bien-être particulier du légataire ; alors, elles forment, ou une cause finale, ou un Mode, ce qui revient au même quant à l'effet.

" Le droit romain nous fournit plusieurs décisions relatives à ce cas. La loi 71, § 1, D. *de conditionibus, et demonstrationibus,* dit que, dans cette espèce, ' je légue à Titus cent écus, afin *ou* pour qu'il épouse Mœvia, qui est veuve,' le legs est conditionnel, et que la condition ne doit point être remise ; mais c'est proprement un Mode qui opère, à cet égard, le même effet qu'une condition, comme le prouve la loi 1, *C. de his quæ sub Modo legata vel fideicommissa relinquuntur.* On sent que, dans ce cas, il ne s'agit pas d'une simple cause impulsive, ni d'un fait qui ait pour objet le seul intérêt du légataire, mais d'une chose à laquelle le tiers désigné par le testateur est personnellement intéressé ; et c'est pourquoi la disposition est considérée comme modale.

" En général, lorsque les mots *pour* ou *afin que* ne renferment qu'un simple précepte, *nudum præceptum,* il n'en résulte ni condition ni Mode. La loi 38, § 4, et la loi 93, D. *de legatis* 3o, le décident ainsi clairement ; et toutes les fois qu'indépendamment de l'intérêt du légataire, le testateur a eu quelque autre vue, les termes dont il s'agit doivent former une clause modale. ⋅ *V.* l'article *Légataire,* § 7, art. 2." 20 Merlin, *verbo* Mode, p. 350.

See also 16 Merlin, p. 510, *verbo Légataire,* §7, art. 2, Nos. 13 & 14.

These authorities clearly establish the two following propositions :

1.  The prohibition to alienate cannot be regarded as not written when it is enforced by a penalty.

The reason of this is very apparent. Where a donee is required to do a particular thing under penalty of forfeiture of the donation, in case of non-compliance with the donor's wishes, it shows that the donor's intention was not so much to confer a favor upon the donee, as to have the particular thing done. And if the thing were not done by the donee, that he preferred some other object as the recipient of his bounty.

2.  Where it is evident, from the will, the testator had in view any other motive than the benefit of the legatee, or the benefit of any other person than the legatee.

The reason of this rule rests upon the fact that in all such cases the donation would necessarily involve a substitution. If so, the whole donation would be void, and could not be rendered legal by trimming off the parts which rendered it a substitution.

4.  Dalloz, Dict. Juris. p. 417, sec. p. 275, "En régle générale, toutes les conditions impossibles ou contraires aux lois et aux bonnes mœurs sont réputées non écrites, lorsqu'elles se rencontrent dans une disposition entre-vifs ou testamentaire, et la donation ou le legs reçoivent leur execution. C. C. 900. *Mais il en est autrement en matière de substitution prohibée.*"

Now let us apply these principles of the law to the facts, as shown by the will.

1.  Is there a penalty prescribed ?

At p. 30 of the will, the testator says, in substance, he has seen most bequests, such as he had made, perverted from the purposes of the donor ; fearing this, and that the property might be alienated, he interested the two States in his property.

How did he interest them ? By giving them the property in case the cities did not fully carry out his intentions, a main feature of which was, that the property should never be alienated. We find him, on p. 28, fully providing for this contingency and prescribing the penalty.

" And should the Mayor and Aldermen of the city of Baltimore, in the State of Maryland, and the Mayor and Aldermen of the city of New Orleans, in the State of Louisiana, or their successors in office, combine together, and knowingly and willfully violate any of the conditions hereinbefore and hereinafter directed for the management of the general estate, and the application of the

STATE OF
LOUISIANA, &c.,
v.
EXECUTORS OF
McDONOGH.

revenue arising therefrom; then, in that event, I give and bequeath the rest, residue, remainder and accumulations of my said general estate * * * to the States of Louisiana and Maryland in equal proportions."

Here we find the penalty as distinctly declared as it was possible for the testator to have expressed himself. Then, under the foregoing authorities, the prohibition to alienate cannot be disregarded.

2. Had the testator in view any other motive than the benefit of the cities of New Orleans and Baltimore? He expressly declared he did not intend a dollar of his money to go into the coffers of those corporations He solemnly enjoins upon them never to divert his property to their own benefit. Then, how, under the foregoing authorities, can the prohibitions to alienate be disregarded?

But further, did the testator intend other persons than the corporations of New Orleans and Baltimore to be benefitted by his bequest?

1. The poor of the town of McDonogh were to be benefitted. Will, p. 8.

2. The poor of New Orleans were to be benefitted. The poor of New Orleans are a very different body from the corporation of New Orleans. Will, p. 8, 24, 30.

3. The four classes of annuitants, very distinct bodies from the corporations of the cities of New Orleans and Baltimore, were also to be benefitted.

Thus we find in this case, not one only, but every condition under which the prohibition to alienate cannot be disregarded. Any one of them would be sufficient for our purpose. The defendants are estopped in their very first attempt to apply the pruning knife to the provisions of the will. The prohibition to alienate is there as a substantive part of the bequest to the cities; and there, whether "for weal or for woe," it must remain. If that prohibition stamps the bequest with nullity, as was conceded in a former trial, if it could not be gotten rid of, then the bequest is null, for it cannot be legally erased. But even if the prohibition to alienate was stricken out of the will in every place in which it occurs, it would not at all help the defendants; it would not render the property subject to alienation, for this plain reason, that there is no one or body in which is vested by the will an assignable interest. The cities, under the most favorable view of their title, are but trustees, and could not sell or dispose of the property in contravention of the trusts confided to them, and every sale would contravene those trusts. They have not in law an assignable interest.

The charitable institutions could not alienate the property, for nothing but the revenues are given to them by the will.

The erasure of the prohibitions to alienate would not increase their respective titles. The inalienability of the property results as directly from the character of the titles created, as it does from the prohibitions contained in the will. We think the attempt to erase the illegal parts of the will, under art. 1506, C. C., is based upon a misinterpretation of that article, or from a wrong impression as to the character of the will.

The article applies only to dispositions which are conditional. It is the *conditions* which are impossible, are contrary to law or morals, that are to be regarded as not written. Now it is very apparent that a disposition to one in trust forever, for the benefit of others, is not a donation to the trustee upon condition. To maintain that it is, implies a misapprehension of the true signification of an estate upon condition. It is an estate, the vesting or divesting of which depends upon the happening of some future event. C. C. 2015, 2016, 1546, 1552, 1553, 1554, 1555. 5 Merlin, p. 352, 343, et seq. *verbo Condition.*

Conditional donations are of two classes; those which depend upon the happening or performing of conditions precedent; and those which depend upon the happening or performance of conditions subsequent. In donations depending upon precedent conditions, the property never vests until the performance of the condition. If the condition be not complied with, there is no translation of the property; there is no donation. In those dependant upon subsequent conditions, the property vests at once, and is subject to be divested upon the non-compliance of the donee with the conditions. In both these cases the property always vests somewhere. The title is never in abeyance. Where the conditions are precedent, it never leaves the donor's estate until the happening of the condition. In conditions subsequent, it returns immediately to the donor's estate upon the non-performance of the condition. C. C. 1546, sec. 2 and 3, 1552, 1553, 1554, 1555. 20 Merlin, p. 353.

But a disposition by which property is to be held in trust forever, for the use of others, is not the donation of an estate to the trustee upon condition that he gives the use to others. It is not a donation at all of the ownership of property to the trustee. On the contrary, the very nature of the estate created by the disposition forbids the possibility of the trustee ever becoming the real owner of the property. Having from the beginning no real interest in the property, whether the use be carried out or not, the ownership or the beneficiary title never vests in him. If the use cannot be executed, the property reverts to the estate of the donor. 2 Story, Eq., p. —. 20 Merlin, p, 353.

The estate of a trustee, then, is not an estate vested upon conditions; nor is a donation in trust a donation depending upon the happening or not of a condition. It is a qualified or peculiar title, which vests, such as it is, at once, and depends upon no condition, precedent or subsequent. This view of the case, we think, also clearly results from a comparison of the two articles, 1506 and 1507, of the Civil Code.

If a substitution or a *fidei commissum* was an estate depending upon a condition, then the two articles would be directly inconsistent. For the latter article annuls all such dispositions, both as to the donee and instituted heir or legatee; while the former would preserve them, by simply cutting off the illegal or impossible condition, leaving a good fee simple title in the donee. This shows most conclusively that the framers of the Code did not regard substitutions, or *fidei commissa*, as donations upon condition, or embraced by the provisions of article 1506.

The estate, created by the bequest to the cities, is both a substitution and a *fidei commissum*. If so, the art. 1506 does not apply to the case, and does not sanction the trimming of a substitution, or *fidei commissum*, to legal dimensions. See also 4 Dalloz, Dict. Jurs. p. 474.

There is some difficulty in applying the civil law, and the writings of the commentators upon that system, literally, to a trust estate. For, as we have already observed, trust estates, literally speaking, are of modern origin, and grew up under the common law. A fiduciary bequest, in the civil law, is defined to be " a disposition by which the executor, or legatee, is entreated to restore, or to give to a third person a certain thing." See translation of Domat, vol. II, p. 501, No. 3496, part 2, book IV, tit. 2, sec. 1, art. II.

The difference between this and a trust estate is readily perceived. In the fiduciary bequest the title to the property passes, accompanied with a charge to transfer it to another person. While in the trust estate the real beneficiary title does not pass to the trustee, and the title he does receive he is charged to retain and not to restore to another.

But even if the cities be regarded as vested with an absolute title, or legacy, upon which the uses are to be considered as merely charges, still the cities would be bound to comply with those charges and could not take the property freed of them. C. C. 1515. "The donor may impose on the donee *any charges* or conditions he pleases, provided they be not contrary to law or good morals." Now to educate the poor, and to found charitable institutions, are not things contrary to law or good morals. This is not the illegality we have complained of as existing in the Will. Our objection is that the law does not permit property to be held by titles such as substitutions, *fidei commissa*, or other tenures which tie it up out of commerce. With this explanation we say the cities would be bound to comply with the charges, and could not hold the property without doing so. C. C. 1554, 2 Domat, p. 503, Nos. 3501, 3503, also p. 374, No. 3218, et seq; 16 Merlin, *Légataire*, p. 509, sec. 11, 12, 13. The idea of freeing the cities from those charges by means of Art. 1506, C. C, is altogether illusory, and yet it is conceded the bequest of the cities must fall, if this cannot be done.

Supplemental Brief of *W. W. King :*

In compliance with a request from the Bench during the argument of the cause, I have prepared this supplemental brief to furnish the court with the authorities referred to by me in the course of my oral argument.

Upon the construction of the will: The intention of the testator must be observed. C. C. 1705.

1st. The testator never intended the corporations of the cities of New Orleans and Baltimore to be benefitted by his bequest to them.

2d.   He did not intend that his legal heirs should get his property.

3d.   In case his bequest to the cities did not, or could not, take effect, he intended his property should go to the States of Louisiana and Maryland.

4th.   That he never intended the cities to take his property unless *all* his directions were to be strictly observed.   If the cities did not, or could not, observe his instructions or directions, in that event he desired his property to go to the States.

In support of these positions, the following pages of the printed Will were read and commented upon : pp. 7 and 8 ; pp. 21, 22 and 23 ; pp. 28, 29 and 30 ; pp. 31 and 32.

The construction of the word "*Lapse.*"   Burrell's Law Dictionary ; 1 Jarman on *Wills*, pp. 302, 309, 587.

Construction of the word "*Caduque.*"   C. C. 1696, 1478, 1702, 1508.

The word "*Lapse*" was used in the will, p. 28, in the sense of "*not take effect.*"

The word *Legacies*, at the bottom of p. 28 of the will, was used in the sense of "*property embraced in the bequest to the cities.*"

McDonogh planned a magnificent and fanciful scheme of public charity, which he expected would immortalize his name, and appointed the cities as the supervisors of that scheme.

If his scheme could not be executed, if the cities did not or could not carry out his intentions, then he did not intend to benefit those corporations, or to leave his property subject to their discretion, but intended it should go to the States, vesting in them the discretion of executing his instructions so far and in the manner which might appear to them the most proper.

This position, I think, manifest from an inspection of the bequests on pp. 28 and 29 of the will.

If the bequest to the cities could take effect, and they failed to comply with his instructions, he provided for that contingency, by forfeiting the property to the States, for the education of the poor, (not of the cities only,) but of the States, under a general system of public education.

If the bequest to the cities could not take effect, the testator evidently saw it must be owing to the directions and instructions inseparably coupled with that bequest.   In order, then, to prevent his property going to his heirs, and to insure its application to public purposes, he made a second or substituted bequest to the States, relieving them from the prohibitions and instructions annexed to the bequest of the cities.

In this manner he provided for every contingency which could arise, affecting the dispositions made by him of his property.

Now it is not pretended that the cities can, or will, carry out his intentions. It is not pretended that property can be forever kept in a state of inalienability. That the accumulations, directed by him, will be created and preserved.   That the property will remain forever undivided.   The observance of every one of these directions is requisite to carry out his scheme.   If the property be sold his whole plan necessarily falls to the ground.   The same may be observed of the division of the property, and a very important part of the will must fail by the destruction of the accumulations contemplated.

The contingency provided for by the testator has occurred.   The cities cannot carry out his intentions, and in that event he intended the property to go to the States under the substituted bequest to them.   If his wishes and intentions are to be regarded, the property must go to the States.   To permit the cities to take the property, under these circumstances, would be a palpable violation of the intention of the testator, and of the Art. 1705 of the Civil Code.   An attentive perusal of the will must, I think, satisfy every candid mind of the correctness of the foregoing conclusions ; if so, then nothing further is requisite for the decision of this cause than the simple application of the article of the Code above cited, to the evident meaning of the will.   This is the first and most important point in the case.   If well taken, it is decisive of the cause. Although a great portion of my oral argument was occupied in its discussion, and a considerable portion of the printed briefs, already filed, has been devoted to it, I trust I will be permitted to urge some further considerations on the subject, especially as our attention has been directed to it by the Court.   I shall endeavor to express my views in answering the query very properly propounded by the Court.   It was, as I understood it, to this effect:

" Suppose it appears from the will that the inalienability of the property was so far the dominant idea of the testator, that he would not have given his property to the cities unless his instructions and directions, in that respect, were to be observed, but that if his instructions were not to be observed, he desired his property to go to the States, what, in that event, must become of the property ? "

As a question of law I do not see how the right of the States to receive the property, under the circumstances proposed, could be doubted. A will is but the expression of the intentions of the testator. The whole object of our laws upon the subject of testaments, is to insure the execution of the intentions of the testator. If those intentions be lawful, the will is itself the law of the case, and the Courts are bound to carry out those intentions. There is nothing in our law which prevents a man from willing a legacy for any purpose whatever, and in the event of that legacy being void, or not taking effect, willing the same property to a substituted legatee. The right to make such a substituted legatee is necessarily implied from the power of making a will. Further it is expressly recognized by Art. C. C. 1508.

The will in itself shows, as clearly as language can express the idea, that McDonogh would not have given his property to the cities freed from the prohibition against alienation. That if any of the *conditions directed* for the *management* of his estate, or *the application* of the revenue arising therefrom, were to be violated, in that event he desired his property to go to the States. It is difficult to elucidate or explain language which, in itself, is so unequivocal. Like the clear fountain, the more you disturb it the less transparent it becomes.

The very fact that he substituted the States, instead of the cities, to take in case his previous bequest to the cities did not take effect, shows beyond all question that he was not willing to trust his property to the discretion of the cities, or that they should take it freed from the prohibitions against alienation, &c., imposed by him. It would have been very easy for him, in providing for the contingency of his bequest to the cities not taking effect, to have made a substituted bequest in favor of the cities ; to have said, in case my first bequest to the cities cannot take effect, from any cause whatever, then I will my property to the cities, leaving it to them to carry out my intentions " so far, and in the manner which will appear to them the most proper." The fact that he did not do so, but substituted the States to · take, in that event, is conclusive proof that his intention was, the cities should not take the property freed from the prohibitions and restrictions embraced in the bequest to them.

How can any one read the will and come to the conclusion that McDonogh intended the cities to take the property freed from the prohibition to alienate ? We find him repeatedly giving expression to that favorite and dominant idea, the inalienability of his property in their hands. We find him openly expressing his distrust of the cities. Under the apprehension that his wishes and intentions might be disregarded by the strong will of the cities, we find him endeavoring to fence round this favorite idea, with what he supposed would prove effectual barriers. To conclude, after all this, that he intended the cities to take the property freed from the prohibition to alienate, would be an utter perversion of reason and of the plain meaning of the English language. It is conceded, on all sides, that the cities cannot take the property by a tenure or title which will necessarily render the property forever inalienable. That such a title cannot exist under our law. If the cities then take at all, they must take · with the power of alienation, in other words, they must take in direct opposition to the intentions, nay, supplications. and remonstrances of the testator. To meet this contingency, and to prevent the property going to the legal heirs, the testator made the substituted bequest to the States. The cities cannot take the property without a palpable violation of the intentions of the testator. The States cannot fail to recover it, without an equally clear departure from his wishes.

In the original brief, filed by the counsel for the States, we have endeavored to demonstrate that the prohibition against alienation, in the bequest to the cities, could not be disregarded without a manifest violation of the rules of law. See that brief.

In addition to the authorities therein cited, I invite the especial attention of the Court to the following : 12 Pothier's *Pandects*, p. 245 ; Roman Dig, book 33, tit. 2, sec. 17.

The last authority is conclusive, not only in regard to the prohibition to alienate, but also as to the other instructions and directions coupled with the bequest. It is, in substance, this: "A citizen left his estate to the Republic, wishing to found certain games (*ludos*) out of the annual revenues; and added: 'quæ legata, peto decuriones et rogo, ne in aliam speciam, aut alios usus, convertere vilitis.' That he forbid his property being used in any other way, or converted to any other use.

"The Republic, for four consecutive years, did not found the games, the question was whether the Republic should pay over to the heirs the annual revenues which had been received, or whether they should discharge the duty imposed by the will in some other way, (compensare in aliam speciam legati ex codum testamento?) The answer was that the Republic was bound to restore the revenues, which had been received, to the heirs, and that it was not permitted to inquire what might have been the second wish of the testator, by the doing of which the obligation imposed by the will would be discharged."

This decision was rendered in Rome, where the *cy pres* doctrine of modern times was recognized in its fullest extent, and where substitutions and *fidei commissa* were not prohibited.

It broadly asserts the principle, that where the testator wills his property for a particular purpose, directing that it shall be used for no other, the legatee is bound to so apply it, or the persons next called to the succession are entitled to take it. In this case, it went to the legal heirs, but if there had been a substituted residuary legatee, as in McDonogh's will, the property would have gone to that substituted legatee.

Let us apply this case to McDonogh's bequest to the cities. He repeats, in a variety of forms, the manner, and the only manner, in which his property shall be managed and used. He forbids, in the most positive terms, any other mode of managing or applying it. In this respect, these two wills are identical. The above decision shows that the cities cannot take the property and manage or use it differently from the manner in which he directed. It is not pretended that the cities can, or will follow his instructions. If they be not able to follow them, it is tantamount to a refusal to follow them; and, under the authority of the above case, the property must go to the States, being next called to the succession. The above reference is preceded by the response of *Modestinus*, sec. 16, which was read to the Court. The Roman law was similar to art. 1506 of our Code. If the article of our Code be so potent, in regarding *McDonogh's* directions as not written, because they are contrary to law, we ask why did not *Modestinus* make that answer when questioned as to the effect of similar instructions forbidden by law? He did not regard them as not written, but enforced them, *cy pres*, which cannot be done under our law.

I have thus, at considerable length, endeavored to express my views, as to the proper construction of *McDonogh's* will. I have done so with a firm conviction that nothing further was necessary to enable the Court to decide the cause, at once, in our favor, than a proper understanding of the will, and the application to it of the article 1705 of the Civil Code.

To show how the questions involved in this case strike other minds, somewhat acquainted with it, I will here insert an anonymous and rather mysterious brief, which was printed and circulated by some person unknown to the counsel for the States, during the progress of the trial in the lower Court. It contains some striking thoughts, and presents some features of the case in bold relief:

"MCDONOGH'S WILL.—'I hope I don't intrude;' but I would like to say a word on the subject.

Old McDonogh has not bequeathed, nor did he ever intend to bequeath anything whatever; no, not the first demi-dime, to the cities of New Orleans and Baltimore.

We need not bother ourselves about substitutions, *fides commissa*, institution of heirs, nullity of conditions, modes, &c.; but the whole solution is in the will itself, fairly interpreted.

What does the Will say?

'*If* I die, without dying; *if* I can give, and yet keep; *if* the Legatees can have, and yet not take; *if* I can own, after I am dead; *if* I can make a law, above the law; *if* I can prohibit my Legatees from doing what I could not bind myself, when alive, not to do; *if* I can do and command these and many

other illegal and impossible things, I bequeath my estate to the cities; but *if* they and I cannot do this, and I am well aware that we cannot; THEN, I bequeath the whole succession purely and simply to the States of Louisiana and Maryland.'

Now this is the sum and substance of *McDonogh's* will. Turn it which way you please, it means nothing else. Don't imagine that I dodge your 1506 art. of the Code. It does not fit the case. Certainly, if I bequeath my estate to *Sam*, IF *he can touch the sky with his finger*, Sam will, by your law, take the estate; for it is the rule, to annul impossible conditions rather than destroy the Will itself; but when I go *further*, and, foreseeing the event, say, that *if* the condition is not or cannot be performed, I choose another person to be my absolute heir. What then? Ay, what then? 'there is the rub.' Does not a case arise to apply other rules than those of art. 1506?

When I say, 'I give my estate to *Sam if* he touches the sky with his finger, but *if* he cannot, I give all to *Tom* without condition; it is clear that I, in fact, give to *Tom*. To contend that, in such a case, *Sam* should take absolutely as if the impossible condition were not written, is evidently to defeat the expressed Will of the testator; for, he has declared, that *if* his estate is to go unconditionally to any one, it shall be *Tom*, and not *Sam*. This intention is clearly expressed, to exclude *Sam* as an unconditional heir, and to prefer *Tom* as such.

Art. 1506 fits a case where no provision is made by the testator, himself, for the contingency. Then, the law steps in, and as no other alternative is presented, and in order to come as near as possible to the testator's desire, gives the estate unconditionally to *Sam*: always on the principle that effect, as far as the law permits, should be given to the Will.

But the present case is not such a one; and presents a conditional alternative, which offers no difficulty of solution under art. 1506; and, under authority, quoted by Merlin in his Repertoire de Jurisprudence, tit. *Legs*, sec. 3, ¶ 3, art. 5, vol. 9, p. 704, 5th edition.

All the authorities by the cities, relate to cases where impossible conditions were imposed upon the legatees; and where, at the same time, *no* provision was made for a substitute, in the event of the impossibility being recognised.

Let them show, if they can, a case where the legatee, under an impossible condition, was ever preferred to the substitute instituted without charge, condition or mode.

That's the point! Hoping 'I don't intrude,' I remain, yours truly,

PAUL PRY,

*Of Counsel for the State.*"

During the course of my oral argument, I was stopped by the announcement from the Court, with the apparent concurrence of every member of the bench, that there was no doubt the bequest to the cities was a *fidei commissum*; but that the question was, whether the bequest was saved by any of the exceptions to *fidei commissa* that were reprobated? Whether, in fact, it was not a *fidei commissum* not reprobated?

The general rule of law is, that all *fidei commissa* are reprobated. If the bequest of *McDonogh* to the cities be saved by any exceptions to that general rule, it was certainly incumbent on the opposing counsel to have shown it. Up to the time the above suggestion fell from the Court, there never had been an attempt to point out any such exception. The existence of certain exceptions to the sweeping language of the art. 1507, C. C, was well known. The rule for ascertaining those exceptions had long been settled. Mere naked trusts or *fidei commissa*, uncoupled with any interest and susceptible of immediate execution, were not embraced in the prohibitions of that article. But no one had ever been so rash as to contend that the bequest to the cities fell within that class of exceptions. It is believed that the above rule covers every imaginable exception, which can exist to the prohibition against *fidei commissa* contained in art. 1507, C. C. The bequest to the cities is not saved by that rule, it must therefore be classed among the reprobated *fidei commissa*, and declared null.

During the oral argument, owing, I now believe, to a misapprehension of a suggestion from the bench, for the first time the counsel for the cities did affect to have discovered another exception to the Art. 1507, C. C, viz: in Art. 1536, C. C.

This article is found in that part of our Civil Code which treats of the manner in which donations *inter vivos* shall be accepted.

STATE OF          Art. 1532 directs that donations to married women are to be accepted by the
LOUISIANA, &c.,   authorization of their husbands. ·
   v.
EXECUTORS OF      Art. 1533.  Donations to minors must be accepted by their tutors.
McDONOGH.         Arts. 1534 and 1535.  Donations to persons under interdiction, and to the
deaf and dumb, are to be accepted by their curators.
     Art. 1536.  Donations made for the benefit of an hospital, of the poor of a
community, or of establishments of public utility, shall be accepted by the ad-
ministrators of such communities or establishments.
     Whoever before imagined that these articles formed exceptions to Art. 1507 ?
If any one of them be an exception, they must all be.  If the administrators
of the poor of a community can accept donations involving substitutions and
*fidei commissa*, and thereby render them valid, so may the tutors of minors,
and the curators of persons interdicted.
     There are two radical errors running throughout the arguments of our ad-
versaries :
     1.  In their construction of the will.
     2.  In their imagining there is something in the nature of municipal corpor-
ations which enables them to rise superior to the law, and permits them to hold
property by titles which, in the hands of individuals, would be classed as sub-
stitutions and *fidei commissa*.  There is no foundation for any such distinction.
If any difference existed, it should be against the corporations, rather than in
their favor.  The first struggle against the perpetuation of estates was against
corporations.  It is usual in this country to insert, in all special acts of incor-
poration, limitations upon their right to hold property, and upon their duration,
imposed for the avowed purpose of guarding against the danger of the accumu-
lation and perpetuation of estates in their hands.
     The only reason they are not imposed with the same uniformity in the charters
of municipal corporations, is, that from the nature of our institutions, such cor-
porations can have none but delegated powers.  To execute the limited powers
of government entrusted to them, they have no power or right to enter the
market as traders in property, and whenever they are thus allowed to deal in
property, it is only done by virtue of a special authority conferred by law.  If
they possessed such a power, merely as corporations, without any special au-
thority, why is it that we find so much legislation in our statute books, confer-
ring upon the city of New Orleans the power of holding and disposing of pro-
perty ?  The statutes, giving the power to the old corporation, were extremely
guarded, and confined it within very narrow limits.  The act of 1836, dividing
the city, greatly extended the limits, in vesting this power in the different
municipalities; but no law authorised this corporation to hold property by
tenures or titles reprobated by our Code, or to legalize in its hands substitutions
and *fidei commissa*.
     *Messrs. Coin-Delisle*, and others, (referred to by *Mr. Graihle* at p. 36,) say :
" In our opinion, the word *fidei commissa* was added to the Art. 896 of the
French Code, in Art. 1507 of the Louisiana Code, on account of the English
origin of the other States of the Union, and in order to prohibit at once both
the substitutions of the old French law, and the trusts of the English law."
     The Supreme Court of the United States, after quoting the Art. 1507, de-
cide, " This abolishes express trusts."  2 Howard, 650.
     If, then, the bequest of *McDonogh* to the cities creates what, in the common
law, would be styled a trust estate, it is forbidden by Art. 1507, and must be
declared null.
     Now, no one can read the subjoined list of authorities without being satisfied
that *McDonogh's* bequest to the cities would, in a common law State, be pro-
nounced a trust estate.
     1 Jarman on *Wills*, p. 334, et seq ; 2 Story's Eq. p. 295, 8, p. 452, 3 ; the
case of *Girard's Will*, 2 Howard, 131 ; *Inglis* v. *Sailor's Snug Harbor*, 3
Peters, 119 ; *Baptist Association* v. *Hart*, 4 Wheaton, 27 ; *Wheeler* v. *Smith*,
9 Howard, 56.
     I have thus, I trust, satisfactorily shown—
     1st.  From a proper construction of the will, the intention of the testator
was that his property should go to the States, under the contingencies which
have arisen.
     2d.  That the Court having pronounced the bequest to the cities a *fidei com-
missum*, it is not saved by any of the exceptions to prohibited *fidei commissa*.

*McDonogh's* bequest to the cities embraces a scheme, which, to carry out his intentions, must be preserved entire. Any departure from his instructions, especially the alienation of the property, destroys the whole scheme, and, in fact, destroys the will. It is conceded that those instructions cannot be complied with by the cities. In that event he never intended the cities to get the property, but desired it to go to the States, in whose discretion he placed greater confidence. To defeat his intention, in this respect, would be to defeat or destroy his will.

To give the property to the cities absolutely, would not be executing *McDonogh's* will, but making a new and altogether different one.

To let the cities take the property, subject to the prohibitions against alienation, partition and compromise, would overthrow our express laws against the perpetuation of estates, and the whole course of our jurisprudence upon the subject of tieing up property out of commerce.

To sustain the bequest, and execute it, as the will directs, would be engrafting upon our law the complex machinery and doctrines of trust estate, at common law.

Under these circumstances we cannot see how the Courts can hesitate to give a judgment in our favor, which seems called for by every consideration of expediency and public policy.

[ The Briefs of the Counsel in this case would make a volume. The Reporter, therefore, did not feel himself at liberty to publish them. The preceding abstract of the argument of the counsel for the States of Louisiana and Maryland, was prepared by *Mr. King*—as was also the abstract of the supplementary brief filed by him. *Mr. Hunt* had prepared an abstract of the argument of the defendants—but suggested that the "Opinion" prepared by *Coin-Delisle*, and other French Jurists, embraced all the points that were relied on by himself and colleagues—and that if that was to be printed—as he thought it should be—it would be quite unnecessary to publish what he had written. As this "Opinion" has been alluded to in high terms by the Court—as it has been very generally commended by the bar—and as it presents fully, and with marked ability, the legal positions taken by the Counsel for the defendants—the Reporter considered that he would be doing a service to the Profession by giving it a permanent form in the Reports.]

## OPINION ON MR. McDONOGH'S WILL.

In this case a testator leaves all his worldly estate to two cities : to the one, because it was his birth place ; to the other, because it was his adopted home. The property of the donor is extensive. The States of Louisiana and Maryland have discovered, or, at least, painfully strive to discover, fanciful substitutions and imaginary *fidei commissa*, supposed to be lurking in these donations ; and, by virtue of the same will, which they declare to be invalid in some of its dispositions, they claim for themselves the property which the testator has disposed of in favor of the two cities.

The cities of New Orleans and Baltimore resist a pretension which would strip them of the endowments vested in them by the testator's bounty. The facts are as follows :

### STATEMENT OF THE FACTS OF THE CASE.

*John McDonogh*, a native of Baltimore, an inhabitant of McDonoghville, State of Louisiana, made his olographic will at McDonoghville aforesaid, on the 29th of December, 1838, according to the forms prescribed by the local law.

No question is raised about the form of the instrument ; nor could it be otherwise. The Civil Code of Louisiana gives every man the right of making an olographic will. Such a will, in Louisiana, as in France, is one written by the testator himself ; and, in order to be valid, it must be entirely written, dated and signed by the testator's own hand. (Art. 1581.) This kind of will is subject to no other form, and may be made anywhere, even out of the State. [Same art.] These are the same rules as those contained in arts. 970 and 999 of the French Civil Code.

STATE OF
LOUISIANA, &c.,
*v.*
EXECUTORS OF
McDONOGH.

SUPREME COURT OF LOUISIANA,

*John McDonogh* died in October, 1850. His will was proved in due form of law.

This will has been printed at New Orleans at full length, with the testator's instructions appended, under the title of "The last will and testament of *John McDonogh*, late of McDonoghville, State of Louisiana; also his Memoranda of instructions to his executors, &c." We do not mean to give it here *in extenso*, deeming a synopsis of it quite sufficient for our purpose.

The testator, after having called on the holy name of God, commences by declaring that he was never married, and that he has no heirs living, either in the ascending or the descending line. So that, according to the laws of the State, his power of willing away his property was unlimited. [Civil Code of Louisiana, 1483.]

He orders that, immediately after his death, an inventory shall be made of his property, by a notary public, assisted by two or more persons, whom his executors shall appoint; the same to be done on oath.

First comes a devise to the children of his sister *Jane*, the widow of *Mr. Hamet*, of Baltimore, of land which he purchased on the 29th of February, 1819, of one *John Payne*, in Baltimore county. This lot, containing ten acres, more or less, together with the improvements, goes to his nephews aforesaid, a life estate in the same being, however, reserved to their mother.

He also bequeaths to his said sister, widow *Hamet*, six thousand dollars, recommending to her so to place the capital as to make the interest support her in her old age.

He then bequeaths their freedom to certain slaves, fixes a fifteen years' term of service to be performed by certain others on his plantations, and orders the remainder of his black people to be sent to Liberia by the American Colonization Society.

And now, in language expressive of piety towards God, and charity towards mankind, the testator, (after having made these deductions for his sister, *Mrs. Hamet*, for the children of his sister, and for the freedom of a certain number of slaves,) goes on to lay down what may be called emphatically his will. [Printed Will, pp. 7 and 8.]

He gives, wills and bequeaths all the rest, residue and remainder of his estate, real and personal, present and future, as well that which is now his, as that which may be acquired by him hereafter, at any time previous to his death, and of which he may die possessed, of whatsoever nature it may be, and wheresoever situate, unto the Mayor, Aldermen and Inhabitants of New-Orleans, his adopted city, and the Mayor, Aldermen and Inhabitants of Baltimore, his native city, and their successors forever, in equal proportions of one-half to each of the said cities of New Orleans and Baltimore.

He wills, at the same time, that the entire mass of property thus bequeathed and devised, shall remain charged with several annuities, or sums of money to be paid by the devisees of his general estate, out of the rents of said estate.

He adds, that the legacies to the two cities are for certain purposes of public utility, and *especially* for the establishment and support of free schools in said cities and their respective suburbs, (including the town of McDonogh, as a suburb of New Orleans,) wherein the poor—and the poor only—of both sexes, of all classes and castes of color, shall have admittance, free of expense, for the purpose of being instructed in the knowledge of the Lord, and in reading, writing, arithmetic, history, geography and singing, &c., &c.

This is the principal object of the testator's bounty, as appears by the words which usher in the general devise: "And for the more general diffusion of knowledge, and consequent well-being of mankind, convinced as I am, that I can make no disposition of those worldly goods which the Most High has been pleased so bountifully to place under my stewardship, that will be so pleasing to him, as that by which the poor will be instructed in wisdom, and led into the path of virtue and happiness, I give, &c."

For the execution of his will, and with the unequivocal intent of increasing his real estate, after his death, the testator [p. 33] appoints executors, to whom he gives the seizin of all his personal estate, corporeal and incorporeal [p. 32], and clothes them with the most extensive powers, without the interference of judicial or extra-judicial authority. [p. 33.]

As relates to his real estate [p. 8], such as it will be found to be at his death, which estate he has just devised to the cities of New Orleans and Baltimore, he

expressly forbids the Mayor, Aldermen and Inhabitants of each of the cities, and their successors, ever to alienate or sell any part thereof; but the cities shall let the lots improved with houses, to good tenants, by the month or year; they shall let the unimproved lots in New Orleans, its suburbs, town of Mc-Donogh, or elsewhere, for a term not to exceed twenty-five years at any one time, the rent payable monthly or quarterly, and to revert back, at the end of said time, with all the improvements thereon, free of cost, to the lessors; and, as to the lands, wherever situate in the different parishes of the State, the cities shall lease them in small tracts, for a term not to exceed one to ten years, revertible back with their improvements, to be re-leased for a shorter time, and at higher rates.

As concerns his personal estate, (which, as we have seen in the general bequest above, also belongs to the cities of New Orleans and Baltimore,) the testator [p. 9] instructs his testamentary executors to invest his personal estate of all kinds, as well as the amount of all debts owing to him, as fast as they are received, together with the interest and increase, in real estate of a particular description, to wit: lots of ground, improved and unimproved, lying in the city or suburbs of New Orleans, and to hand over said real estate, with the title deeds, to the commissioners and agents of his general estate, so that, by said means, the whole of his estate, real and personal, shall become a permanent fund on interest, as it were, (viz: a fund in real estate affording rents;) no part of which fund shall ever be touched, divided, sold or alienated, but shall forever remain together as one estate, termed in his will "The General Estate," and be managed as hereinafter directed. [p. 9.] The net amount of the revenues collected annually shall be divided equally, half and half, between the two cities of New Orleans and Baltimore, by the Commissioners and Agents of the General Estate, after paying the several annuities and sums of money hereinafter provided for, and applied forever to the purposes for which it is intended.

The testator, dividing into eight equal portions the revenues of his estate, thus made up of the immovables left at his decease, and of those which shall be acquired by his executors, with the aid of his personalty and the interest accruing on his credits, gives and bequeaths the FIRST EIGHTH PART of the net yearly revenue of the whole, during forty years, to the American Colonization Society for colonizing the free people of color of the United States; but the society shall not receive or demand, in any one year, a larger sum than twenty-five thousand dollars. [p. 10.]

He gives and bequeaths the SECOND EIGHTH PART of the net yearly revenue of the whole, to the Mayor, Aldermen and inhabitants of the city of New Orleans, until said eighth part of the net yearly revenue of rents shall amount to the full and entire sum of six hundred thousand dollars; and that for the express and sole purpose of establishing an Asylum for the poor of both sexes, and of all ages and castes of color. [p. 10.]

He gives and bequeaths [p. 13] the THIRD EIGHTH PART of the net yearly revenue of the whole to the Society for the relief of destitute Orphan Boys of New Orleans, for the express and sole purpose of its being invested in real estate, until the annuity shall amount to the full sum of $400,000, exclusive of the interest which may have accrued on it.

He gives and bequeaths [p. 14] the FOURTH EIGHTH PART of the net yearly revenue of the entire estate to the Mayor, Aldermen and Inhabitants of the city of Baltimore, for the express and sole purpose of establishing a School Farm on an extensive scale for the destitute male children of Baltimore, of every town and village of Maryland, and of the great maritime cities of the United States, until the said eighth part shall amount to the sum of $3,000,000.

There now remains the revenue of one-half, or four-eighths of the revenue of what the testator styles his General Estate. The two cities of New Orleans and Baltimore being the principal legatees, it is obvious that they are entitled to the four-eighths not bequeathed by a particular title: consequently, it is laid down [p. 16, at bottom,] that, until such time as these four annuities bequeathed under a particular title shall have been paid off and expire, the cities of New Orleans and Baltimore shall receive, for the establishment and support of said free schools, one-half only of the net yearly revenue of rents of the General Estate, and no more.

Moreover, the total amount to be received by each of the legatees of one-eighth of the revenue, until the respective sums of $25,000, $600,000, $400,000,

28

STATE OF
LOUISIANA, &c.,
*v.*
EXECUTORS OF
McDONOGH.

or $3,000,000, are realized, shows that one of the annuities is to determine before the others are paid off. The testator, therefore, orders that, as soon as any one of the annuities shall be filled and paid off, the proportions of the net yearly revenue of rents of the General Estate, which were payable under the extinct annuity, shall go and be payable to the annuity bequeathed to the city of Baltimore for the establishment of a School Farm; so that the $3,000,000 may be made up in as short a space of time as possible. It will not be till the full and entire discharge of the annuities that the two cities will divide between them the net yearly revenue of rents of the General Estate. [pp. 15, 16.]

We will now turn our attention to the means and devices adopted by the testator to improve the condition of his particular legatees.

He forbids [p. 8] the alienation of the real estate which he leaves, at his death, to the two cities, and points out how the houses shall be let for short terms, the unimproved lots let for 25 years at most, so as to be revertible, together with all improvements, to the mass of his estate; and the lands leased out so as to bring in returns more and more ample.

He also orders [p. 9] his testamentary executors to invest his personalty in houses and building lots in New Orleans and its suburbs.

He has not ordered any thing of the kind for the $25,000 of the Colonization Society [*first eighth*, p. 10,]. The sum is a small one, and can be paid off in a short time.

But, as respects the Society for the relief of destitute Orphans, [third eighth, p. 13,] he gives this third-eighth part of the revenues to be first deposited in one or more of the Banks in New Orleans, which allow interest on deposits; and then, always *with the approbation of the Mayor, Aldermen and Inhabitants of New Orleans, who shall become parties to the deeds,* the said Society shall invest the money, as good purchases offer, in houses and lots lying in New Orleans and its suburbs, so that such real estate, once acquired, shall be inalienable, and shall forever be retained and held by it, and remain its property, in order that the revenue of said real estate may be sufficient for the support of the institution.

With respect to the particular legacy bequeathed to the city of New Orleans for the purpose of establishing an Asylum for the Poor, [*second eighth*, p. 11,] he orders that, annually or semi-annually, the amount of the fractions of eighths be invested, as the Commissioners receive it, in bank stocks, or other good securities on landed estate, on interest, so that the capital of $3,000,000 may be thereby augmented up to the time when the last of the annuity shall be received from the General Estate; that, after this period, (or even earlier, if a favorable opportunity occur,) one third of the whole (not more) be invested in the purchase of landed estate, in the erection of buildings and the furnishing of necessary articles; and the remainder, or two thirds at least, invested in the purchase of such houses and building lots in New Orleans and its suburbs, as will probably greatly augment in value; which real estate, when purchased, shall never be alienated, but a permanent revenue derived therefrom for the support of the institution.

Again, as regards the particular legacy bequeathed to the city of Baltimore for a School Farm [*fourth eighth*, p. 14 and following,] which legacy is to reach the amount of three millions of dollars, to be taken out of the eighth charged therewith, and out of the other three eighths, as soon as the other three legacies are finally paid off, the fund must be increased as it is received, by investing the moneys in bank stocks, or other good securities on landed estate, on interest; and this capital, with its increase, shall be invested, for one sixth part at the utmost, in the purchase of such land, animals and agricultural implements as the institution shall need; and the other five sixths invested in the purchase of houses and building lots situated in the city, suburbs and vicinage of Baltimore, or of tracts of land in its immediate neighborhood, viz: such lots or lands (to be all purchased under fee simple titles) as will probably greatly augment in value. And, in this instance too, the real estate, when purchased, is never to be sold or alienated, but is to remain forever the property of the institution, to the end that a permanent revenue may be derived therefrom.

We will now examine the measures taken by the testator to prevent the cities from giving the moneys a different destination from that prescribed by the testator.

Not content with appointing testamentary executors, *McDonogh*, wishing to debar the city corporations from the handling of moneys, has ordered that there be Commissioners of his Estate, having a principal and central office in the city of New Orleans, where all the muniments and papers relating to his affairs may be kept, as well for the Asylum for the Poor, [p. 11] for the investment of the moneys due to the Orphan Relief Society [p. 14], for the School Farm of Baltimore [p. 17], as for the management of the General Estate or fund for the education of the poor [p. 21]. These Commissioners are to have the sole management of the General Estate, the leasing and renting of its lands and houses, the cultivating of its estates, the collecting of its rents, the paying of the annuities bequeathed as above, and are to do all acts necessary to its full and perfect management. [p. 22.]

STATE OF LOUISIANA, &c., *v.* EXECUTORS OF McDONOGH.

These Commissioners cannot be members of the City Councils; but they shall be appointed by the City Councils of New Orleans, as regards the Asylum for the Poor [p. 11]; by the Mayor and City Councils, as respects the School Farm at Baltimore, with the style of Directors; [p. 17] by the respective City Councils of New Orleans and Baltimore, as to the management of the fund for the education of the Poor.

New appointments shall be made annually, on a day fixed by the will. (pp. 11, 17, 21.)

The City Councils shall have a supervision over their operations; and to them the Commissioners are liable for the performance of all their duties, and must annually render an account of their administration. (pp. 11, 17, 23, 24.)

Besides these Commissioners, each city shall have agents on the spot to represent its Commissioners; and these agents shall also be appointed by the Mayors and City Councils. (pp. 21, 22.)

And, after the payment of the annuities, the respective Commissioners or the agents representing them shall receive one moiety of the net revenue of the year, to be disposed of conformably to the will. (p. 23.)

As for the purchases to be made, before the full payment of the annuities, by the Commissioners of the Asylum for the Poor, they must be approved by the Mayor and City Councils of New Orleans. (p. 13.) The same rule is laid down for the purchases to be made by the Directors of the School Farm. They must be approved by the Mayor and City Council of Baltimore. (p. 19.)

The testator recommends (p. 13) to the Commissioners of the Asylum for the Poor, to apply to the Legislature of the State of Louisiana for an act of incorporation, subject, always, however, to the conditions provided for in the will. He has also recommended (p. 19) in the same language and under the same conditions, to the Directors of the Farm School, to apply for the same purpose to the Legislature of the State of Maryland. He recurs to the same idea in p. 27, using the same phraseology; and with the intent, no doubt, that his *General Estate* should become a juridical person, he also recommends to the Commissioners to sue out an act of incorporation for said *General Estate*, always subject to the conditions laid down in the will.

We omit a variety of minute regulations concerning the publication of the annual accounts, the building and locality of school-houses and residences for teachers, the school organization, the immense lands for the Poor Asylum, together with the high-flown disquisitions in which the testator indulges. All this matter appears to be foreign to the controversy. The whole may be reduced to these few words: "*The Cities are the devisees; but the administration of the property devised shall be carried on for ever by Commissioners appointed by the Cities, and accountable to them; and it shall be the duty of said Commissioners to hand over the moneys to the new public institutions which the testator orders to be created.*"

The testator goes on to say: "No compromise shall ever take place between the Mayor, Aldermen and Inhabitants of Baltimore, and those of New Orleans, or their successors, in relation to their respective rights to my General Estate."

"Neither party shall receive from the other, by agreement, a certain sum of money annually, or otherwise, for its respective proportions. Neither party shall sell its respective rights under this will, to the General Estate, to the other or to others; but said General Estate shall for ever remain, and be managed, as I have pointed out, ordered and directed.'

"And, should the Mayor and Aldermen of New Orleans, and the Mayor and Aldermen of Baltimore, combine together, and knowingly and willfully violate

any of the conditions hereinbefore and hereinafter directed, for the manage-
ment of the General Estate, and the application of the revenue arising there-
from, then I give and bequeath the rest, residue, remainder and accumulations
of my said General Estate, (subject always, however, to the payment of the
aforementioned annuities,) to the States of Louisiana and Maryland, in equal
proportions, to each of said States, of half and half, for the purpose of educa-
ting the poor of said States, under such a general system of education as their
respective Legislatures shall establish by law—(always understood and provid-
ed, however, that the real estate thus destined by me for said purpose of edu-
cation, shall never be sold, or alienated, but shall be kept and managed as they,
the said Legislatures of said States, shall establish by law, as a fund yielding
rents for ever; the rents only of which General Estate shall be taken and ex-
pended for said purpose of educating the poor of said respective States, and for
no other.) And it is furthermore my wish and desire, and I hereby will, that
in case there should be a lapse of both the legacies to the cities of New Orleans
and Baltimore, or either of them, wholly or in part, by refusal to accept, or any
other cause or means whatsoever, then, both or either of said legacies, wholly
or partially lapsed, shall enure, as far as it relates to New Orleans, to the State
of Louisiana, and, as far as it relates to Baltimore, to the State of Maryland,
that the Legislatures of those States, respectively, may carry my intentions, as
set forth in this my will, as far and in the manner which will appear to them
most proper."

The above is a faithful analysis and summary of the will.

After the death of the testator, McDonogh, the States of Louisiana and
Maryland instituted a suit in one of the State Courts of Louisiana against the
cities of New Orleans and Baltimore, with a view to avoid the legacies be-
queathed to said cities.

The collateral heirs have also impeached the will. They might have inter-
vened in the suit brought by the States; but they preferred seeking their
remedy in the Circuit Court of the United States.

To dwell on this suit would be unnecessary. The will is valid in its exter-
nal form. It was made in the olographic form, agreeably to art. 1581 of the
Louisiana Code, which · is but a paraphrase of art. 970 of the French Code,
coupled with art. 999 of the same. In both countries, when the olographic
will is entirely written, dated and signed by the testator's hand, it is subject to
no other form, even if made out of the State. It cannot, therefore, be on the
external form that the collateral heirs rest their grounds of avoidance. Neither
can they rest them on the rights of relationship. Wherever the testamentary
power has been established, a will or testament is an exertion of human liberty
and of human volition over property. The law guarantees that this last re-
quest shall take effect. The law-appointed descent or distribution of property
is ousted by the testator's will, unless there be exceptions laid down in the law
itself. Now, the laws of Louisiana make no exception but for the case of the
existence of children and descendants, or that of the survivorship of the de-
ceased's father and mother (Louisiana Code, 1480, 1481); and art. 1483 speaks
unequivocally: "When there are no legitimate descendants, and in case of
the previous decease of the father and mother, donations inter vivos or mortis
causâ may be made to the whole amount of the property of the disposer."

There is but one exception to this art. 1483, which ends with these words,
"saving the reservation made hereafter." This reservation is spoken of in art.
1484: "The donation inter vivos shall in no case divest the doner of all his
property; he must reserve to himself enough for subsistence; if he does not
do it, the donation is null for the whole." But this enactment has nothing to
do with wills. From the very fact that art. 1483 allows a man to give away all
his property inter vivos or mortis causâ, when he has neither ascendants nor
descendants, from the fact that this article speaks of a reservation; and this
reservation, in the following article, is made only for the case of a donation
inter vivos, the necessary consequence is that the same Code makes no reserva-
tion, imposes no limits on donations mortis causâ, nor on testamentary disposi-
tions by which such donations are effected. Qui dicit de uno, negat de altero.

And art. 1564 says explicitly what the combined articles 1483 and 1484 say
implicitly: "By will, the testator disposes of his property, either universally
or under a universal title, or under a particular title."

The universal legacy carries seizin with it, so that, in respect of property given in entirety, either universally or under a universal title, there is no room for a succcession *ab intestato*. This is an unavoidable deduction from the title *Of Successions*, in the same Code, especially from art. 871, which distinguishes three sorts of successions, the testamentary, the legal, and the irregular, and places the testamentary succession foremost, as having precedence over the succession *ab intestato*. The will of man ousts the law. *Dicat testator et erit lex*. This also results from articles 875 and 880, and still more strongly from article 934 : "There are three kinds of heirs, which correspond with the three species of successions described in the preceding articles, to wit :

Testamentary or instituted heirs ;

Legal heirs, or heirs of the blood ;

And irregular heirs. (875.)

The person who has become the universal successor of the deceased, who is possessed of all his property and rights, and who is subject to the charges for which the estate is responsible, is called the heir, whether he be such by law, by the institution of a testament, or otherwise. (880.)

A succession is acquired by the lawful heir, who is called by law to the inheritance, immediately after the death of the deceased person to whom he succeeds. *This rule refers as well to testamentary heirs as to instituted heirs, and universal legatees*, but not to particular legatees. (934.)

We ask by what right collaterals could lay claim to the property of a relative who has made his will according to the laws of the country where he had his domicil, and where he was at the time of making his will. How could they support such a claim in the face of a law which, similar in this respect to the French law, (article 913 and following,) establishes no reservation or legitime in favor of collaterals of any degree, not even of brother and sister? In the Roman law, there was no legitime but for descendants and ascendants. In a single case, the brothers of the whole blood, or those of the half blood on the father's side, could, we will not say, claim a legitime, but punish the disgrace put upon the family by the deceased, when the latter, by his will, had instituted heirs of bad character and blemished reputation : " Consanguinei fratres contra testamentum fratris sui vel sororis de inofficioso quæstionem movere possunt, si scripti heredes infamiæ vel turpitudinis, vel levis notæ macula aspergantur. (Cod. Justin. lib. 3, tit. 28, l. 27.) Assuredly, such a law was never applied to a case where the testator gave his property to renowned communities, and for the benefit of his fellow citizens. The French law, which has given to the legitime pretty nearly the extent which it had in the *pays de droit écrit*, has not even let in the case provided for in Justinian's Code : in article 732 of the French Code, as at a later period in article 881 of the Louisiana Code, the rule *paterna paternis, &c.*, was abolished by the declaration that, "The law does not take into consideration the origin nor the nature of the property, in order to regulate the succession ; " and after searching discussions, the French lawgiver rejected every reservation or legitime in favor of collaterals, even of brothers and sisters, induced thereto by the forcible remarks of the House of Tribunes (Fenet's *Recueil*, vol. 12, pp. 444, 445) : "But if there are none but collaterals, even brothers or sisters, or their descendants, there can be no sufficient motives for hampering the power of disposal. It is in the nature of man to look upon this privilege as one of the most precious boons. It is also the generating principle of a feeling of dignity ; and it may well be reckoned among the means of arousing emulation and industry. Men cling with most pertinacity to what may afford most enjoyment ; and it is undoubtedly an enjoyment securely to indulge the thought that we shall be able to reward good offices, or to help a friend. Nor will family ties thereby be loosened. On the contrary, perhaps it will be a means of drawing them tighter. A childless man will be better protected against the unkindness or ill treatment of his collaterals, when they shall know that he has it in his power to punish them."

It is perfectly plain that all this is applicable here, the laws of Louisiana being framed in the same spirit as the French laws ; that the suit instituted by the collaterals can be supported by no arguments appropriate to their cause ; and that the suit brought by the two States against the two cities, claims alone our attention.

To this latter suit we will, therefore, return.

STATE OF
LOUISIANA, &c.,
v.
EXECUTORS OF
McDONOGH.

The points insisted on by the States against the cities of New Orleans and Baltimore, were the following :

1. That it was the purpose and intention of the testator, as shown by the will, and carried out by the legacies, to convert all his personal estate into real estate, and render the real estate so purchased, as well as the vast quantity of real estate of which he died possessed, forever inalienable ; to create a capital of real estate perpetually increasing, which would ultimately embrace all the landed property in the country; to establish a fund so large as to be ruinous to commerce, and dangerous to the peace and prosperity of the State. All which purposes are illegal, contrary to public policy, and render the said legacies void.

2. That it was the intention of the testator, in making those legacies, to convey his property to be held by a title unknown to the law. As the law requires an owner for every species of property, and as the title created by the legacies is not recognized by the law, they are null.

3. That the said legacies are substitutions and *fidei commissa*, which are expressly forbidden by law.

4. That the said legacies are made upon impossible conditions; are contrary to public policy, and are made to persons and corporations having no capacity to receive. They are, therefore, null.

5. That, as the said legacies are void, all the annuities and other legacies dependent on them must, necessarily, fall with them; but if not, then all the annuities and all the legacies which were to be paid out of the said legacies to the said cities, are subject to the same objections, and are null and void, for the same reasons which have been hereinbefore urged against the validity of the legacies to the said cities.

The will was not to be overthrown by such arguments. It was sustained ; but the States took an appeal, and the two cities rest their defence on the following grounds :

1. That the cities of New Orleans and Baltimore are, by the will, instituted legatees under a universal title ;

2. That, by virtue of this institution, they are clothed with a full right of ownership over the property of the succession ;

3. That the absolute right of ownership in their favor results manifestly from the express terms of the will, "I give, will and bequeath, &c.," repeated in various passages of the instrument; and it results also from the prohibition to alienate the immovables ; since such a prohibition could only be addressed to the true owner, and likewise from the cities being forbidden to compromise in relation to the succession, and to attempt a partition of the property belonging to it, &c.

4. That the cities have the capacity to take.

5. That this double institution is made subject to certain charges, conditions and modes, which the cities are willing to carry out and perform, if possible.

6. That if, among these charges, conditions, modes or obligations, any are found which the Courts pronounce to be illegal, impossible or contrary to public policy, they must be deemed not written, and be erased from the will, without the testamentary institution being in the least affected thereby.

7. That under the head of impossible or illegal conditions, the Roman law, the act (French) of 1791, article 900 of the Napoleon Code, article 1506 of the Louisiana Code, the decisions of the Courts of France, and the text books of her illustrious jurists, embrace not only the condition, properly so called, which suspends the vesting of the gift, but especially every kind of impossible or illegal condition, mode, direction, obligation or clause.

8. That the plaintiffs who could lay claim to the succession only in case it had been declared not to belong to the two cities, have no present interest in the question, and cannot be allowed to moot it, since the legatees under a universal title first instituted, are alone entitled to profit by the nullity or lapse of such legacies as cannot be fulfilled but by a violation of the law.

9. That the testamentary penalty inserted in the will in favor of the States of Louisiana and Maryland, (known in law under the name of *translation de libéralité*,) is not incurred, and cannot vitiate the universal institution in favor of the two cities, if the conditions, charges or modes on which this translation *nomine pœnæ* is based are deemed not written, and consequently performed, the non-performance or non-fulfilment of these charges and conditions not laying at the door of the instituted heirs.

STATE OF
LOUISIANA, &c.,
v.
EXECUTORS OF
McDONOGH.

10. That the dispositions under a universal title which are impeached, contain neither substitutions nor *fidei commissa* prohibited by our laws; that *fidei commissary* substitutions are essentially, and of their very nature, impossible, incompatible with, and irreconcilable to, the perpetual existence of the instituted cities.

11. That the testator's principal object may be attained, and his charitable and philanthropic intentions accomplished, even though the immovables of his succession should not remain perpetually inalienable, and although the heirs instituted by the will should be prevented from strictly pursuing the mode of administration pointed out.

12. That, in the present case, the principal object which the testator had in view, was that the revenues of his estate should be applied tó the diffusion of public education, and to other purposes of general interest; but that the means recommended by him for the attainment of that end, are not essential to the validity and maintenance of the institution; that they only constitute a *mode*, not obligatory on the heir, and the *forced* non-observance of which cannot, consequently, in anywise affect the testamentary institution.

13. That, whilst it is admitted that a testator has, during his lifetime, an absolute right over the property which is to form his succession, the proposition is not to be understood so as to allow him to prescribe FOREVER a mode and system of administration for such property; that such a direction on his part, has always been, and of right ought to be, deemed not written, and of no validity; for otherwise, the unavoidable result would be, the absolute negation of the right of property; and the living generations would be thus wholly debarred from the exercise of this right, which is continuous and imperishable, and would remain the slaves of by-gone generations, with whose bones this precious right of property, the groundwork both of society and of civilization, would be buried.

Such are the grounds relied on by both the contending parties. The Counsel for the city of New Orleans, one of the legatees, has requested the five undersigned advocates in the Paris Court of Appeals to give their opinion on all these points. The latter have considered of the subject, and are of opinion that the controversy presents the following questions:

I. Supposing the bequests made to the two cities, by whatever title soever, *whether by universal title*, as the general legacy of the residue for the more general diffusion of knowledge, or *by particular title*, as the bequest made to the City of New Orleans, for the purpose of establishing an Asylum for the Poor, and that made to the City of Baltimore for the purpose of establishing a School Farm, supposing them, we say, to be tainted with conditions void, impossible, illegal, contrary to public policy, first in the formation of said legacies, by the investment of the testator's personal estate in immovables, by the inalienable character of the General Estate, by the absorption of vast tracts of land for the benefit of one corporation, or otherwise; secondly, in the carrying out of said legacies, in respect of their being made under conditions, charges and modes impossible to be executed or contrary to the laws, to good morals or to public policy, would it follow that said legacies would be null in themselves that they would vanish, and that the cities could not claim them?

On this first question, which embraces the first and fourth positions of the plaintiffs, and which likewise embraces the latter part of the fifth position together with the sixth, seventh, eleventh and twelfth positions of the cities, THE UNDERSIGNED ARE UNANIMOUSLY OF OPINION, that, if, (excepting the case of a substitution) the conditions, charges or modes imposed by the will on the formation of the legacies or their execution, are morally or physically impossible, contrary to the laws or to good morals or to public policy, said conditions, charges or modes are *ipso facto* reputed not written; that consequently, they are in the eye of the law as if they were not; that the will is cleared and discharged of them by the mere power of law; and that, as a further consequence, there remains but one legacy or principal disposition, the fulfillment of which can be insisted on.

II. Are the bequests made to the cities of New Orleans and Baltimore tainted with and made void by substitutions or *fideicommissa!*

This second question corresponds to the third position of the States, and to the tenth of the cities.

On this second question, THE UNDERSIGNED ARE ALSO UNANIMOUSLY OF OPINION that the will, which they have examined in its whole extent, contains none of the substitutions or *fideicommissa* prohibited by art. 1507 of the Louisiana Code; and that a disposition by which a bequest is made to an existing corporation, such as a city, to the intent that the whole or a part of the moneys shall be applied towards erecting, or causing to be erected, another corporation for public purposes beneficial to the City, is not and cannot be either a substitution or a *fideicommissum.*

III.  Was it really the intention of the testator to dispose of his property without transferring the ownership?

This third question corresponds to the second position of the plaintiffs, and to the first, second and third positions of the defendants.

On this third question, THE UNDERSIGNED ARE UNANIMOUSLY OF OPINION, that the cities are the full and perfect owners to the property devised, and that the attempt to avoid the legacies has no support in law.

IV.  Have these bequests been made to corporations having no capacity to take?  Are the legacies, the object of which is to provide the cities with an Asylum for their poor, a School Farm, and a regular system of education for destitute children, null and void, and are the annuities granted to the cities to be denied them?

This fourth question embraces the fourth position of the plaintiffs, and the fourth of the defendants.

Here again, THE UNDERSIGNED ARE UNANIMOUSLY OF OPINION, that the question must be answered in the negative, the bequests having been made, not to corporations not yet in being, but to the Cities themselves, with the charge of having such corporations erected.  This is applicable as well to the bequests of annuities as to the general devise of the testator's estate.

V.  Can the translation to the States of the bequests made to the two Cities take place merely, because the specific performance of these bequests is impossible, contrary to the laws, to good morals or to public policy?

This fifth question corresponds to the first and fourth positions of the States, and to the eighth and ninth positions of the Cities.

Here again, THE UNDERSIGNED ANSWER IN THE NEGATIVE, because the nullity of a condition, reputed not written, is such that, on the one part, in the eye of the law, the testator never could have willed it, and, on the other, the legatee could never have entertained the thought of fulfilling it, in so far as it was morally or physically impossible; whence it follows that it is legally reputed absent from the will, and that, as a further consequence, no one, not even the legatee appointed to take in the case of non-performance of the charges, can set up against the legatees originally instituted the non-fulfillment of a charge impossible or contrary to the laws, to good morals and to public policy.

VI.  If the municipal administrators of the cities had thought that such or such conditions, charges or modes of the legacies were impossible, contrary to the laws, to good morals or to public policy, and had even claimed judicially or extra-judicially, to be released from a particular condition or charge, or relieved from a particular mode of execution, would that have worked, *ipso facto,* a loss of the legacy and a translation of the same to the behoof of the States?

This question relates only to a particular point of view contained in the eighth position of the Cities.

On this sixth question, THE UNDERSIGNED ARE OF A POSITION that, should it arise in this controversy, it must be answered negatively, because the governors of a city, or other corporation, have no right of ownership over the property belonging to the corporation which they represent; that, consequently, an error on their part could be looked upon as an act of administration only, and not as an abandonment of property over which they have no disposing power.

VII.  Has the case arisen, which is provided for in p. 28 of the printed will, at the words " And should the Mayor," and which lays down forfeiture and the translation of the legacies by universal title as the penalty?

THE UNDERSIGNED FEEL NO HESITATION IN ANSWERING IN THE NEGATIVE, both for the reasons set forth under the preceding questions, and because harsh provisions ought always to be construed strictly, and not to be extended by equity.

VIII. Has the case of a lapse arisen?

THE UNDERSIGNED, without a moment's wavering, ANSWER IN THE NEGATIVE, for a legacy can never be said to lapse, but when it is absolutely without effect.

IX. Is a legacy tainted with an illegal condition, when the testator has prescribed forever a scheme and plan of administration for his property, and when he has manifested the intention of having his personalty invested in realty, in order to form a capital of immovables, so as, in the same State or Country, to place an enormous mass of landed property in the hands of one or several corporations?

This ninth and last question is drawn from the first position of the States and from the thirteenth of the Cities.

THE UNDERSIGNED, in this particular case and with relation to McDonogh's will, ARE OF OPINION that the testator, in the conditions to which he has subjected his property, has exceeded the powers given by the law to testators; and that, consequently, several of these conditions are void, or may become so by their exaggerated character, as we shall show more at length in the ninth section of this argument.

But, THE UNDERSIGNED must add that, in their opinion, this last question is superfluous as regards the controversy, and can possess no interest, but for the future.

## ARGUMENT.

### § I.

The undersigned commence by admitting for the sake of argument, that the general bequest to the two cities, and the object of which is the more general diffusion of knowledge; that the particular legacy to the city of New Orleans for the purpose of establishing an Asylum for the Poor; that the particular legacy to the city of Baltimore for the purpose of establishing a School Farm, are all, or one of them, tainted with conditions void, impossible, illegal, contrary to public policy, either in their formation, because the law, or the nature of things, will not allow the deceased, after his death, to direct the increase of his property and to order the accumulation of a new mass of immovable wealth; or because, in the charges and modes imposed on the cities for the execution of the legacies, it would be impossible to perform them in as full and specific a manner as the testator pointed out; or because the testator's directions might offend, in some point, against the laws, good morals or public policy.

And, with this admission for the sake of argument, they express a deliberate and matured opinion, that the nullity of the condition, charge or mode of execution, impairs in no respect the right of the legatees; that the legacies are not the less valid; that the cities will not the less have a vested right to the legacies; that the conditions alone of the legacies must be erased, because the law itself erases them by reputing them not written, agreeably to the well settled rule in regard to wills. *Utile per inutile non vitiatur.*

It will be remarked that we do not discuss the nullity of the conditions. We take the word of the States for this nullity. The language of the States to the Cities amounts to this: "In what respects you, the bequests made to you are so fraught with danger to the public interest, if you execute them with the charges imposed, that we insist on the avoidance of the conditions, and consequently the avoidance of the legacies; but let your minds be easy: the immense fortune of the testator shall not be lost; and we claim it for ourselves."

In reply, the cities point to art. 1506 of the Louisiana Code, drawn from the Roman Law, which, on this point, has ever been followed in France, and especially from art. 900 of the French Civil Code:* Every impossible condition, or

---

* TEXTS OF THE ROMAN LAW.

Gaii Inst. Comm. 3, § 98. Legatum sub impossibili conditione relictum, nostri præceptores proinde *valere putant* ac si ea conditio adjecta non esset.

Instit. Justin. lib. 2, tit. 14, § 10. Impossibilis conditio in institutionibus et legatis....*pro non scripta habetur.*

Digest, lib. 35, tit. 1, l. 3. Obtinuit impossibiles conditiones testamento adscriptas *pro nullis habendas.*

condition contrary to the laws or to good morals, is reputed not written in a will, nothing remains but the institution which is valid.

This is, therefore, the dilemma which the cities put. Either the conditions, charges or modes of our legacies are lawful and possible to be executed. In this case, we will execute them, and we claim the legacies. Or these conditions, charges and modes are illegal and impossible, as the States contend. And in this case, article 1506 expunges the conditions, charges and modes, and here again we insist on retaining the bequests made to us.

And why so? Because, when the law declares that she reputes conditions of this kind not written, she exerts her volition above the volition of man; she even exerts it in so sovereign a manner, that she nowhere assigns her motive therefor. Gains sought it in vain: *Et vix idonea , . . . ratio reddi potest (Inst. Comm.* 3, § 98.) No doubt the law willed it thus, because the instituted heir or legatee is a stranger to the testator's plans; perhaps even she intended to punish the testator for having abused the power intrusted to him. It is out of our province to search for the motive. Our portion is to obey the law, and not to scrutinize its reasons. *Non omnium quæ a majoribus constituta sunt ratio reddi potest ; et ideo rationes rorum quæ constituuntur inquiri non oportet ; alioquin multa ex his quæ certa sunt subvertuntur.* Dig. lib. 1, tit. 3, ll. 20, 21.

The cities are, therefore, entitled to retain the legacies, whether the conditions are possible and lawful, or impossible and illegal.

What matters it, we ask, if the States should declare it contrary to the laws that the testator should have ordered his testamentary executors to invest his personalty in realty? that he sought by this transmutation of his property, to create a fund of landed estate, which might ultimately swallow up the whole territory of a city, the whole territory of a State? that they should declare it contrary to law to have made this immovable capital inalienable, to have directed the creation of a mass of landed wealth so considerable as to jeopardize the interests of commerce and to endanger the public peace and tranquillity? What even would it matter if they should insist on the nullity of the condition that the property given to the cities for determinate objects and purposes should be forever administered by others than the city corporations?....What will the States have achieved when they have proved that all these conditions are impossible of execution, or that they are, wholly or in part, contrary to the laws, to good morals, or to public policy?....Nothing. They will have reduced the bequest made to the two cities to a pure and simple legacy, or to a legacy modified only by the conditions found compatible with public policy and the laws.

We boldly assert that nothing is less open to debate or cavil than the bequest by universal title made to the cities at p. 8 of the printed will, since, after the deduction of the legacy to *Mrs. Hamet's* children and to *Mrs. Hamet* herself, and the other bequests there mentioned, it is nothing more than a legacy of the rest, residue and remainder of the testator's personal and real estate present (that existing at the date of his will) and future (that existing at the time of his death)—all which he explains in these words: "as well that which is now mine as that which shall be acquired by me hereafter, at any time previous to

---

Digest, lib. 28, tit 7, l. 1. Sub *impossibili conditione vel alio mendo* factam institutionem placet *non vitiari.*

Digest, lib. 30, tit. 1, l. 112, §§ 3 & 4 Si quis scripserit testamento fieri quod contra jus est vel bonos mores, non valet; veluti si quis scripserit contra legem aliquid, vel contra edictum prætoris, vel turpe aliquid. Divi Severus et Antoninus rescripserunt jusjurandum contra vim legum et auctoritatem juris in testamento scriptum *nullius esse momenti.*

Digest, lib. 28, tit. 7, l. 14 Conditiones contra edicta imperatorum, aut contra leges, aut quæ legis vicem obtinent, scriptæ, vel quæ contra bonos mores, vel derisoriæ sunt, aut hujus modi quas prætores improbaverunt, *pro non scriptis* habentur. Et perinde ac si conditio hereditati vel legato *adjecta non esset,* capitur hereditas legatumve.

And other laws scattered here and there.

TEXTS OF THE FRENCH LAW.

Loi du 5 et 12 Septembre, 1791.
Toute clause impérative ou prohibitive qui serait contraire aux lois et aux bonnes mœurs est réputée non écrite.

Code Civil des Français, art. 900. Dans toutes dispositions entre vifs et testamentaires, les conditions impossibles, celles qui seront contraires aux lois ou aux mœurs, *seront réputées non écrites.*

CIVIL CODE OF LOUISIANA.

Art. 1506. In all dispositions *inter vivos* or *mortis causâ,* impossible conditions, those which are contrary to the laws or to morals, *are reputed not written.*

STATE OF
LOUISIANA, &c.,
v.
EXECUTORS OF
McDONOGH.

my death, and of which I may die possessed." Thus we see the testator has given nothing but the property forming his succession, and the legacies by universal title do not bear, in any respect, on the property to be acquired after his decease. It is vain to talk of the investment of personal effects in real estate, and of the accumulation of the revenues in order to form with the whole a *General Estate.* It is not this *General Estate* which is the object of the universal title, it is the estate *as found at the testator's decease;* if the purchases and revenues are to go to augment the *General Estate* for the benefit of the two cities, it is because the purchases are to be made with the moneys belonging to the cities *testamenti jure,* and because the fruits belong to the cities *accessionis jure ;* and all this is nothing more than an investment, made agreeably to the testator's will, of moneys belonging to the legatees by universal title from the day of the testator's death, and of revenues yielded in a due course of management by the legatees' own property.

We conclude that the disposition by universal title, purified * by the very nullity of the condition, is in no respect open to objection, and that the property belongs to the cities, universal legatees.

And still the States contend that art. 1506 of the Louisiana Code only speaks of conditions properly so called, that is to say, of those on which the existence of the legacy depends, and not of the interests, charges and modes with which the legacies are bound by a testator.

This is an abuse of words, a mere quibble. *Condition,* in its *extended* signification, means every quality or manner of being which makes a determinate thing to be what it is and nothing else. This word is derived from *condere,* to give being and form to a thing, to form it, to found it. The French Academy, under the word *condition,* defines it thus: " La nature, l'état et la qualité *d'une chose* ou d'une personne." (The nature, state and quality *of a thing* or of a person.)

In a *more restricted* signification, it means *the event,* without which a thing cannot come to be. In the language of the law, especially, it is what is called a *suspensive condition,* when a testator or a contracting party makes the existence of a legacy, of an act, of a purchase, of an obligation, to depend on a future uncertain event. (French C. C. 1040, 1168 ; Louisiana C. C. 1691 and 2016.)

But this restricted and special meaning is so far from taking away the general and extended acceptation of the word, that this same Dictionary of the French Academy, which exhibits the language as it stood in the days of Louis XIV, adds, " CONDITION also signifies *the clauses, charges, obligations, in consideration of which a thing is done.*"

Thus, the wording of the article 900 of the French Civil Code, and of article 1506 of the Louisiana Code, when they say that conditions impossible, or contrary to the laws, or to good morals, are, in a will, reputed not written, embraces not only the condition in its restricted meaning, (that which suspends the taking effect of the gift,) but also every kind of impossible or illegal charge, mode or clause, since those enactments make use of the general term *condition,* in its broad signification, and to restrict its meaning, would be to curtail the purview of the law. For what is a mode or charge imposed on a gift? It is everything that restricts the extent of the donation, with regard to the donee ; everything that impairs, abridges or diminishes the boon. A right of reverter and a substitution are modal charges or dispositions ; the same may be said of particular legacies, of obligations to do or to give, imposed on the universal legatee or legatee under a universal title. All these constitute charges or modes of legacies ; and although, before the accruing of the reverter, or of the substitution, the delivery of the particular legacies, or the fulfillment of the obligations to do or to give, the legacy exists by itself, (as the substance before the accident, which is no part of its essence,) whereas, the conditional legacy has its being from the happening of the condition only, these charges and modes are not the less, both in the language of the unprofessional, and the language of the law, conditions of the legacy or institution which they modify ; and which, consequently, are reputed not written, if they are impossible physi-

---

* *Purified.* A term peculiar to the French law. A disposition is *purified,* that is to say, becomes a pure and simple disposition, when the condition is either fulfilled, or released, or extinguished, or deemed no longer to exist.

cally, morally or legally, but without any disparagement to the legacy, which exists independently of the illegal or impossible accident.

There was no doubt about this point in the old French law. Let us hear what Domat says, Lois Civiles, liv. 3, *des testamens*, tit. 1, sec. 8, n. 7. That illustrious jurist, after having laid down a specific distinction of the conditions, charges, appointments and motives which are met with in wills, goes on to say : " Although the conditions, charges and appointments are distinguished as we have just shown, the word *condition*, as used in our language, often comprehends the charges and appointments."

If the reader seek a proof that this word is taken in this extent, in our laws, let him open the French Code, at articles 954 and 1046, and the Civil Code of Louisiana, at articles 1546, § 3, and 1703, and he will see that the non-performance of the conditions imposed by a *donation inter vivos*, or by a will, may be a cause of revocation of the legacy or the donation. These articles, therefore, speak of the clauses or charges of performance imposed on the donee or legatee. The law, therefore, gives the name of conditions to the imperative clauses and modal dispositions with which testators charge their legacies.

Again, if an illegal charge or a prohibited modal disposition, added to a legacy, tainted it *ipso facto* with nullity, article 896 of the French Civil Code, and article 1507 of the Louisiana Code would never have been written ; for both prohibit substitutions, and both declare that not only the charge of preserving and restoring to the substitute shall be null, but the principal legacy also. Why did the French lawgiver, in 1804, and the Louisiana lawgiver, in 1824, thus order the matter ? Because, in the absence of an express enactment, the institution or principal legacy would have remained, and the substitution alone would have been deemed not written, according to the tenor of article 900 of the one Code, and article 1506 of the other, as a condition contrary to the laws. For, though substitutions were abolished on the 14th of November, 1792, the institutions or legacies made with a charge of substitution in the interval between 1792 and 1803, when article 896 of the French Civil Code was first promulgated, were valid, and an action lay for their recovery, for the very reason that, during the aforesaid period, the substitution was considered to be a condition not written.

Thus, nothing can be better ascertained than that article 1507 of the Louisiana Code, and article 896 of the French Code, were framed, in order to create, with respect to the charge of substitution, an exception to article 1506 of the former Code, and article 900 of the latter. The common spirit of both systems is, therefore, evidently, that a legacy should not be avoided on account of the invalidity of the charge : *utile per inutile non vitiatur.*

Not that the undersigned pretend that there is no exception to article 900 or 1506 ; they have just been citing one, for the case where the charge is a substitution. They can adduce several others. Thus, a donation *inter vivos* is not annulled by a condition contrary to the laws, and will, nevertheless, be null, if that condition destroys the essence and the nature of the donation *inter vivos*, as conditions depending on the donor's will alone, or which leave him the means of increasing, at his pleasure, the charges imposed on the donee. (French Code, articles 944 and 945 ; Louisiana Code, articles 1516 and 1517.) But all these exceptions result from positive enactments ; they confirm the general rule, and bring additional proof that the word *condition* comprehends all that modifies the principal disposition, either for the present or for the future.

Here a kindred remark suggests itself. The English law has also adopted the general principles of the Roman law, on the doctrine of impossible conditions in will.[*] But let it be borne in mind that, even if there should be found,

---

[*] The writers of this opinion do not wish to be understood as deciding a question of English law; they confess, as becomes men trained in the laws of their own country, that they would not attempt to speak authoritatively on a system of law foreign to their national system. But their assertion here is founded on a valuable and learned English work, "The Law Dictionary," by *Tomlins*, reprinted at Philadelphia in 1836, vol. 1, p. 419, *Vo. Legacy* :

"By the civil law, which has been adopted in our Courts of Equity, [1 Eden, 116,] and which differs from the common law as regards devises of real estates, when a condition precedent to the vesting of a legacy, (*now, this is certainly the suspensive condition of the French law,*) is impossible, the bequest is discharged of the condition, and the legatee will be entitled, as if the legacy were unconditional. [Swinb. p. 4, c. 6, pl. 2, 3, com. rep. 73.]

" Where the performance of a condition subsequent (*now, this is our condition taken in its most extensive sense, for the charges imposed on the legatee, when in possession,*) is illegal, then as well at the common law as by the civil law adopted in the courts of equity, the condition is void, and the bequest freed from it." [Co. Litt. 206; a. b.; Mad. 32.]

either in the English law, or in some particular texts of the Roman law, any exceptions to these general principles, annulling at one blow the condition and the legacy, it is not by a recurrence to those English precedents, or to those Roman laws, that the question can be solved; the rule of decision must be the local laws of Louisiana, and article 1506 of the Louisiana Code. For the law which exclusively governs wills is the law of the testator's domicil. Now, this law is a Civil Code, framed, like the French Code, with the ruling idea of disentangling jurisprudence from the previously prevailing customs and laws.

This article 1506 is, therefore, a special law of the State of Louisiana; it is conceived in the most general terms; and, to escape from it, there must be found some special derogating enactment in a posterior statute, emanating from the Legislature of the same State.

On the other hand, supposing the pretended nullities in the conditions, clauses, charges and modes of the legacies, to be real, the cities are willing to execute the legacies, *if it is possible;* they wish to fulfill the principal end of the testator, and to carry out his charitable and philanthropic intentions, even though the immovables of the succession should not remain for ever inalienable, even though the cities should find themselves prevented from strictly pursuing the mode of administration chalked out by the testator himself. If there is a real impossibility, *natura et legibus,* of strictly conforming to the scheme of administration pointed out, at least the cities will attain the chief end which the testator had in view, by applying the revenue of his estate to the diffusion of public education, and to other purposes of general interest.

Under § IX, we shall inquire whether there is any impossibility in the clause of execution. Here the undersigned have only one point to consider, which is whether the nullity of a clause of execution dispenses the legatees from executing the charges of the legacies, if it is possible to execute them, and as far as it is possible.

Certainly not; nor do the cities think so. On the contrary, they are ready to carry out the charges, as far as in them lies, and herein they act in strict conformity to law. For, it is only so far as a condition, charge or mode might be impossible or contrary to law, that said charge or condition would be considered not written; if it is compound, and legally possible in one part, impossible in another, this latter part only will be rejected; but what is possible, *natura aut lege,* must stand good as a legal volition legally expressed.

This is the doctrine which flowed from the Roman laws, and which before the Revolution of 1789, we had adopted in France as written reason; for, when we resorted to the Roman law for the construction of wills, *non ratione imperii, sed imperio rationis,* we discarded all its subtilties. If, in the same condition, says Furgole, (*Testamens,* ch. 7, sect. 2 & 27,) there is one part possible, and another impossible, that which is possible must be performed, and that which is impossible rejected; and he is supported by the following texts: Dig. lib. 35, l. 6, § 1, and Dig. lib. 33, tit. 4, l. 12. Such was also the doctrine laid down by Ricard, *Traité des Dispositions conditionelles,* n. 236.

Now, nothing is more natural than to distinguish the substantial and *bona fide* performance of a legacy from the minute mode of execution pointed out by the will, if such mode is found to be impossible *lege aut natura.* The great point is that the revenues of the property should be appropriated by the cities to the works of charity ordered by the testator. If this is accomplished, the principal condition will have been fulfilled; the testator's desires will have been virtually performed by the rejection of everything which in its details might have been clogged by the laws or by an impossibility *de facto.*

## § II.

### OF THE ALLEGED SUBSTITUTIONS OR FIDEI COMMISSA.

A second difficulty, raised by the States, is that the bequests under a universal title made to each of the two cities, are burthened with substitutions and *fidei commissa,* which would avoid the bequests themselves. This position is based on art. 507 of the Louisiana Code: "Substitutions and *fidei commissa* are and remain prohibited.

"Every disposition by which the donee, heir or legatee is charged to preserve for or return a thing to a third person, is null, even with regard to the donee, the instituted heir or the legatee.

"In consequence of this article, the trebellianic portion of the Civil law, that is to say, 'the portion of the property of the testator, which the instituted heir had a right to retain, when he was charged with a *fidei commissum*, or fiduciary bequest;' is no longer a part of our law."

This article is taken, in its first part, from article 896 of the French Civil Code:

"Substitutions are prohibited.

"Every disposition by which the donee, the instituted heir or the legatee shall be charged to preserve for and return a thing to a third person, shall be null, even with regard to the donee, the instituted heir or the legatee."

In the opinion of the undersigned, *McDonogh's* will contains neither substitution nor *fidei commissum*, in the meaning of art. 1507 of the Louisiana Code, or in that of art. 896 of the French Code, from which the former was borrowed.

Besides, as it is a kind of disposition which the law proscribes and which carries with it the nullity of the principal disposition (contrary to the rule of law, *Utile per inutile non vitiatur*,) since the right of making a will is a sacred right, the last solace that society affords to the citizen, and the last right which she guarantees, the words *substitutions* and *fidei commissa* must necessarily be taken in their most restricted sense, and it must be borne in mind that wills and the clauses contained in them, must always be construed so that the act shall stand, *magis ut valeat quam ut pereat*, a maxim of law of which article 1706 of the Louisiana Code has made a positive enactment: "A disposition must be understood in the sense in which it can have effect, rather than that in which it can have none."

At the outset, we gave it as our opinion that there is no prohibited substitution in the will, and we are puzzled to find out in what such substitution can be made to consist. For, the substitutions aimed at by the law consist in the obligation on the part of the *gravatus* to preserve during his life, as owner, the property bequeathed to him, and to return it at his decease to the substitute who takes in the second degree, so that the substitution establishes, for the property subject to it, an order of succession different from that pointed out by law. All our authors are agreed that, when the period fixed for the surrender of the property is independent of the death of the *gravatus*, there is no prohibited substitution within the meaning of art. 896 of the Civil Code. See, on this point, Rolland de Villargues, Des substitutions prohibées, chap. 4, n. 57; Toullier, Droit Civil Français, t. 5, n. 22; Merlin, Questions de droit, *Vo. Substitution fideicommissaire*, § 6, and all the text books.

And the third position in the grounds of defence relied on by the cities answers, with singular appositeness, that substitutions are essentially and of their nature "impossible, incompatible with and repugnant to the perpetual existence of the instituted cities."

For a city is a moral person constituted in order to be perpetually renewed by the successive renewal of its inhabitants. Its essence will not, therefore, permit it to have any successors natural or artificial, and forbids that property donated to it should ever fall into the hands of another by *succession* or *substitution*. And, even should a city receive property with the charge of establishing some public institution for the benefit of the inhabitants, and of devoting the whole or part of the property thus donated to the inalienable endowment of such public institution, would that be a substitution? No. It would be a legacy with the charge of a specific destination for the behoof of the city, not burthening the city with the duty of preserving and returning, but with an obligation consisting *in faciendo*, nothing more.

Now, if the legatees were natural persons, and the legacy were of a sum to be employed in obtaining the degree of doctor, and for no other purpose; in building a house for the legatee, and for no other object; in providing a marriage portion for a daughter, and for no other purpose whatsoever, would any such legacy be one saddled with a substitution? We say, no, emphatically no, and for this reason: that there is but one gift made *in præsenti* to a single person with the charge of a specific destination. Just so, in the case in hand, a testator gives, under a universal title to the instituted cities, the residue of his property, with the charge on the cities of allowing the personal estate to be in-

vested in real estate, of administering the General Estate by special commissioners, who shall acquire to the use and behoof of the cities in order to increase the fund and swell the revenues until certain portions of these revenues shall have produced revenues large enough to furnish the cities themselves with the means of establishing an Asylum for the Poor, a School Farm, and Public Schools, on the plan drawn up by the testator. Is there in all this any thing like a prohibited substitution? Not in the least. The testator does not give any thing either to the Asylum, or to the School Farm, or to the Public Schools. He gives to the cities alone, in order that they may cause the institutions which he deems necessary, to be created; and these institutions are really for the use and behoof of the cities; they are really municipal foundations. Let us even suppose that, once created, they become corporations by an act of the Legislature, and, consequently, civil persons having a peculiar existence and property, it will still be a fact that they were created for a municipal purpose, and that they will contribute to the well-being of the inhabitants, the renown, splendor and convenience of the cities. This vain idea of a substitution must, therefore, be discarded. Nothing can be found in the will but legacies to the cities with the charge of investments for their respective interests.

But the States will say: "The Louisiana Code is more comprehensive in its purview than the French Code. The latter speaks of *substitutions* only; the former also speaks of *fidei commissa*." We will first remark that art. 1507 of the Louisiana Code is not to be understood even of those fraudulent *fidei commissa* which are made under the name of a capable person in order that the gift may reach an incapable person. The reason thereof is evident: just as the French Civil Code has reprobated such fraudulent *fidei commissa* in its art. 911, so has the Louisiana Code done it in art. 1478: "Every disposition in favor of a person incapable of receiving shall be null, whether it be disguised under the form of an onerous contract, or be made under the name of persons interposed." It is therefore clear that the *fidei commissa* in favor of incapable persons, which are reprobated and annulled even as to the first limitation by art. 1478, are not those which it is the object of art. 1507 to reprobate and annul even as to the first limitation. Nor does the latter article apply to legacies *with a charge*, for legacies *with a charge* are certainly lawful in Louisiana, and indeed everywhere, as good sense requires it. It is lawful in every country of the world to impose charges on one's own gift, *dare legem rei suæ*, and art. 1703 of the Louisiana Code proves it by saying, with respect to the *forced heirs*, (in France called *héritiers à reserve*,) that *no charges or conditions* can be imposed by the testator *on their legitimate portion;* which is tantamount to saying that every other heir, even testamentary, can be burthened with charges, and that the forced heir can be burthened with them like any other, provided it be not on his legitimate portion.

In our opinion, the word *fidei commissa* was added to article 896 of the French Civil Code, in article 1507 of the Louisiana Code, on account of the English origin of the other States of the Union, and in order to prohibit at once both the substitutions of the old French law, and the trusts of the English law. Now, in no part of his will has *McDonogh* appointed any *trustees.* The cities have the legal estate of the property donated to them. The annual commissioners are not *trustees* but annual administrators, who have not either the possession or the use of the property which it is their duty to administer. The accumulations of funds and moneys are ultimately to turn to the advantage of the cities. The dispositions are, therefore, nothing more than legacies made to the cities, with the charge of investing them in a specific way, and for municipal purposes. In all this machinery there is neither substitution nor *fidei commissum.*

## § III.

### OF THE PRETENDED WANT OF TITLE IN THE CITIES.

The undersigned have said on this point, that the cities have the perfect ownership of the property devised to them. In the law of Louisiana, article 866 of the Civil Code, just as in France, according to article 711 of our Code, "the property of things is acquired by inheritance, either legal or testamentary, by the effect of obligations, and by the operation of law."

STATE OF
LOUISIANA, &c.
*v.*
EXECUTORS OF
McDONOGH.

Succession is the transmission of the rights and obligations of the deceased to the heirs; and, in a second point of view, succession is the estate, rights and charges which a person leaves after his death [ articles 867, 868 ]; it also includes all that has accrued thereto since the opening of the succession. [Article 869.]

There are three sorts of successions, the testamentary, the legal, the irregular, [Article 871.]

The person who has become the universal successor of the deceased, who is possessed of all his property and rights, and who is subject to the charges for which the estate is responsible, is called the heir, no matter whether he be such by law, by the institution of a testament, or otherwise. [Article 980.]

A succession is *acquired* by the lawful heir, who is called by law to the inheritance, immediately after the death of the deceased person to whom he succeeds.

This rule refers as well to testamentary heirs as to *instituted heirs* and universal legatees, but not to particular legatees. [Article 934.]

This right is acquired by the heir *by the operation of the law alone*, before he has taken any step to put himself in possession, or has expressed any will to accept it. [Article 935.]

The heir being *considered seized* of the succession from the moment of its being opened, *the right of possession* which the deceased had, *continues* in the person of the heir, as if there had been no interruption, and independent of the fact of possession. [Article 936.]

Every legacy, not included in the definition before given of universal legacies, [Art. 1599,] and of legacies under a universal title, [Art. 1604,] is a legacy under a particular title. [Art., 618.]

Every legacy under a particular title, gives to the legatee, *from the day of the testator's death, a right to the thing bequeathed,* which right may be transmitted to his heirs or assigns; and this takes place as well in testamentary dispositions, universal or under a universal title, as in those made under a particular title. Nevertheless, the particular legatee can take possession of the thing bequeathed, &c. (Art. 1619.)

The best way of showing the law was to bring all the statutory texts together.

Livery of seizin is not any more in use in Louisiana than in France. Amongst us, formerly, it was only required for feuds or fiefs. Since the abolition of the feudal system, all lands are allodial. It is the power of the law that transfers the ownership of things, and it makes the seizin result from the title deed that conveys the property. Here the investiture results from the will itself, from the quality of the legatee under a universal title, and from the above cited enactments, which require no commentary.

We even see, from article 1619 of the Louisiana Code, that the only modification made with respect to the particular legatee relates to possession alone; but even the particular legatee is the owner of the thing bequeathed him, by the mere effect of the will, since his right, if he has not made use of it, passes to his heirs. *A fortiori,* when a legatee has a universal title—as the cities have—he is the absolute owner of the thing bequeathed to him. One cannot, in Louisiana, be instituted a legatee under a universal title of the residue of a testator's property for one-half, without being, at the same time, *seized* by the death of the testator and the power of the law, of the undivided ownership of this residue.

This idea the cities have very well expressed in their first and second positions; nor can anything be more accordant with right reason than the third, which is a development of the first two.

The terms of the will are terms of disposal and command: "*I give, will and bequeath.*" They are universal terms as to the thing given: "ALL *the rest, residue and remainder of* MY ESTATE, REAL AND PERSONAL, PRESENT AND FUTURE :" they express grammatically the transfer of ownership from the person of the testator to the person of the legatees, "UNTO *the Mayor, Aldermen and Inhabitants of* ——." Now it is evident that, by virtue of the law of Louisiana, which confers the ownership on the donee, and clothes him with it by the mere effect of the will and of the opening of the succession, the cities, universal legatees, or legatees by a universal title, each for one-half, are invested

with the ownership and domain, even independently of the formalities which confer possession as to third parties.

Moreover, the will contains passages which help to put this truth in a still stronger light. It is because the cities are owners, that the testator thought it necessary to forbid them (p. 8, at bottom of printed will,) to alienate or sell any part of his real estate; it is because they are owners, that he had to resort to special dispositions to deprive their administrators in ordinary of the management of said estate. It is because they are owners that he confers on them the right of appointing, under certain titles, annual administrators of the mass of his property; it is because the cities are owners, that these administrators, under the title of Commissioners of the General Estate, are bound to render annual accounts to the cities; that the cities have a supervision of their doings; that the purchases made by the Society for the Relief of Orphans must be made (p. 13) with the approbation of the Mayor and Aldermen of New Orleans, who must be parties to the deeds; that the purchases made by the Commissioners of the Asylum for the Poor, must be approved by the Mayor and Councils of New Orleans; and the purchases made by the Directors of the School Farm, by the Mayor and Council of Baltimore. (p. 9.) It is especially because those cities are owners, that he forbids any compromise on their part, in relation to their respective rights, and that he insists on their remaining forever tenants in common, for it is impossible to suppose the right of compromising and of remaining tenant in common, without supposing the right of ownership.

But will it be contended that there is no ownership vested in the cities, for that very reason that there is a perpetual prohibition to alienate, which would constitute, apparently, an endless usufruct, without any real ownership? This would be an error contrary to all principles of law.

Undoubtedly, in the case of natural persons, of private individuals whose life is bounded by birth and death, the perpetual *jus utendi* stripped of the *jus abutendi*, would be a juridical chimera. But, in the case of a civil corporation, such as the cities of New Orleans and Baltimore, that is to say, "of an intellectual body, created by law, the members of which succeed each other, so that the body continues always the same, notwithstanding the change of the individuals which compose it, (Louisiana Code, art. 418,) this college of inhabitants is capable of possessing, *as owner*, property which it will use and not alienate.

Indeed, it cannot be otherwise, from the very nature of things, for all that property the use of which is common to the whole city, as the streets, the markets, the town-hall, has an owner, to wit, the community; and if the law says (art. 474 of the Louisiana Code,) that things naturally susceptible of ownership may lose that quality in consequence of their being applied to some public purpose incompatible with private ownership, the law never meant to say that the State had not the dominion of the high roads established by State authority, or that cities had not the dominion of the streets and markets opened by them. Nothing more is meant by art. 474 than that, so long as things are in that predicament, the lands of the State or a municipal corporation cannot be *in commercio*, or become private property.

On the other hand, cities, in order to minister to certain public wants or purposes, may find it necessary to hold such property as is and forms *patrimonium civitatis*. And the Legislature has the power to declare certain property of cities to be inalienable. The Louisiana Code, in art. 476, speaks clearly on this point: "individuals have the free disposal of the property which belongs to them, under the restrictions established by law."

But, the property of the corporations of cities, or other corporations, are administered according to laws and regulations which are peculiar to them, and can only be alienated in the manner and under the restrictions prescribed in their several acts of incorporation.

Hence it follows that, when a private person gives to a city, even with the charge of never alienating, the gift is not the less a gift of the ownership; and if the city which is the object of the bounty derives a perpetual enjoyment from the thing, the city is not the less the owner of such thing, whether she appropriates it to a branch of the public service, or devotes its revenues to municipal purposes. The ownership is in her. It is as a city, and for her own exclusive interest, that she is deprived of the *jus abutendi* over her own property. Cities, public institutions or corporations can be deprived of the *jus abutendi* over

STATE OF
LOUISIANA, &c.,
*v.*
EXECUTORS OF
McDONOGH.

things which belong to them, without their right of ownership being impaired. When the thing is devoted to some public use, there exists a state of ownership *pro indiviso*, resulting from that very public use; when the thing is inalienable in order to secure certain branches of the public or municipal service, the loss of the *jus abutendi* results, not from the ownership being vested in any other person, but from the city (a perpetual entity) having expressly or tacitly incurred the obligation of not transferring the property to others.

## § IV.

### OF THE RIGHT WHICH THE CITIES HAVE OF ACQUIRING, EVEN FOR THE PURPOSE OF FORMING OTHER ESTABLISHMENTS OR CORPORATIONS.

Nothing can be more free from doubt than the right and capacity of the Cities to take property for themselves, or to the intent of forming establishments for municipal purposes.

We will first speak of the right and capacity of the Cities to receive by will for themselves.

The old jurisconsults of Rome were long of opinion that cities, bodies corporate and the other artificial entities, which they called *universitates*, were not capable of being instituted heirs, on the ground that one could dispose in favor of determinate persons only, and that corporations had no physical existence. A man could not leave his estate to a College of priests, but he could lawfully give it to the temple, in which they ministered (Fragm. of Ulpian, tit. 21, § 4, and tit. 25, § 5,). But gradually cities and all corporations or *universitates* came to be considered as individuals, and were accounted civil persons, when their formation had been authorized or recognized by the State. Thenceforth all companies, bodies or institutions sanctioned by the Sovereign Power, came to be ranked among persons capable of being instituted heirs. *Hereditatis vel legati seu fidei commissi aut donationis titulis, domus aut annonæ civiles aut quælibet ædificia vel mancipia ad jus inclytæ urbis, vel alterius cujuslibet civitatis, pervenire possunt,* says the Code of Justinian, lib. 6, tit. 24, l. 12. To the same purport are the laws 1, 14, 22, 23, of book 1, tit. 2, of that Code.

Thus, in the last stage of the Roman law, communities of inhabitants and all corporations could be instituted heirs, legatees and donees.

In France, in the latter period of the old monarchy, some restrictions were imposed on such acts of liberality, especially when they consisted of real estate, and the corporations instituted were ecclesiastical bodies. But the Civil Code was promulgated. In its 902d article, it enacts that "all persons may... receive either by donation, or by will, except such as the law declares incapable." The consequence is that cities, communities of inhabitants, public institutions, and all authorized corporations, which are, also in France, civil persons, are capable of receiving by will or by donation.

It was, therefore, not necessary that the Civil Code should declare their capacity to take, unless the intention of the Legislature had been to impose some limit or check on acts of liberality towards them. Such would be the course pointed out by logical accuracy to a lawgiver compiling a body of positive laws. *He does not enumerate capacities ;* he establishes them for all, and only makes special enactments with respect to incapacities or abridgments of right.

Hence our art. 910 : "Dispositions *inter vivos*, or by will, in favor of hospitals, of the poor of a parish, or of institutions of public utility, shall not take effect unless authorized by an order of the king in counsel."

Thus amongst us, cities, like private persons, have an unlimited capacity to take a legacy of any amount, under a universal title, or under a particular title; only, their capacity is restricted by the necessity of obtaining a decree of the head of the government before accepting. Such is the French law. Let us turn to the law of Louisiana.

Under the title of *Donations and Testaments*, chap. 2, it is said in art. 1456 of the Louisiana Code: "All persons may dispose or receive by donation *inter vivos* or *mortis causâ*, except such as the law *expressly* declares incapable." This article, it will be seen, is still more peremptory than art. 902 of the French Code, for by this word "expressly" it forbids any incapacity being raised by reasoning or induction.

The following articles, down to art. 1477, treat of the incapacity of giving STATE OF LOUISIANA, &c., v. and taking. Cities and corporations, legally authorized, are ranked among persons, and no article of this chapter declares them incapable. The cities have, EXECUTORS OF McDONOGH. therefore, a capacity to take, the law being silent on that point. Nor is this all.

The title X of book 1, of the Louisiana Code, treats of corporations. The 418th article defines them, and says that, "for certain purposes, they are considered as natural persons." The 420th article distinguishes corporations into political and private; under another point of view, article 421 distinguishes them into civil and religious, and article 422 places among civil corporations those which relate to temporal police, *such as the corporations of cities*, and art. 424 says, that corporations legally established are SUBSTITUTED FOR PERSONS, and further on, that "THEY ARE CAPABLE OF RECEIVING LEGACIES AND DONATIONS." So that the proposition, contained in the fourth ground of the plaintiffs, "that the legacies have been made to persons and to corporations who have no capacity to accept them," is a proposition confuted by the very text of the Louisiana Code.

All the legacies are made to the cities themselves, the general legacy by way of universal title, the special legacies of annuities for a School Farm and for an Asylum for the Poor, are also made to the cities, not even to be taken out of the legacy under a universal title, but only out of the fruits and revenue thereof. It is certain, and no body thinks of disputing the point with the plaintiffs, that the testator could give nothing to the School Farm, or to the Asylum for the Poor, since these institutions did not exist at the opening of the succession, and since none can take who does not exist.

Now this is the second branch of the proposition. Has the testator given to a corporation which did not exist?

The undersigned answer no, and they have already touched upon this answer above, pp. 34 and following.

The testator has left a particular legacy of annuities to New Orleans herself, a particular legacy of annuities to the city of Baltimore, in order that the former may open an Asylum for the Poor, and the latter, a School Farm. Therefore, neither the Asylum for the Poor nor the School Farm is a legatee under a particular title. The only legatees under a particular title are the cities, with the charge of investing the annuities at some future day in the erection of two useful institutions, an *Asylum for the Poor and a School Farm*.

We have already shown, pp. 45 and following, that these were nothing else but two particular legacies made *with a charge*; and that the only question is whether the charge is possible or not, legal or not. This has been treated of under § I.

But the States will probably say : If the commissioners to be annually appointed by the cities carry out the recommendation to obtain, so soon as they are inducted, an act of incorporation for the Asylum of the Poor, the Farm School, and the Free Schools for the Poor of both cities (p. 27, line 19 and line 30,) these four different establishments will then become the owners of the testator's fortune. Therefore, these future establishments are the true recipients of the testator's bounty.

This we, once more, deny. A testator does not bestow his bounty on an institution which does not exist, even should he order it to be created and richly endowed; but he bestows his bounty on a city when he provides it with the means of banishing mendicancy from its precincts; when he furnishes it with the means of raising a population of poor men, but of men trained up from childhood to the hardy toils of husbandry, initiated in the first rudiments of letters, and improved by a moral and religious education ; when he helps it to the means of imparting to poor children of all classes, conditions and castes of color, born in the cities and their suburbs, the first and necessary instruction which enlightens mankind as to their religious and moral duties, and prepares them, by the elements of literary knowledge, to practice the mechanic arts and the various lines of business, without needing the help of others to read, write and cipher.

This needs no proof: it is self-evident. The cities alone are the recipients of the testator's bounty. The Asylum for the Poor, the School Farm, the Free Schools, are not. These future establishments or corporations will not be establishments of the creation of *John McDonogh;* they will be establishments of the cities themselves, created by the cities, at the suggestion of the testator.

Thus, the annual Commissioners of the cities (when the annuities shall have reached the specified amounts,) will not call on their respective legislatures for the incorporation of the Asylum for the poor, of the School Farm, of the Free and Public Schools for the Poor, in the name of the testator ; they will call for it as Commissioners of the cities for this purpose ; they will call for it by virtue of the power conferred on them by annual election. And if the Legislatures sanction the erection of these new corporations, the corporations will not take the testator's property, as in a substitution, where the substitute or *fideicommissary* takes from the *gravans*, not from the *gravatus ;* they will receive their property directly from the cities, who will thus have divested themselves in order to form institutions for their own advantage ; they will receive *ab urbibus gravatis, non a testatore gravante.*

Moreover, should the States insist that the pretended charge of incorporating at a future day the Asylum for the Poor, the School Farm and the Free Schools, is a ground for avoiding the legacies, although it has been proved superabundantly that it is, at the very utmost, an impossibility which does not avoid anything, and that there would be neither a substitution nor a *fidei commissum*, nor absence of ownership in the cities : even in this case, and with the will spread before the court, the cities will prove that the testator never imposed on them, either by way of charge, condition or mode, the obligation of incorporating either the Free Schools, the Asylum for the Poor or the School Farm.

Assuredly, a city appropriating a portion of its property (even that which a testator has devised to it for that purpose,) to the annual support of like establishments, has the power of retaining the directors of said establishments among its own employees ; of setting forth the costs of the creation and support of such establishments in the account of its municipal expenditures, without taking any steps for making corporate bodies of such institutions. That does not prevent the city from having Free Schools, an Asylum for its Poor, a School Farm ; only, in that case, the establishments are part and parcel of the municipal *patrimonium* and administration, subject to the city government.

Now, all that the testator has WILLED, all that he has required by *words of command,* is that the annuities should be received out of the four-eighths of the remainder of his property until the cities can found these establishments ; and that, till then, the other four eighths of the revenues should be employed by the cities in the public education of the poor, so that (the funds being made up by the accumulation of the annuities for the four particular legacies, first to the Colonization Society ; secondly, to the city of New Orleans, for an Asylum for the Poor ; thirdly, to the Society for the Relief of the Orphans of the same city ; fourthly, to the city of Baltimare, for a School Farm ; ) the cities, legatees under a universal title, disincumbered of the burthen of the four particular legacies, may, thenceforward, devote the entire revenue of his succession to the gratuitous education of the poor of the two cities and their suburbs. Nothing more has he said by *words of command.* And assuredly, all *that* can be done without creating corporations, even should each charity be administered by annual commissioners.

But when he spoke of erecting the charities with which he charged the cities into corporations, or artificial beings clothed with their own personality, he did not make a disposition ; he merely expressed a wish, a desire. He did not use the terms : "It is my will, and I direct," (p. 6,) and others which betoken a well-settled purpose. He has, on the contrary, made use of *prayer* and *advice.* He has not made it a charge of his will or his legacies.

In all the passages where he speaks of this subject, (p. 13, line 18 ; p. 19, line 13 ; p. 27, lines 19 and 30 ; ) he does not say : "It is my will ; " he merely says : "I also recommend," that is to say, I deem it expedient, I deem it useful that these charities should be incorporated, but that does not mean : "I direct that it be done."

Our interpretation is the more to be relied on, that the testator might well fear *all* his conditions would not be sanctioned by the Legislatures. And whenever he recommends the obtaining of an act of incorporation, he adds the clause : "subject always, however, to the conditions herein provided for." Therefore, this recommendation was only made in case the cities or their annual commissioners should conclude that the Legislatures would introduce no modifications ; therefore *I recommend* is not an order, but the expression of a wish. An additional reason why our construction should be the true one, is,

that the last two lines of page twenty-seven of the printed will are quite in the language of dubitation: "Should it be necessary and desirable to have said institution incorporated."

Even were our interpretation erroneous, it ought to be adopted by the Court, if, as the States pretend, the charge of employing a legacy in the establishment and endowment of a corporation ought to avoid the legacy itself. For there is a principle of the Roman law that must always govern in the construction of an instrument, which is, that it must be construed *potius ut valeat quam ut pereat*, and this principle is adopted in article 1706 of the Louisiana Code, cited above.

Therefore, if the words *I recommend* are ambiguous; if they can be taken in a sense of command which would avoid the legacy made to the cities, or in a sense of prayer or advice, article 1706 would make it the duty of a court of judicature to take them in this latter meáning of *prayer* or *advice*, in order to uphold the legacies made to the cities, who would remain free to follow or not to follow the *prayer* or *advice* of incorporating.

Such is the constant rule of decision in France, whenever a legacy is burthened with a substitution which would annul the legacy itself.

When the charge of substitution is written in terms of command, the legacy is null; when the charge of returning the property is couched in terms of *prayer* or *advice*, the legacy is valid and the charge falls to the ground. On this point we refer to Toullier, *Droit Civ. Franç.* vol. 5, n. 27; Grenier, *Traité des Donations, Observations préliminaires*, n. X; Rolland de Villargues, *Des Substitutions prohibées*, n. 173.

In order to leave no doubt as to this position, which gives fresh corroboration to what the undersigned have said in §§ II and III, they will set forth the opinion of Merlin, given in a case of this kind, he being then Attorney General in the French Court of Cassation.

One *Bourge*, by his will, had instituted his wife his universal heir. By art. 7 of the instrument, *he begged* (*il priait*) his universal heir to dispose of one moiety of his real estate in favor of his brother-in-law.

The testator's brothers sought to have the will set aside with respect to the moiety burthened with a substitution in favor of the brother-in-law.

The widow answered that art. 7 was expressed in precatory words; that the testator had *advised* not *commanded;* that she remained prefectly free, and that there was no substitution.

On April 4, 1807, the Court of Appeals of Brussels rejected the claim of the collaterals, "inasmuch as the disposition, in art. 7 of the will, *is not expressed in words of command*, and confers no right on him in whose favor the instituted heir *is requested* to dispose."

The brothers of the deceased filed their petition in error in the Court of Cassation. On January 5th, 1809, the Court dismissed the petition. Thus the will was sustained in its entirety, because *to beg, to advise, to recommend*, is not *to order, to dispose.* And Attorney General *Merlin* explained, in his *réquisitoire*, why the words "I beg, I wish," which are sufficient to express what is willed by a testator agreeably to law, are insufficient when he wills a thing prohibited by law:

"The reasons that might be assigned for imparting an obligatory force to the words 'I beg, I wish.' are counteracted, in our system, by a great principle furnished by the Roman Law itself; in case of doubt as to the meaning of a clause, a construction which tends to the validity of the act of which that clause is a part, must be preferred to a construction which would annul it. *Quoties in actionibus aut in exceptionibus ambigua oratio est, commodissimum est id accipi quo res de qua agitur magis valeat quam pereat.* Dig. lib. 34, tit. 5, l. 12.

"It is true that such a construction of this clause (the precatory clause) renders it illusory. But, as there is a rule which in doubtful cases, deems the testator to have written nothing useless, so is there another which says that, in doubtful cases, a testator is not deemed to have attempted what the law forbids, and still less what would have drawn along with it the annihilation of his chief disposition. Now, in the clashing of these two rules, the first ought, beyond all dispute, to give way to the former, the second ought, incontestably, to prevail over the first." (Merlin, Argument delivered on January 5, 1809, *Répertoire de Jurisprudence, Vo. Substit. fidéicommissaire*, sec. 8, n. 7.)

We could hardly avoid citing the above decision (which our courts of judicature have adhered to since 1809, and the legal accuracy of which has not been impeached since the promulgation of the Code,) because it answers all the questions embraced in §§ II, III and IV.

## § V.

### OF THE TRANSLATION OF A LEGACY PŒNÆ NOMINE, ( OR GIFT OVER BY WAY OF PENALTY.)

Before entering on this point, the discussion of which is, undoubtedly, useful, since counsel have mooted it in America, THE UNDERSIGNED deem it proper to remark, that it is much more general than the questions that arise from the will itself.

The will says (p. 28, line 12,) that the legacies shall go from the cities to the States, if the two cities shall combine together, and knowingly and willingly violate the conditions laid down for the management of the General Estate, and the application of its revenue. Now, this is a case which has not arisen as yet, and which will be examined in § VII.

The same will says (p. 28, line 33,) that the legacies shall also go from the city to the State of which it is a part, in case of a lapse ; and it will be shown, § VIII, that no lapse has taken place.

These are the only cases of translation of legacies provided for by the will.

With this preliminary remark we will proceed to the general question.

From the mere fact that the *literal* fulfillment of the charges, modes and conditions of the legacies bequeathed to the cities, is impossible or contrary to the laws, to good morals, or to public policy, does it follow that the transfer of legacies ordered by the testator ought to take place, from the cities first instituted to the States, who claim the benefit of this gift over?

Ethics and natural law answer in the negative.

Every transfer of a legacy deprives the legatee of a vested right, and deprives him of it by way of penalty.

Every penalty imposed on any one in case he should not fulfill a charge or condition contrary to the laws, to public morals, or to public policy, is an immoral or illegal penalty.

The infliction of an unjust, immoral, or unlawful penalty, if the courts gave it effect, would lead men to attempt impossible things (which would be folly,) or to violate the laws, good morals, or public policy, to secure to themselves the possession of the property given to them, (which would be criminal.) Therefore, in equity and natural law, when a legacy is burthened with conditions, charges and modes impossible, contrary to the laws, to good morals and to public policy, a testator cannot, in case the legatee should refuse to fulfill the impossible or illegal conditions, revoke it by a gift over, or by what is called a translation of the liberality.

The penalty and the translation of liberality *pœnæ nomine* ought to be allowed when the condition of the original legacy is legal and possible. The penalty and the translation of the gift *pœnæ nomine* are ineffectual when the condition or charge of the legacy is illusory and impossible. Such are the dictates of reason, of logic and of natural equity.

Let us now pass to the history of the law on this point.

Testators undoubtedly abused, at an early period, the absolute liberty of making a last will. They thought they had a right to tack on their will the most whimsical dispositions. But not only did the rule which grew into practice of regarding conditions physically or legally impossible as not written, bring back testamentary dispositions to rational principles; but another rule came to prevail about the time of the Antonines, which rule is, that institutions of heirship and legacies are acts of grace and beneficence, and that they ought not to be marred by penalties laid on the very persons whom the testator honors with his bounty. This rule was an offshoot from the doctrine of the philosophers which then so powerfully influenced legislation: "*Beneficium nullum est, nisi quod ad nos primum aliqua cogitatio defert amica et benigna,*" Senec. lib. 6, *De Beneficiis*.

*Capitolinus*, in his Life of *Antoninus Pius*, says this emperor was the first who reprobated legacies by way of penalty: "*Primus constituit ne pœnæ*

*causa legatum relictum maneret.*" He declared them all void, even when the condition was possible and lawful.

From *Antoninus Pius* to *Justinian*, every bequest, revocation or gift over of legacies *pœnæ causa*, was absolutely void. This absolute nullity was established without opposition for legacies in general; there had never been any difference of opinion as to the application of the principle except for institutions of an heir and legacies of freedom, but the controversy had died out in the days of *Marcus Aurelius: Pœnæ nomine* (says *Gaius*) *inutilitur legatur. Pœnæ autem nomine legari videtur, quod coercendi heredis causa relinquitur, quo magis aliquid faciat aut non faciat.... Sed nec libertas quidem pœnæ nomine dari potest, quamvis de ea re fuerit quæsitum.* [Inst. Com. 2, n. 235, and n. 236.]

*Ulpian* says as much in his Regul. Lib. tit. 24, *De legatis*, n. 17.

*Justinian* himself acknowledges that, before his reign, all penal dispositions in wills were null and void: "*Pœnæ quoque nomine inutilitur legabatur, adimebatur vel transferebatur. Pœnæ autem nomine legari videtur* ... (the remainder as in *Gaius*) *et in tantum hæc regula observabatur, ut quam pluribus principalibus constitutionibus significetur nec principem quidem agnoscere quod ei pœnæ nomine legatum sit.* [Instit. lib. 2, tit. 20, § 36.]

However, *Justinian* partially repealed the law of *Antoninus Pius*, by the law in the Code, lib. 6, tit. 41, *De his quæ pœnæ nomine in testamento, &c.*, and by the aforesaid § 36 in the Institutes: *Generaliter ea quæ relinquuntur, licet pœnæ nomine fuerint relicta, vel adempta, vel in alium translata, nihil distare a ceteris legatis constituimus, vel in dando, vel in adimendo, vel in transferendo:* EXCEPTIS *videlicet iis quæ* IMPOSSIBILIA *sunt, vel* LEGIBUS INTERDICTA, *aut alias* PROBROSA: *hujusmodi enim testamentorum dispositiones valere, secta meorum temporum non patitur.* [Inst. lib. 2, tit. 20, § 36.] And in the constitution of 528, inserted in the Code *repetitæ prælectionis*, published after the Institutes, after having allowed testators to make penal dispositions against the heir, the legatee, the fideicommissary or the freedman, *si minus dispositionibus suis heres vel legatarius, vel libertate donatus paruerit,* the Emperor adds: *Quod si aliquid facere vel* LEGIBUS INTERDICTUM, *vel alias* PROBROSUM, *vel etiam* IMPOSSIBILE, *jussus aliquis eorum fuerit,* TUNC *sine ullo damno, etiam* NEGLECTO TESTATORIS PRÆCEPTO, *servabitur.*

Nothing can be more explicit. The law of *Antoninus* is preserved, and the testator's disposition is ineffectual, without the original legatee sustaining any damage therefrom, and without the possibility of ademption, revocation or translation taking place, whenever the legacy threatened with revocation, ademption, or translation, is tainted with conditions, charges or modes contrary to law.

To the same effect is the law of Louisiana. It does not say that every infringement of the conditions of a legacy will annul it or give a right of action for annulling it: it merely says, art. 1703 of the Code: "The same causes which authorize an action for the revocation of a donation *inter vivos*, are sufficient to ground an action for revocation of testamentary dispositions." Now, as art. 1506 reputes conditions impossible or contrary to the laws or good morals not written, the second legatee cannot have a better right to claim the revocation for his own benefit than the donor *inter vivos* could have, in case of the non-performance of these conditions so prohibited and reputed not written. The original legatee would answer the donor *inter vivos* with art. 1506, and thus also does he answer the second legatee: "The testator has instituted you to take as second legatee, in order to compel me *by fear* to do what is impossible or contrary to law; your second institution is as defective as the void conditions imposed on my legacy."

In vain will it be said that a distinction must be made between a case where the testator purely and simply revokes the legacy if the condition is not fulfilled, and a case where the testator has appointed another legatee, who will take the legacy by translation; that, in the first case, the threat is made *in terrorem;* that in the second, as there is a person capable of taking the benefit of it, the revocation by gift over must have its effect.

The ready and peremptory answer is as follows:

The position may be true sometimes when the condition which the legatee refuses to perform is legal and possible. Then, if the will contains no clause of translation, the Court, without discharging the condition, will consider it as inserted *in terrorem,* and will grant delays and accommodation to fulfil it, before

allowing the property to go to the collaterals whom the testator certainly wished to deprive of it; but the Court will be more easily brought to decree a revocation, if there is a *third party* appointed to take the gift by translation.

But those who profess this doctrine must necessarily restrict it to the case where, the charges, clauses and conditions of the first legacy being legal, the original legatee has positively refused to perform what is possible and lawful: otherwise, they would violate art. 1506 of the Louisiana Code, and even the laws of *Justinian*. For, since the law reputes these conditions not written, it supposes by a legal presumption *juris et de jure*, that they are not in the will; it supposes it as well with respect to the secondary legatees as with respect to the testator himself. The secondary legatees cannot, therefore, base an action against the original legatees on the pretended non-performance of the conditions which the law itself declares not to exist in the will.

And let it not be said : "Why should it not be lawful to give to one on an illegal or impossible condition, and to make a gift over, if the person first instituted should not fulfill the condition?" Your alternative in favor of the second legatee will be nothing more than a continuation of the impossible or illegal condition. You will give effect to a violation of the law, if you allow a third party to improve his condition by the fact of the original legatee refusing to violate the law.

Thus are the cities obliged to come back once more to their dilemma : either the literal performance is possible and legal, and then we will perform ; or we shall be arrested by the absolute impossibility of executing certain clauses, or by their repugnancy to law, and, in this case, the testament being purged of these conditions by the power of the law, the States have nothing to claim of the cities, and have no rights against them.

## § VI.

### ON THE EFFECTS OF THE PERSONAL ACTS OF THE MAYORS AND ALDERMEN.

The proposition which will be developed in this section is entirely hypothetical, and if the undersigned touch upon it, it is because they know nothing more of the facts than what has been set forth in the beginning of this opinion.

It does not even appear that hitherto the Mayor and Aldermen of either city have done, in that capacity, any act indicating that they will not obey the testator's will.

Nor does it appear that they have made judicially or extra-judicially any demand to be discharged from any conditions, charges or modes of execution.

Our sixth resolution does not contemplate the case of an attempt on the part of the Cities (or one of them), through the instrumentality of their administrators, by means of a judicial or extra-judicial demand or otherwise, to get rid of a condition, charge or mode impossible or contrary to the laws or to good morals: for we have always answered that the condition, mode and charge disappeared entirely, in fact, never existed, and that nothing could work the loss of the legacy, on account of there having been a legitimate refusal to execute a condition, charge or mode, which would have vanished before the power of the law. The resolution just spoken of relates solely to the case (a case of which the undersigned are, in fact, wholly ignorant, but whose existence they are bound to suppose, in order that all states of the question may have been foreseen in their opinion,) of the Mayor and Aldermen, in those capacities and in the exercise of their functions, having manifested, by municipal resolves or ordinances, by judicial demands or otherwise, the desire of being freed from certain clauses, charges and conditions, because they considered them as impossible or contrary to the law, to good morals and to public policy, though the notion of the Mayor and Aldermen should be erroneous, and though what they held illegal was perfectly legal in itself, and finally, though what they deemed impossible was nevertheless possible, although difficult of execution.

Now, in this case, the undersigned have said in their sixth resolution, that such an act on the part of the administrators (Mayors and Aldermen) of a city, would not, of itself, bring about a loss of the legacy to the cities, nor a translation of the legacy to the use of the States.

For this there are two reasons equally powerful.

The first, is that the question whether an act ordered to be done is possible and legal, is often a nice and delicate question, respecting which there can be

error with good faith. A nearly imperceptible shade separates the possible    STATE OF
from the impossible; so it is with the legal and the illegal. In a variety of  LOUISIANA, &c.,
cases there is not the slightest doubt; but there are also circumstances in which  EXECUTORS OF
what is not possible appears to be so, where what appears to violate no law is    McDONOGH.
yet forbidden. In this debateable land, where physical or moral possibilities or
impossibilities are found side by side, shall a legacy be forfeited because a lega-
tee has asked to be discharged from a condition which he considers, improperly
no doubt, but through error and with an appearance of reason, as impossible or
contrary to the laws or to public policy? No. Forfeitures and penalties are
not to be inflicted lightly. If the legatee has not acted in a spirit of contuma-
ciousness and rebellion against the testator's will; if he had plausible, though
insufficient reasons, for considering the clause as impossible or illegal, equity
will not consider his seeking to be discharged from the clause as a positive re-
fusal to perform it; a court of judicature will not ignore the secret motives that
actuate men, and will not punish them before they have morally deserved the
penalty. It will decree the legatee to perform the doubtful clause; it will bur-
then him with the costs of suit as an amercement of his imprudence or his mis-
take. If the legatee has a competitor, a court will perhaps allow the original
legatee a delay, during which he will be bound to begin the performance which
he neglected through error, after which delay the second legatee would prevail;
but that is all it would do for the present. It would not think itself bound to
decree a forfeiture, a translation of the legacy. It will only be on the refusal
to execute the judgment that a court will decree the revocation or translation
of the gift.

For the penalties and clauses of revocation, attached to testamentary gifts,
must be distinguished from the penalties and forfeitures imposed by contracts.
The latter are the work of the contracting parties, and the result of the *aggre-
gatio mentium*. In such case there is hardly anything to do, but to ascertain
the fact of non-performance in order to give judgment for the other party; and
still even then, the laws often allow the courts to inquire into the good faith of
the delinquent, to examine whether the obligor is *in mora*, and to grant delays.
(See arts. 1927 and 2042 of the Louisiana Code.)

But as for testamentary dispositions, the author is no longer present to inter-
pret his work. From the very fact that he has conferred a benefit on the origi-
nal legatee, he is presumed to have been unwilling that the courts should re-
voke it for a doubt, for an error, for a false notion of the legatee. This respect
for the principal intention of the deceased is a powerful reason for not decree-
ing a forfeiture, before a court has shown the doubts be unfounded, by ordering
the performance of the clauses.

The second reason is still more powerful. Hitherto we have supposed the
mistake as to the nature of the clauses and conditions to be that of the legatee
himself. In this section of our opinion, we suppose, not the instituted cities
themselves, but the administrators of the cities, their Mayors and Aldermen, or
municipal councils, to have misapprehended the nature of the conditions, and
to have unfoundedly sued to be discharged from them. Now, if this hypothesis
had become, or at a later day became, a reality, the undersigned are of opinion
that it would be contrary to equity, and even contrary to the testator's inten-
tion, to decree a forfeiture or translation of legacy because the Mayors and Al-
dermen (*who are nothing more than administrators*) had fallen into a mistake
respecting the meaning and validity of the clauses and conditions.

This would be punishing the instituted cities for the mistake of their admin-
istrators. It would be forgetting that the administrators of cities cannot alien-
ate the property of cities but in cases where they are expressly empowered to
that effect; that whatever an administrator does is always taken and inter-
preted in an administrative sense, and that a suit by an administrator to be re-
leased from certain conditions, cannot be an occasion of damage to the city or
corporation subject to his administration.

§ VII.

OF THE CLAUSE: "AND SHOULD THE MAYOR, &c."

At any rate, THE UNDERSIGNED are of opinion that the cities are not within
any case of revocation, because the testator has only provided for one, "the
combining together of the two cities, and their knowingly and willfully violating

31

STATE OF
LOUISIANA, &c.,
*v.*
EXECUTORS OF
McDONOGH.

any of the conditions directed for the management of the General Estate, and the application of the revenue arising therefrom."

On examining this clause of the will, we cannot avoid falling back on the general principles which have been expounded above. If those conditions are impossible, if they are contrary to the laws, if they put public policy in jeopardy, it does not become the testator to punish the cities because neither of them, nor the administrators of either, are willing to abide by what is illegal or impossible in those conditions.

But, in the contrary case, and supposing the Mayor and Aldermen to be in error respecting the alleged nullity of the conditions, where would be "the combining together and violating?"

Because each city is placed in the same situation, because the States attack them both, because they are both forced to defend themselves, and that by the same arguments, against the claim of the State, will it be thence concluded that they combine together for the purpose of violating the testator's conditions? Evidently not.

They certainly would have a right to combine against aggression. And more than that, they have a right to examine, even combinedly, what conditions are legally possible, what conditions are legally or physically impossible. So long as the cities examine these questions in a spirit of candor, and with the intention of bowing to the decrees of the Courts on the doubtful points, they cannot be charged with such an improper combination as would avoid the legacies.

## § VIII.

### OF THE PRETENDED LAPSE.

In another part of the will it is said, that if one of the legacies left to either of the cities *lapsed*, the legacy must go to the State to which the city belongs.

Now, what is a lapsed disposition, or one that is *caduque?* It is one which, valid in itself and not having been revoked, yet, by an accidental cause, produces no effect.

It is evident that there can only be a lapse in the cases provided for by law. The French law has specified the causes of lapse : the case of the legatee's death before the testator, [article 1039,] or before the accomplishment of the suspensive condition on which the existence of the legacy depends, [article 1040,] the incapacity of the legatee, at the time of the opening of the right, [article 1043,] the loss of the thing bequeathed, [article 1042,] the refusal of the legatee to receive the thing bequeathed, [articles 898, 1043.] We do not know of any other case.

Such is the law, as it results from articles 1690, 1691, 1693, 1696 of the Louisiana Code, which in its article 1698, adds a new case of lapse, the birth of a child after the date of the will.

What have all these causes of lapse to do with the present controversy? There is only one which would be applicable, the case of one of the cities refusing its legacy. Now, both wish to enjoy their legacies.

Will the States say that the word *lapse* may also be understood of cases of revocation? We do not think so. *Lapse* is used in English as *caducité* is in French, in cases where the legacy has never vested in the person of the legatee. But, should a different meaning be given to the word *lapse*, it would be merely mooting anew the questions already treated of, since the whole of this argument goes to prove that the cities do not come within any case of revocation.

## § IX.

### WHETHER THERE ARE REALLY ILLEGAL OR IMPOSSIBLE CLAUSES, CHARGES, MODES OR CONDITIONS IN McDONOGH'S WILL.

The undersigned have already said that, at the first blush, this question does not appear absolutely necessary in the controversy as raised by the States against the cities.

How stands the case ? The States are plaintiffs ; and the cities offer to execute the conditions, if they are possible and legal.

As the cities cannot be compelled, even by a threat of revocation, to execute what is reputed not written in a will, the cause is confined to the dilemma already put.

However, it is obvious how useful at a future day may be the consideration of this question which covers so wide a field, and all the branches of which we do not profess to solve. We are not initiated in the public law of the United States. There are even matters of fact of which we are ignorant, for instance, the value of the property of the deceased, and its annual revenue.

We have said that *John McDonogh*, in the conditions imposed on his property, has exceeded the powers granted by law to testators, and that consequently several of his conditions are null or may become so by their exaggerated character.

Thus, testamentary executors can be appointed; according to the law of Louisiana, they may have the seizin of the movables and immovables, and sell them even, if necessary, to pay the legacies; they have power to receive what is due the succession, and to administer fully on the estate.

But are they clothed with the power of converting personal estate into real estate? of purchasing lands and houses, as if they were the owners of the moneys? To do these things would be outstepping the law. The universal legatees alone are owners; the testator can undoubtedly charge them to make an investment in real estate with the moneys which he leaves them; he can empower his executors to superintend the investment; but he has no right to order his testamentary executors to purchase at their will, because they are not the owners of the moneys to be invested.

Can a testator who deems himself not rich enough, with what he has acquired during his life time, to establish the charities which his benevolence has projected, validly order his testamentary executors and his legatees under a universal title or a particular title, not only to invest, at his death, his personal estate in realty, but also to make the moneys and revenues productive, to put them out, and call them in; to watch the proper opportunities for purchasing real property at a cheap rate; to lend on mortgage, to let the property on advantageous terms, but for short periods, so that the improvements shall be clear gain, afterwards to let at higher rents; in fine, to administer the fortune he leaves, so as to increase it more and more, and heap it up till his succession shall have become as wealthy as he himself would have wished to be to fulfill his benevolent views.

In our opinion, such conditions are contrary to the nature of things, to public policy, and, in a certain degree, to good morals, especially when legacies of this nature are left to cities, whose administration ought to tend to the welfare of their inhabitants.

Man, at his death, transmits the ownership of his property to legatees and heirs; he exercises a last act of volition over his worldly estate by disposing of the ownership. But can he, without violating the rules of public policy, extend his volition over the mode of managing his estate? Shall he be able to acquire after his death? Can he order that his testamentary heir shall accumulate during a long period of years? His last will can only affect the estate which he leaves, the wealth with which God has blessed his labor, and not the property which will be acquired with the profits. The sovereignty of his volition cannot extend from beyond the grave over the habitual and every day management of the property which he leaves to his legatees.

Besides, what would be the consequence to the citizens of New Orleans and of Baltimore? (the former as the town property, the latter as the country property) Why, that an enormous proportion of houses to be let in the city (and of lands to be leased in the vicinity of the city)—for it is there that the testator orders all purchases to be made, both with his personal estate and with the product of the annuities—would belong to the city. The city corporation would, therefore, have the monopoly of letting tenements, and, agreeably to the testator's intentions, the city would let them at the highest possible rent. In New Orleans, the number of house owners would diminish as the city increased its purchases.

What would be the consequence of this to the city corporation? Why, it would be bound to administer after the mode pointed out by the will; it could never lease out property on long leases, as is often required for commercial establishments and manufactories; instead of giving aid and protection to the

STATE OF LOUISIANA, &C.,
*v.*
EXECUTORS OF McDONOGH.

STATE OF
LOUISIANA, &c.,
*v.*
EXECUTORS OF
McDONOGH.

citizens, the city corporation would think itself bound to remain within the letter of the will, and to raise the rents; at the same time other owners of houses would also raise their rents; citizens who are obliged to live in hired houses, would be laden with heavy burthens, whilst the property of the Free Schools and of the Asylum for the Poor would increase.

Another condition, which appears to us equally contrary to public policy, is that the property left to the cities must be administered by others than the administrators of the cities themselves. The cities are corporations constituted, each according to its municipal laws and regulations: it is according to these regulations that each appoints its Mayor, Aldermen and City Councils. The good order of the community requires that neither city should be burthened with a double administration, nor with useless employees and expenses; and the law which gives testators the power of disposing of their property, does not bestow on them the right of. creating, for the cities, a special mode of administration in regard to the property of his succession, and perpetual commissionerships, though delegated by the cities. For, in such a case, it is no longer a law which the testator makes respecting his property, it is a law on the management and mode of administration, in contradiction to the mode of administration existing for the cities, which changes according to time and place. It is agreeable to law to dispose of the ownership of property forever, by testamentary disposition; it is contrary to law to regulate forever the administration of the property bequeathed, because the testator has the ownership *in bonis*, but not so the future administration.

Is it contrary to the laws that a testator should order the inalienability of the property which he gives to the cities, even of the property acquired by the investment of the personalty in realty, or by the capitalizing of the revenues?

The principle is that it belongs to the legislature of each country to decide whether the patrimonial property of the cities and corporations ought to be alienable or not. It is the public interest which, in the various emergencies, dictates the laws. This public interest varies according to time and place. The testator can therefore forbid alienation; it is the province of the legislature, or of the courts, according to their respective powers, to apply a remedy to the effects of the donation. In France, corporations cannot alienate, unless a law allows them; but in France, also, there has been a series of edicts and of laws which have forbidden them to acquire real estate. There have ever been laws which have stripped them of the real estate they had. None of these laws concern us at present. The only certain guide for the legislature is the public interest, and this sacred interest is not always soundly appreciated.

In other countries as well as France, it is possible that the public interest should be seriously jeopardized if a corporation should become the owner of a considerable portion of the territory, and that the love of country itself should be diminished by the necessity of having a dwelling place by precarious title only. A legislative prohibition which would thwart *McDonogh's* will on this point, would only be an impossibility of execution in the way of a mode annexed to the gift; and if, in the present controversy, the motives expounded above are sufficient to show the dangers attending such a mass of property in the hands of corporations, it would not be easy to understand why the cities should not have the right of examining this point in a spirit of candor and good faith.

Considered at Paris, December 18, 1851.

COIN–DELISLE, *Advocate,*
*Late of the Council of the Order of Advocates of Paris.*

DELANGLE,
*Late Bastonier of the Order of Advocates of Paris.*

GIRAUD, L. L. D.,
*A member of the National Institute.*

DURANTON, PERE,
*Advocate, Professor in the Law Faculty of Paris.*

MARCADÉ, *Advocate,*
*Late Advocate in the Court of Cassation.*

EUSTIS, C. J. (DUNBAR, J., concurring.) This appeal is taken by the State of Louisiana and the State of Maryland from judgments of the Court of the Fifth District of New Orleans. The judgment from which the State of Louisiana has appealed, is general in favor of the defendants, for the reason that the State of Louisiana is not entitled to take, under the will of the late John McDonogh, the half of his estate, in the place and stead of the City of New Orleans.

The judgment from which the State of Maryland has appealed, dismisses the petition of intervention filed by that State, for the reasons given for the decision of the Court, as between the State of Louisiana and the defendants. The State of Maryland claimed the legacy in favor of the City of Baltimore, on the same grounds that the State of Louisiana claimed that in favor of the City of New Orleans, and in its petition of intervention prayed for a citation against the City of Baltimore, to answer and plead to their petition through *Thomas J. Durant, Esq.*, the Attorney appointed to represent the absent heirs in the mortuary proceedings. The citation and petition having been served on him accordingly, he filed an exception that he had no authority to represent the City of Baltimore by virtue of his appointment of Attorney of absent heirs, and was not bound to answer the petition, and on this he prayed the judgment of the Court. The exception thus taken was, after argument of counsel, sustained by the Court, and the said Attorney of absent heirs dismissed from the suit.

The City of Baltimore is not in Court under these proceedings through the medium of the Attorney of absent heirs. I find no appearance entered for this party, nor any authority to make the City a party to this suit.

The dismissal of the petition of intervention, there being no antagonist interest represented on the record, was a just consequence of the decision on the exception. According to my judgment, neither the State of Maryland nor the City of Baltimore is in Court, and we have no power to adjudicate upon the rights of either.

The grounds of this opinion may or may not be applicable to the legacy in favor of the Colonization Society. That institution is not a party to this suit. I am not advised that the State would undertake to defeat this legacy, alone and separated from the residuary bequest to the City of New Orleans, and I desire to be considered as expressing no opinion whatever in relation to it. The subject has not been fully treated in argument, and ought not to be acted upon except under the most deliberate examination.

The construction of the will, in relation to the titles created by it, is exclusively a question of law. From a very considerate perusal of it, from a scrutiny of every part of it, and in viewing its character as a whole, I have been able to come to no other conclusion than that contended for by the counsel for the defendants, viz : that it conveys the title or ownership of the property embraced by the legacies to the residuary legatees—the Cities of New Orleans and of Baltimore. The words of the will on this subject are :

"*I give, will and bequeath all* the rest, residue and remainder of my estate, real and personal, present and future, as well that which is now mine as that which may be acquired by me hereafter, at any time previous to my death, and of which I may die possessed, of whatsoever nature it may be, and wheresoever situate, subject to the payment of the several annuities or sums of money hereafter directed and set forth, which said annuities or sums of money are to be paid by the *devisees* of this, my general estate, out of the rents of the said

estate, unto the Mayor, Aldermen and inhabitants of New Orleans, and the
Mayor, Aldermen and inhabitants of Baltimore, my native City, in the State of
Maryland, and their successors, in equal proportions of one-half to each of the
said Cities of New Orleans and Baltimore, forever, to and for the several inte-
rests and purposes hereinafter mentioned, declared and set forth, concerning the
same, especially for the establishment and support of free schools, &c."

There is some confusion in the will, which is confined to the administration,
however, and in no respect affects the title created in the residuary legatees.
The other parts of the will contain the same words used in the portion just cited
—" willed and bequeathed "—and the title of the cities is used in no other
sense throughout the whole instrument.

The prohibitions of the will seem to be in affirmance of the titles of the lega-
tees.    The prohibition to alienate, to compromise, the annuities, the charges on
the legacies, the penalty, the provision for the lapse, in my judgment all concur,
and none of them conflict with the hypothesis of the title being vested in the
legatees.

Municipal corporations are expressly authorized to receive legacies by the
Louisiana Code ; their capacity in this respect is recognized by Article 423, and
by the whole course of legislation on this subject.

My conclusion is, therefore, in favor of the position of the counsel for the
defendants, that the City of New Orleans is a residuary legatee under an uni-
versal title.

This legacy clearly belongs to a class known to the civil law from the founda-
tion of Christianity, by the name of legacies to pious uses.    They are an element
in the polity of municipal administrations in all countries which have preserved
the features and jurisprudence of Roman civilization.

Legacies to pious uses are those which are destined to some work of piety,
or object of charity, and have their motive independent of the consideration
which the merit of the legatees might procure to them.    In this motive consists
the distinction between these and ordinary legacies.    Domat, lib. 4, tit. 2, sec-
tion 6, § 2.

The term pious uses includes not only the encouragement and support of pious
and charitable institutions, but those in aid of education and the advancement
of science and the arts.    Makelday on the Roman law, § 145.

They are viewed with special favor by the law : *ils sont considérés comme
privilégies dans l'esprit des lois*, and with double favor on account of their
motives for sacred usages and their advantage to the public weal.    Domat loc.
cit.

The great consideration which the law attaches to these legacies, controls
tribunals in the interpretation of them, and has secured for their support a
doctrine of approximation which is coeval with their existence.

That without a positive prohibition municipal corporations in Louisiana should
be incapacitated from receiving legacies for the public purposes of health, edu-
cation and charity, seems to me repugnant to all sound ideas of policy, and to
the reason of the law.

What legacies could they be expected to receive except for some public or
humane object ?    Who would give a city a legacy, to be absorbed by its debts
or appropriated to common expenses?    Certainly, so far as the conscience of
the public is concerned, a legacy of money to a city, without any designation,
would be held to have been given for some object of charity or beneficence.

I think there are Articles in the Code which exclude the conclusion as to the incapacity of the City of New Orleans to take legacies of this kind.

The Article 1536 provides that donations for the benefit of a hospital of the poor of a community, or of establishments of public utility, shall be accepted by the administrators of such communities or establishments.

Provision is made by this Article to give effect to donations for the poor made by living persons—*inter vivos*—because in donations of this kind the donor is not bound, and the donation is without effect until the act of donation is signed and accepted by a party competent to receive the donation. The Article relates to the form of the act, and provides for its acceptance and the completion of the donation, and is not its legality pre-supposed? Is it not predicated upon the legality of this mode of property for pious uses? Such appears to me to be the obvious intendment of the Article. There is not the slightest ground for any distinction as to the legality of the holding or ownership by donation—*inter vivos* and *mortis causa*—that is, that the property could be acquired by one donation and not by the other.

Nor does the law make any distinction between a legacy to the poor of a city and a legacy to a city for the poor. In both cases it is a legacy to pious uses, and the city is the recipient. Domat lib. 4, tit. 2, sec. 2, § 13; id. sec. 6, §1 et seq.

The article 1543 provides that when the donation is made to minors, to persons under interdiction, or to public establishments, the registry shall be made at the instance of curators, tutors or administrators.

The Article 607 provides that the usufruct granted to corporations, congregations and other companies which are deemed perpetual, lasts only thirty years. If these corporations, congregations and companies are suppressed, abolished, or terminate in any other manner, the usufruct ceases and becomes united with the ownership.

The legislation concerning the powers of the City of New Orleans, I think is in the same sense.

Doubts having existed as to the power of the City to hold property out of its limits, the corporation was declared capable of holding or possessing real estate without its limits, and of acquiring, retaining or possessing by donation or legacy any property, real or personal, whether situate within or without the limits of the City. Act of 1840, p. 50. Digest of Statutes, 144, § 150.

I have no doubt of the legality of the testamentary disposition under consideration. I think it would follow as a necessary consequence from the definition, origin and nature of legacies to pious uses that those in favor of the Cities are of that sort; those in favor of the States, in the contingency provided, are of the same character. The difference is that in the former the mode of administration is regulated by the will; in the latter it is left to the wisdom and discretion of the legislative power.

The administration of property, devoted to pious uses by a legacy, through the instrumentality of overseers, commissioners or a quasi corporation, makes no difference as to the title; both, in fact, are legacies to pious uses, and not unlike the *Girard* legacy, maintained by this Court in 2d Annual Reports, 898. *Girard heirs* v. *New Orleans.*

The objections to the validity of these bequests may be reduced to three heads, which I will now proceed to consider separately, and in the order they are presented.

It is said they are void, because of the uncertainty of the recipients of the charity; because the estate created is a trust or *fidei commissum*, and therefore prohibited, and because the conditions of the bequest being impossible, and against public policy, the contingency provided for by the will has occurred, and the intention of the testator must be carried into effect, and that intention will be entirely defeated unless the States are to take the legacies as provided by the will.

I. From what has preceded it is plain that under the civil law it is no objection to the validity of a legacy to pious uses, that it is for the benefit of the poor even without any designation of locality. There is no principle better settled than that such legacies are valid. I met with a case in the course of my examination of this subject in which a will was maintained in which a testator instituted *the poor* his heirs. Indeed, the very generality complained of is an illustration of Christian charity; and uncertainty of individual object at the time of the gift is its characteristic and element.

In the language of the Partidas, "when the testator declares I institute for my heirs the poor of such a city or town, or I order that my estate shall be given to the poor for the good of my soul, as doubts may arise who the poor are, we will explain ourselves in this respect. And we say that it ought to be given and distributed among the poor in the hospitals of the city or town designated by the testator, and especially to those who are afflicted with such infirmities as to be unable to leave the hospitals to seek for alms, as the maimed, the lame, the blind, the foundlings, who are reared there, and the aged, or those who are affected with such infirmities as to prevent them from walking and going out of the hospitals, as they are more in want of assistance than those who can ask for alms. And if the testator had not designated the city or town, to the poor of which he intended to give his estate, then it shall be divided among the poor of the place where he makes his will." Partidas 6, 3, 20. By the general beneficence to the poor, without distinction—*istis fecundior pietas est*—the greater the merit in the donor, as the charity is the more comprehensive and catholic.

So the bequest of a sum of money "*to the orphans of the First Municipality of New Orleans*," was recovered by the Council of that Municipality under the Article 1536. This was a donation *causa mortis*, indefinite and comprehensive in its terms, making no distinction among the beneficiaries either as to age, sex or religion, and was maintained as valid by the Supreme Court of this State. *Succession of Mary*, 2d Robinson's Reports, 438.

II. Before considering the second objection to the validity of these legacies, because they create trust estates or *fidei commissa*, a few observations seem to be required as to the decision rendered by this Court on the will of the late Isaac Franklin.

I do not think that what was decided or said in that case has any application to this. I so expressly stated in the separate opinion which I delivered in that case. I undertook to give my reasons for deciding that the prohibition in the Code of substitutions and *fidei commissa* intended trust estates. I showed that these words *trusts* and *fidei commissa* were used as of the same sense by *Kent* and *Blackstone*, and that the Supreme Courts of the United States, and of this State, had both held the prohibition of *fidei commissa* to include trusts. That they are not the same thing every one knows. The English trust estate had no place in the Roman law, and its resemblance to the *fidei commissum* is remote.

But that in the common language of jurisprudence the word trust is used to express the *fidei commissum* is most certain. *Gibbon* so uses it. *Dr. Cooper*, an accomplished jurist and scholar, so uses it in his translation of the Institutes. *Dr. Browne*, in his treatise on the civil law, so uses it, and it is used in that sense in *Wood's* Institutes.

But whether the trust estate was or was not included in the prohibition is a matter of no moment in the present case. We have always held the trust estate to be an impossible estate, that the two cotemporaneously existing estates had no place in our laws, and that we could recognize no right of property in real estate, no tenure, no holding, no title, in relation to it, which the Code did not recognize.

*Franklin* gave by his will a legacy of a large portion of his lands and slaves in Louisiana to his brothers, residing in Sumner county, in the State of Tennessee, in trust, for the foundation and support of a seminary of education in that county. The title thus attempted to be created in the property was held to have no effect as a conveyance of it. The testator undertook to establish a trust estate in the technical sense of the English law. The title was held to be impossible between the parties, and to be prohibited by law.

*Judge Preston* thought the legacy was one to pious uses, and that the title created by the will was therefore valid. He supported his views by a very elaborate argument, but they were not concurred in by a majority of the Court.

Legacies for pious uses, I considered, were authorized by law for the purpose of procuring aid from individuals in supplying those wants which the State itself, or the communities into which it is divided, were bound to provide for in the interest of society, and as a function of government; that in their objects they were local and limited to the jurisdiction of the State, being for the support and education of the poor, and for purposes which fall within the circle of the duties of government; that the Articles of the Code recognized legacies to pious uses for these objects, and none others, and that there was no warrant of law for a title in real estate in trust in Louisiana to be held for the exclusive benefit of a foreign corporation. I thought that this diversion and holding of property from private uses and ownership, with all the privileges and favor the law can bestow, was exclusively in the interest of the public weal. The privileges and favor with which these legacies are maintained and carried into effect —the doctrine of *cy pres* would all be inapplicable when attempted to be applied for the benefit of persons beyond our jurisdiction—the reason of all these would fail in such an application, it being the obligation of every State to provide for the wants of its own inhabitants in this respect.

But the answer to this second objection is, that if the residuary legacies do create trusts or *fidei commissa*, they are, with numerous other testamentary trusts necessary in the execution of a will, saved from the general prohibition by the provisions of the Code itself. It is to be observed that I use the words trusts and *fidei commissa* in their most general sense. Vide §33, tit. 2, 16 and 17.

III. It is urged that the testator never intended the Cities to take his property, unless his directions were to be observed, and if the Cities could not and did not carry into effect his directions, in that event his will was that his property should go to the States.

I believe I am only following in the uniform current of opinion in the civil law writers, and in the decisions of the Court of Cassation, in treating the directions contained in this will, concerning the property and its administration, as

32

modes, charges or conditions. There is one mode or condition, and it is that on which the District Judge has decided the case, the utter impossibility of the compliance with which cannot be contested. It is that prohibiting the partition of the lands bequeathed to the Cities of New Orleans and Baltimore, and requiring their joint ownership to continue forever. The same may be said of the supervision and check which the testator attempts to organize of one corporation over the other, through the instrumentality of commissions. In these respects it is clearly impossible under our laws to carry into effect the intention of the testator. The condition is impossible, and there are others equally so in the will which it is not necessary particularly to note.

Our inquiry is to be directed to the effect which the law gives to impossible conditions in testamentary dispositions. At the commencement of the inquiry we are met by this dilemma on the part of the defence. If the conditions, modes, or charges imposed on the legatees by the will are legal and possible, we will execute them ; if they are not legal or possible, as the plaintiffs insist they are, then and in that case they form no part of the will. By the Article 1506 of the Code, every impossible condition, or condition contrary to the laws and to good morals, is reputed not written in a will, and the property remains to the legatees free from the incumbrance of the impossible condition, mode or charge.

This Article is not in the ordinary form of a prohibitive law. It is the first of the chapter which treats "of dispositions *reprobated* by law in donations *inter vivos* and *causa mortis*." The expression *reprobated—reprouvées—by the law* implies something even more than prohibition. The terms made use of are plain, general and comprehensive, excluding all exception, direct, positive and unambiguous, the whole tenor imperatively· establishing the law having for its object the exclusion of the possibility of the legal existence of this class of conditions in testaments.

Concede that to give effect to this Article is to defeat the intention of the testator, and by reading the will without the impossible or illegal condition, the intention of the testator is sacrificed. But if the law so ordains it that a rule established in the interest of order and sound policy, shall be the paramount consideration in giving effect to the wills of men disposing of their property after their death, who can gainsay it?

That this consequence of defeating the intention of the testator is recognized as following the same legislation on the same subject in the Code Napoleon, is abundantly shown. The authority of *Merlin* is conclusive on this point. Code Napoleon, 900. Merlin, Repertoire, verbo *condition*, sec. 2, § 4.

The effect of this rule is to maintain the purpose and intention of the law, notwithstanding the intention of the testator, who has undertaken to regulate his property after his death, in a manner which the law reprobates and declares its ministers shall not execute.

The Article 1705 of the Code, which provides that in the interpretation of acts of last will the intention of the testator must principally be endeavored to be ascertained, is in its very terms a rule of interpretation of wills valid in all the requisites and forms of law, and having no radical defect as conveyances of property, and is clearly subordinate to the prohibition of the Article 1506, standing under the significant head of " dispositions reprobated by law." In my judgment, the intention of the testator might, with the same propriety, be invoked in the interpretation of a will not having the requisite number of witnesses, or deficient in some necessary form, as in aid of the dispositions of this

will in favor of the States. It is equally clear to my mind that the impossible or illegal condition cannot be read for the purpose of ascertaining the intention of the testator in order to give it effect. The law, in saying it shall be reputed as not written, has said it shall not be read for any purpose except for that of utter exclusion from the testament.

The right of a man to dispose of his property after his death is derived exclusively from the law, and if the law says that in certain cases, from motives of policy, the vain conceits of testators—*ineptæ voluntatis*—shall be held not written, in the administration of justice by its ministers how can this command be disobeyed?

I find no reason for disobeying it, in the opinion of learned jurists, who are of opinion that such an Article ought not to have been introduced into a Code. It has been, after the most mature deliberation, introduced into the Napoleon Code, and adopted in ours. I think I see great and comprehensive foresight in thus exterminating triviality from jurisprudence, and putting an end to the endless controversies which it engenders. The principle of the rule has its foundation in a very high consideration of law as a science, which ought not to be conversant with anything impossible, nor be applied to any thing illegal or immoral, except for purposes of prevention or punishment. Its ministers ought not to be employed in seeking to carry into effect the whims and fancies of dying men, in which society has no interest, useless in themselves and utterly beneath its dignity as a system of enlightened reason and policy.

The history of this subject is given correctly in the printed argument of the learned counsel for the defendant, and in the *mémoire* prepared by several of the most eminent jurists of France.

It is shown that the same principle with regard to the impossible or illegal condition prevailed in the Roman law, in the ancient jurisprudence of France, and under the law of Spain. As a general rule it was adopted and still prevails in the English law. But there were a number of exceptions established by the civilians to the operation of the principle, which gave rise to subtle, difficult and intricate questions. Vide Swinburne on Testaments, part 4, section 6, and the works referred to by this author.

The Article 900 of the Napoleon Code, which corresponds with our Article 1506, was adopted without any discussion in the deliberations which preceded the formation of that Code. Its object unquestionably was to cut off, as far as possible, all exceptions to the general rule, to extinguish all controversy about useless things, to free the science of the law from all communion with that which involved no matter of right, and which it was the public interest to suppress.

So vast and comprehensive is this science that even to this rule there was a necessity for certain exceptions to meet the exigencies of other principles established by the Code. These few cases are all expressly provided for, which fact re-asserts the paramount authority of the rule in all other cases.

The general idea of property under the Roman law, and under our system, is that of simple, uniform and absolute dominion. The subordinate exceptions of use, usufruct and servitudes are abundantly sufficient to meet all the wants of civilization, and there is no warrant of law, no reason of policy, for the introduction of any other.

In conclusion, I think the dilemma presented by the defendants stands unremoved and unanswered. If the conditions of the will are lawful and possible,

the legatees avow themselves ready to fulfill them ; if they are neither one nor the other, the law holds them to be not written.

My opinion is that the judgment of the District Court ought to be affirmed.

It is considered by the Court for the reasons given in writing in the opinions of the Judges, that the judgment appealed from be affirmed, and on the intervention of the State of Maryland, it is considered by the Court for the reasons given in the opinion of the Chief Justice, that the judgment appealed from be affirmed, without prejudice, the State of Maryland paying costs in both Courts.

ROST, J. I concur in opinion with the Chief Justice, that the claim of the State of Maryland cannot, in the present state of the record, be acted upon, and that the judgment, dismissing the petition of intervention filed in its behalf, should be affirmed. I have nothing to add to the reasons adduced by him.

The main difficulty in arriving at correct conclusions upon an instrument so obscure and perplexing as the will under consideration, is to ascertain which rules of interpretation are applicable to the apparently conflicting dispositions it contains : and at the threshold of that inquiry it is proper to premise that the rules of interpretation, found in the Code, belong to the doctrinal part of the law ; that their enactment by the Legislature is not restrictive of the rules for the interpretation of contracts and testaments found in the body of the Civil law : that all alike are advices given to the Judge, landmarks they might be called, taking effect to the cases to which they apply, not so much *ratione imperii* as *imperio rationis*, and that while it is his duty not to lose sight of any of them, he must in every case exercise his discretion in applying them, ever bearing in mind that the least circumstance is at times sufficient to prevent their application. *Simul ac in aligno vitiata est, perdit officium suum.* Leg. 1 ff. *de reg. jur.*

The true meaning of those rules and their relative force and effect, present some of the most embarrassing questions in jurisprudence, and the correct application of each to the class of cases for which it was intended, is an unerring test of judicial ability. 6 Toullier, No. 333.

Before examining the respective claims of the parties to this litigation who are properly before us, it is well to ascertain whether there is in the heirs at law of the deceased an outstanding title to his succession. For if, upon examination, such a title should be ascertained to exist, a decision in favor of either party would be vain and useless.

The heirs at law of the testator are not before us. They have elected to exercise their legal rights in the Federal Courts, where their claim to the succession of their relative is now pending. Their counsel in that suit, who were also of counsel in the case of *Acklen* v. *Franklin's ex'ors*, alluded to by the Chief Justice in his opinion, submitted to us, as part of their argument, the brief prepared by them. In that brief the following statements are found :

" *McDonogh* looked upon his legal heirs as his enemies, because the law assigns them as the successors of his wealth."

" The Counsel for the defence labors with a *bonhomie* worthy of all commendation, to show that the testator meant to exclude, *at all events*, his heirs at law. The pains taken to prove this are superfluous ; it is admitted, without hesitation, the testator certainly intended to exclude his heirs at law for ever, and they do not claim one cent under the will, or the intention of the testator ; he

had the right to disinherit them if he devoted his property to some legal purpose, but if he has devoted his property to illegal purposes, his will is void, and the estate falls to them by the legal order of succession. They claim not under the will, but against it.

"They do not seek to show that they, whom the testator has so ruthlessly disinherited, were in any possible event to be the objects of his beneficence."

This is all true and manifestly results from the bequest by the testator of a mere pittance to his favorite sister and her children; from his omission to provide for his other numerous relatives, and especially from his declaration that if he had children, he would bequeath a very small amount to them merely sufficient to excite them to habits of industry and frugality, and no more; thus intimating that he would violate the law which secures to children a *légitime* in their father's estate. But I am unable to perceive how, upon legal grounds, his admitted insensibility to the ties of kindred can benefit relatives claiming his succession. It necessarily makes against them, and is one of those circumstances calculated to prevent the application of rules of interpretation which they might perhaps invoke if he had abundantly provided for them, and it could be inferred from the will that, under certain contingencies, he preferred them to the States of Louisiana and Maryland. It is to such a case that the rules "*in testamentis, plenius voluntates testantium interpretantur*," and "*optimum ergo esse, Pedius ait, non propriam verborum significationem scrutari, sed in primis quid testator demonstrare voluerit*," particularly apply. D. 50, 17, 12; D. 33, 7, 18.

The intention of the testator to exclude his heirs at law, at all events, being admitted, the conclusion is inevitable that if the cities could not take the legacies or violated the conditions which the testator had the right to impose, he intended to vest his succession in the States of Louisiana and Maryland. And if, in the language of *Judge Story*, the lawful intention of the testator is the polestar to guide Courts in the exposition of his will, or if, as *Coin-Delisle* graphically expresses it, it is the trail which the Judge should follow in all its turns and windings, it must be the rule of our decision, unless this case comes under some arbitrary law which controls the will of the testator.

Considering, imprimis, what the testator intended, it is too clear for argument that if the bequest to the cities did not take effect, or become forfeited by the violation on their part of lawful conditions, the States were to take it without conditions, as the next best thing he could do to insure the preservation of his fortune, and the application of it in his name to charitable uses.

It is said that the legal meaning of the word lapse does not cover a case of this kind, and that cases of lapsed legacies should not be extended by implication. The intention of the testator, and the sense in which he used the word lapse, being manifest, under the rules already cited, and the additional one, "*in conditionibus testamentorum voluntatem potius quam verba considerari oportet*," that sense should be preferred though not the most correct and usual. D. b. 35; C. 1, b. 101; Coin-Delisle, *Donations et Testamens*, page —.

If the will simply provided that the lapsed legacies shall enure to the States, it may be that the States could receive, under that disposition, only the title or interest first bestowed on the cities, and that in that case the thing bequeathed would not be altered in its nature or extent in passing from the first legatee to the second; but it will not be denied that the testator might have added that the legacies, so lapsed, should enure to the benefit of the States, free from some

or all of the conditions imposed upon the first legatees.  This I conceive he has done by requesting the Legislatures of those States to carry his intentions into effect as far and in the manner which will appear to them the most proper. No one reading the will can fail to see that when he says, "If the legacy to the Cities lapses, it shall inure to the benefit of the States."  He means "the property composing it shall inure to the benefit of the States ; " and it would be strange if Courts of Justice could not reach that meaning.

It is true that in the construction of wills Courts of Justice ought not to depart, without necessity, from the proper sense of the words used.  That necessity seldom occurs in cases of single dispositions, unconnected with others the will may contain ; but when the several dispositions in the will are constituent parts of one scheme, each must receive the sense which results from the entire instrument, and the rule relied on has, in that case, reference, not to the terms used in any one disposition, but to the entire contents of the will.  In such a case, "if there is a just reason to believe that the testator has used terms in a sense different from that sanctioned by usage, they must be taken in the sense in which it is believed he understood them."  6 Toullier, No. 312 ; D, l. 24, de reb. dub.

"The intention of the testator must prevail over the grammatical meaning of the words which he has used, provided that his intention is ascertained, by dispositions contained and words used in the will, and it is manifest that he had another object and another thought than that which the terms used in a particular disposition would otherwise convey."  1 Nouveau Furgole, Nos. 507, 508 ; D. l. 7, § 2, in fine de supellectile leg.

Under the authority cited from the Roman Digest, the interpretation should be more plenary in wills than in contracts; by which I understand that when the sense of a particular disposition resulting from the entire instrument has been ascertained, Courts may go further in cases of testaments than in cases of contracts, in disregarding the grammatical meaning of the terms used, so far indeed, as to supply words omitted, which may be done whenever the obvious meaning, and other parts of the will, restore those words naturally.  Coin-Delisle, p. 447, No. 9 ; D. l. 67, § 9, ff. de legat, 2d l. 10 ; C. de fid. l. 1, § ff. de hared. inst. l. 1 ; C. de Test.

The lapsed legacies, that is, the property composing them, was to inure to the States unconditionally, and the mode of execution of the will was left to the discretion of the Legislature.  This disposition created precisely the title which the city of New Orleans claims under art. 1506 of the Code, and the answer of Modestinus, cited in argument, D. 6, 33.  Such a disposition would unquestionably be valid if that in favor of the cities was not, and the claims of the heirs at law may safely be left out of view.

The disposition in favor of the city of New Orleans may be viewed as a bequest for pious uses—and the first question to be examined is, whether the holding of property for pious uses by this city is a tenure recognized by the law of Louisiana.

It is urged that the tenure, under which the city claims, is a technical trust of the English law, similar in all respects to those set aside by this Court, in the cases of Harper v. Stansbrough and Acklin v. Franklin's executors; that if it is not such a tenure, it is at least a tenure invented by the testator, without warrant of law to sustain it, and therefore void.  It is further urged, that the disposition is otherwise void for the want of capacity in the city to take, and.

by reason of the uncertainty of the beneficiaries and of their non-existence at the time of the opening of the succession.

Overlooking the inherent powers of Municipal Corporations, I thought, after the argument, that these grounds were tenable; but further consultation with my brethren, and a reference to authorities, to which, until lately, I had no access, have satisfied me that I was in error, and that under our system of jurisprudence, the capacity of the city of New Orleans to take and administer this charity is substantially the same as that claimed in this suit for the State of Louisiana.

The City was the original element of the Roman world; its organization was so complete, and so well adapted to the wants of civilized man, that after all other institutions perished, in the fall of the empire, the municipalities not only remained, but acquired additional importance, and through them the civilization of Rome impressed itself upon the institutions of its conquerors.

In no part of Europe, during the middle ages, was the importance of municipalities so great as in the country from which the civil law has descended to us. The *fueros* of the cities of Spain were constitutions rather than charters; they exercised under them most of the powers of sovereignty, and it is with truth that *Gregorio Lopez* says:   *Villæ et castra sunt nomina que in se continent jurisdictionem, honorem et districtum et etiam jus patronatus.*   No. 3, l. 9, t. 4, p. 5.

It is in accordance with the spirit of the legislation of that country that the successive constitutions of the State of Louisiana have made the city of New Orleans and its officers permanent functionaries of government, for all purposes of police and good order and for the punishment of minor crimes and offences, and that the Code has authorized it to accept donations made to the poor, and to take by will and by donations *inter vivos*.

It needs not the authority of *Domat*, at the present day, to prove that the police and good order of a city include the education of youth and the care of the poor within its limits.   This is a truth which comes home to the bosoms of all men; deduced at first from the precepts of Christianity, it has become an elementary principle in the theory of our government.   Domat, *Des Comm.* p. 107.

If, for want of other means, the city taxed itself for those purposes, that tax could not be diverted to other objects, or seized by the creditors of the city, *Egerton* v. *Municipality No.* 3, 1 Annual, 436.   If a particular branch of the revenue was affected by law to that object, it would equally be free from seizure. But the revenues of a city are not all derived from taxation; the original act of incorporation of this city recognized that it had other means, and authorized the levying of taxes only to supply any deficiency in other branches of revenue. It being unquestionable that cities can hold property patrimonially, and that the property thus held may be applied by law to any object for which the city is bound to provide, what *is* there contrary to public policy or injurious to creditors in the enforcement of a condition appended to a bequest, and without which the bequest would not have been made, that the property given shall be applied to some of those objects and shall never be alienated?   Nothing that I can see.   The giving, on such a condition, is a reasonable liberty to bestow upon testators, and the bequest, by providing a fund which the city was otherwise bound to supply, enriches it, and increases its means to meet its obligations.

As already stated, the law establishes the capacity of this city to take by will.

It also recognizes donations in favor of the poor, such as were made in the will of *Mary*, in 2d R. R. p. 440, and in that of *Mr. Henderson*, in 5th Annual, 441.

If the legacy, in this case, had been made directly to the poor and to the children of the poor, it would come within the letter of the law; the city would have taken charge of it, and administered it for the beneficiaries. I am satisfied, however, that this is not the only form such a disposition can assume, and that the bequest, as made, comes within the spirit and learning of our jurisprudence in the matter of charitable bequests.

"On peut léguer à une ville ou une communauté, quelle qu'elle soit, ecclesiestique ou laique, et destiner le don à quelque usage licite et honnête, comme pour des ouvrages publics, pour la nourriture des pauvres, ou pour d'autres œuvres de piété, ou du bien public. Et il faut considérer comme un legs fait à une ville ou autre communauté, ce qui serait legué à ceux qui la composent, comme aux habitans d'une telle ville ou autre lieu." Domat, Lois Civ. b. 3, tit. 2, § 2, p. 465 ; Law 17, *Du legs*, l. 1 ; C. law, 122 ; D. law 2d, *de reb. dub.* ; D. law 20, *de reb. dub.*

*Domat* places donations to a city for pious uses, and those for the erection of works of public utility, on the same footing, and the laws which he cites clearly establish the truth of that proposition. He further lays down the rule that, in either case, the destination affixed to the property by the testator, follows it in the possession of the legatee, who is, notwithstanding, vested with the title.

It is hardly necessary to say that a donation of land to the city, within its limits, for the purpose of erecting works of public utility, has ever been held valid and binding towards all persons, so far as the conditions it imposed were lawful. In 1785, *Don Andres Almonaster* built an hospital on a tract of land which he owned, and gave the land and building to the city, with the charge to keep it up for ever as an hospital for lepers, so that the public might have the benefit of it in perpetuity.

In the succession of time the disease of leprosy disappeared from the country. The house ceased to be used as an hospital, and was finally destroyed by fire. In 1833 the city passed an ordinance converting the land into a cemetery, the heir of the grantor then brought suit to recover it by reason of the breach of the condition attached to the bequest. We held that the legacy being for a pious use, could not be revoked by the inexecution of the condition—but we recognized at the same time the principle that the destination given to the property might have been enforced so long as there were lepers entitled to be admitted to the hospital. *Pontalba* v. *The City of New Orleans*, 3d Ann. 660.

Within a few years past, and after the repeal of the Spanish laws, *Abijah Fisk* gave to this city a house and lot, on condition that it should be applied to the keeping of a public library, and to be used for no other purpose.

The residuary legatee contested the validity of this bequest, on the ground that the will in which it was contained had been revoked by a posterior will ; but neither in this case, nor in that of *Pontalba*, was it alleged in the pleading or contended in argument, that the dispositions attacked created a tenure of property unknown to the law. The judgment creditors of the city have seized in succession the taxes of the city, its perpetual rents, and its interest in the water

works; but it has never entered their minds that they could seize this house as the property of the corporation, and disregard the destination affixed to it by the testator. The right of the city to acquire property under a testamentary disposition with a specific destination to some work of public utility, such as the erection of a court-house, a jail, an hospital, a public library or lecture room, &c., admits of no doubt, and, as shown by *Domat*, its right to take and hold property, upon the same tenure for pious uses, rests upon the same principle. It may be said that the city is not bound to make provision in all the cases provided by the testator; this may be true, but the public schools and the asylum for the poor, are certainly things which the city is bound to provide; and they alone would be sufficient to sustain the disposition.

The ground that the bequest is void for uncertainty and for the non-existence of the beneficiaries at the time of the opening of the succession, can hardly be considered serious in any forum governed by the rules of the Civil law.

" *Quod pauperibus testamento vel codicillis relinquitur, non ut incertis personis relictum evaniscat, sed omnibus modis, ratum firmumque consistat,* " is the rule on that subject in the Code of *Justinian*, which, so far as I am informed, has passed into the jurisprudence of all modern nations. An opinion of learned Counsel has been placed in our hands in support of the claim of the heirs at law of the testator, going to show that under the laws of Maryland bequests for the poor, or for their benefit, are void for uncertainty. It seems to have been so held by the Courts of that State, although it is probable that those decisions would not be followed, after the enabling statute, passed in 1842, by the legislature of Maryland. However this may be, I adopt fully the opinion of the Supreme Court of the United States in the cause of *Vidal* v. *the City of Philadelphia*, that the law was otherwise in England before the statute of Elizabeth, and I am very sure that it is otherwise here. See 2 Howard, p. 107.

Although, says *Ricard*, the great interpreter of the Roman law, on this subject—although the poor and the captive do not compose legal communities, and although they may pass for uncertain persons when not otherwise designated, nevertheless as their indigence has placed them under the protection of the public, whose duty it is to assist and sustain the weak, the laws have not only authorized donations and bequests to be made for their benefit collectively, but they have declared them the most favorable of all dispositions, and to avoid the inconvenience resulting from the uncertainty of the persons to whom the gift or legacy is to be distributed, it is customary to leave the distribution to the executors, or to the local authority. Ricard, *Donations*, p. 150.

I agree fully with the able counsel for the city of Philadelphia in the case of *Vidal*, that uncertainty seems to be of the essence of charitable bequests. Whenever the beneficiary is designated by name, he has a legal right which he can exercise, and his merit is alone to be considered; the bequest ceases to have the peculiar merit of a charity.

But it is urged, and it has been argued at great length, that the will under consideration is one connected scheme; that it should be construed so as to give to each portion of it the sense which results from the entire instrument, and that if this rule of interpretation be adopted, it must necessarily lead to one or the other of two conclusions—either the testator intended the general estate as the beneficiary, or he intended to create a trust in the sense of the English law, identical with that in *Franklin's* case; it is further said that as the intention of the testator, when ascertained, is the law of the will, in either

33

alternative the disposition fails, and what has been termed a translation *nomine pœnæ*, is a mere vulgar substitution in favor of the State, expressly authorized by article 1508 of the Code.

I believe that the enquiry as to the nature of the title intended and who was the beneficiary, may be gone into in the manner suggested by the plaintiffs' counsel—and it is lawful to take into consideration for that purpose everything that is written in the will, whether legal and possible, or the reverse. It is to me a self-evident proposition—a proposition which I cannot demonstrate otherwise than by stating it—that for the purpose of ascertaining whether the title intended by *McDonogh* is a conditional, or impossible title, all the conditions attached to it, whether legal or illegal, must be considered. In *Franklin's* case the dispositive words of the bequest to the brothers of the testator, were the same as are made use of in this case. *Franklin* attached conditions to his bequests and provided that it should be in trust for the establishment of an institution of learning in the State of Tennessee. We took those conditions into consideration for the purpose of ascertaining what was the tenure intended, and being satisfied that it was a tenure unknown to our laws, we held that the disposition must fall, the nature of the conditions cannot affect the principle.

The very able jurisconsults, whose *mémoire* has been submitted to us, evidently take this view of the law, or they would not argue from the nature of the illegal conditions imposed, that the testator intended a title in full ownership in favor of the Cities. The counsel here go still further when they assume as one of their grounds of defence, that the right of ownership in favor of the city results, not only from the express terms of the will, but also from the prohibitions to alienate, to compromise, and to attempt a partition of the property.

Art. 1506 does not reach that question, it applies only to illegal, immoral and impossible conditions attached to a title, otherwise valid.

But when all this is conceded and the different parts of the will are interpreted one by the other, they do not establish beyond all reasonable doubt the quality and quantity of the title intended and who was the beneficiary. The intention to give to the City for pious uses remains, at least, as probable as either of those suggested—in proof of this I deem it sufficient to state that each of the three judges who heard the argument, originally came to a different conclusion on this part of the case. The Chief Justice, after some hesitation, adopted the opinion, that the title intended was one to the cities in full ownership, with a destination to pious uses, which attached to the property. *Mr. Justice Slidell* thought, and still thinks, that the General Estate, for which the will provides, was intended as the beneficiary. I was under the impression that the holding intended was in the nature of a trust of the English law, and involved the legal and equitable titles which had caused the disposition in the will of *Franklin* to fail. My brethren have given at large the reasons of their respective opinions. I deem it unnecessary to state those upon which mine was predicated. The diversity of those opinions sufficiently shows that the question is not free from doubt, and the moment it is shown to be doubtful, the words used by the testator in the will are no longer to be construed and weighed; another rule of interpretation comes into play to solve the doubt.

If the disposition was in favor of the General Estate, it is gone.

If it establishes a legal and an equitable title in the technical sense of the English law, it is, in my opinion, equally gone.

If it vests in this City a title in full ownership, with a destination to charitable uses, for which the City would otherwise be bound to provide, it is lawful, and may be carried into effect. How is it then possible to evade or disregard the textual provision of article 1706 of the Code — that a testamentary disposition must be understood in the sense in which it can have effect, rather than that in which it can have none ?

When under all the different interpretations of which a testamentary disposition is susceptible, it is lawful and may be executed, the construction should rest upon the words and arguments used by the testator. But where one interpretation will give effect to the will, and the other would not, the decision of the law supercedes the discretion of the Judge, and commands him to assume that the testator intended what is lawful. A striking example of the nature of this rule is afforded by the decisions of the Courts of France, before and since the prohibition of substitutions in that country. When substitutions were authorized, the words of advice or request, in which the substitutions were often made, were held equivalent to words of command, as lawful wishes and desires of testators always are. But since substitutions have been prohibited, charges of substitutions thus made are disregarded, and the disposition becomes pure and simple. *Merlin* thus explains why the words, "I request," "I desire," although sufficient to express the will of the testator when their object is lawful, cease to be so when the disposition intended is prohibited :

" The reasons which might be adduced to attribute a binding force to the words, I request, I desire, are neutralized with us by the great principle drawn from the Roman law, that when there is doubt as to the sense of a disposition, the interpretation which tends to validate the act of which the disposition forms part, should be preferred to the interpretation which would avoid it. It is true that by thus interpreting the disposition, it is rendered illusory ; but along side of the rule, that in cases of doubt the testator should be presumed to have written nothing useless, there is another which says, that in cases of doubt the testator is never presumed to have intended what the law forbids, and still less what would cause the failure of the principal disposition. In the conflict of those two rules, it is undoubtedly the first which must give way to the second." Merlin, *Rep. verbo sub. fid.* § 8, No. 7. See also 5 Toullier, No. 27 ; Grenier, *Donations et Testaments, ob. pre.* No. 10 ; Roland de Villargues, *Des Subs.* 175.

So in this case, we are bound to presume that the testator intended the disposition which he could lawfully make, to wit : a disposition in favor of the city of New Orleans, with a destination of the property given to pious uses. Having come to this conclusion, it is clear that the disposition cannot be affected by the illegal conditions and charges, which the vanity and avarice of the testator prompted him to attach to it, and that they must be reputed not written, under article 1506 of the Code. I do not think, however, that all those conditions are illegal which have been assumed in argument to be so. I believe that the condition not to alienate, for instance, is as binding in a case like this as in the dispositions made by *Almonaster* and *Fisk,* already referred to—and that a city may, in such a case as this, be deprived of the *jus abutendi* over its property for an object of public utility, without its right of property being affected thereby ; the legislature having always the right to remedy the effects of the disposition whenever the alienation of the property given becomes of public advantage.

STATE OF
LOUISIANA, &C.,
*v.*
EXECUTORS OF
McDONOGH.

It was urged with great earnestness in argument, that the will in this case is not distinguishable from that of *Mr. Henderson*, acted upon in 5th Annual, so far as both establish a perpetuity—and that the decision avoiding the disposition in that case ought to govern the present. The obvious distinction between the two cases is, that *Mr. Henderson* had made no disposition of his property in favor of any one, but had simply provided that it should for ever form part of his succession and be administered by his executors and commissioners to be named after them, to the end of time. While the testator in this case has made a valid disposition of his property, and the perpetuity of the bequest is merely the consequence of the perpetual existence of the legatee. The General Estate does not form, as is erroneously supposed, the object of the disposition. The bequest embraces nothing more than the fortune left by the testator at his decease. The gradual increase of the General Estate, contemplated by the testator, was to be the result of the mode of administration he had prescribed, which is admitted on all hands to be illegal.

It may further be observed that as there was no disposition of the property in *Mr. Henderson's* will, there could be no illegal or impossible conditions within the meaning of article 1506 of the Code. If the dispositions establishing the perpetuity, and providing for the erection of the town of Dunblane, had been reputed not written, the other dispositions, such as the building of a schoolhouse and a church in the projected town, should have been enforced, although manifestly a part of what the Court held to be an unlawful scheme, and inseparable from it. There being no interpretation under which the main disposition could be sustained, the subordinate dispositions necessarily fell with it.

I have not noticed the objection—why is it not permitted to give to one under any condition, and to make a second disposition in favor of another in case those conditions turn out to be illegal or impossible? because, as well observed in argument, the alternative in favor of the second legatee would be but a continuation of the illegal or impossible conditions which the law reputes not written, and it would be giving effect to a violation of the law, if a third person was permitted to profit by the refusal of the first legatee to violate it. No difference can be made on principle between cases where there is a second legatee and those in which there is not—the legal rights of the first beneficiary are the same in both.

I am of opinion that the judgment should be affirmed.

SLIDELL, J., ( dissenting.) This controversy involves the interpretation of the testament of one who, after a long career of industry and avarice, died the possessor of a great estate. Leading a life of isolation, his heart appears to have become insensible to natural affection, and his mind morbid on the single subject by which it was engrossed. Hence, it is not surprising that he should have left at his death a Will, which, with the exception of a small legacy, excludes his kindred from any participation in his enormous fortune, and strives to carry out after his death the process of accumulation which he had so successfully prosecuted. His imagination, heated by solitary musing, saw through a long distant future the result of his cherished schemes, " in a huge mountain of wealth," with which he designed to found magnificent corporations, as imperishable monuments of his wealth and philanthropy.

The questions presented for our solution are, whether the scheme so elaborately prepared by the testator is valid in law, and if it be not, what other disposition consistent with his wishes is to be made of his estate.

For the proper consideration of these questions, it is necessary to arrive at a distinct appreciation of the substance of his will, which is sufficiently manifest, although its style is verbose, and its details minute and complicated.

After a few special legacies of insignificant amount, the will proceeds to give the residue of his estate, real and personal, to the cities of Baltimore and New Orleans, not absolutely, but as he expresses it, " To and for the several intents and purposes hereinafter mentioned, declared and set forth concerning the same, and especially for the establishment and support of free schools in said cities and their respective suburbs, (including the town of McDonogh,) wherein the the poor, and the poor only, of both sexes, of all classes and castes of color, shall have admittance, free of expense, for the purpose of being instructed in the knowledge of the Lord, and in reading, writing, arithmetic, geography, &c." Had the will stopped here, or contained no subsequent provisions in a conflicting sense, it might be held to be a devise of the ownership to the cities for the purposes contemplated. But the proprietary right thus nominally given is afterwards, in substance, withheld, for he subsequently declares that his executors must invest his personal property in real, and that his intention is that the whole of his estate, real and personal, ( except his slaves and the special legacies to his sister and her children,) is to be "a permanent fund on interest, as it were, to wit: a fund in real estate, affording rents, no part of which fund ( of the principal,) shall ever be touched, divided, sold or alienated, but shall forever remain together as one estate, termed, in this my last will and testament, as ' My General Estate,' or 'The General Estate,' and be managed as I herein direct." Again, when he comes to prescribe this management, he uses the following language : " I hereby declare that my intention is not that any part of said general estate, or revenue from rents, arising from said general estate, shall go into the hands of the corporation of said city ; but that they, the said corporations, shall have forever a supervision over it." He accordingly directs that the cities shall each annually appoint, until the end of time, three agents or commissioners, who shall have the sole and exclusive management of said general estate, the leasing of all the lands and houses, the cultivation of all the estates, the gathering of the crops, the collection of rents, and the doing all acts necessary to its full and perfect management. He confers upon the commissioners the seizin and possession of all the real estate from the day of their nomination. He directs his executors, after they have fulfilled their functions, to place all books of account and papers, &c., in the hands of these commissioners. They are to take an office in New Orleans, employ a secretary, and keep regular books, accounts, &c. They are to render accounts annually to the city of New Orleans, which are to be audited by a committee. They are to apply the revenues of the general estate as follows :

*First*—One-eighth of said revenues to the American Colonization Society, for the term of forty years from his decease, to be paid over from year to year.

*Second*—One-eighth part to the Mayor, Aldermen and inhabitants of New Orleans, for the sole purpose of establishing an Asylum for the Poor, until the sums paid should amount to the gross sum of $600,000. This annuity is to be paid to other commisioners, not more than seven in number, to be appointed by the municipal councils of New Orleans. They are required annually to invest

it in good securities, for the purpose of accumulation, until the full payment of the sum of $600,000. After which, one-third of the accumulated fund is to be invested in the purchase of land for the Asylum, and the erection and furnishing of suitable buildings, and the residue to be invested in real estate, to become thenceforth inalienable, and its revenues to be applied to the support of the Asylum.

*Third*—One-eighth part of the revenues of the general estate to be appropriated to the benefit of the Society for the Relief of Destitute Orphan Boys, until the sum paid should amount to $400,000. The fund to be deposited in bank by the commissioners, on interest, and as it accumulates to be invested in the purchase of real estate by said Society, which real estate is to be inalienable.

*Fourth*—One-eighth of said revenues to the City of Baltimore for the purpose of establishing a School Farm in Maryland, until the sum so paid shall amount to three millions of dollars. For the more rapid accumulation of this sum the will directs that so soon as the preceding legacies should be satisfied, the three-eighths bequeathed to them should be added to the school farm fund. The fund is to be received and managed by Directors, who are to be annually elected by the Mayor and Council of Baltimore, and to be subject to their supervision. The Directors are to invest the moneys thus received on interest, so as to augment its amount by the accumulation of interest to the largest possible sum, up to the time when the last payment of the three millions shall be received by them, when they are to invest a portion, not exceeding one-sixth, in land, buildings, furniture, implements, &c., for the School Farm, and the residue in real estate, which, when purchased, is never to be alienated, but its revenues applied to the support of the School Farm.

*Fifth*—The remaining one-half of the revenues of the general estate, to be divided equally between two other sets of commissioners, one to be appointed by the Councils of New Orleans, the other by the Council of Baltimore. These commissioners are required to devote the sums so received by them respectively to the support of public free schools, to be established in the two cities, and under their supervision. After the annuities created for the use of the Societies, the Asylum and the School Farm are satisfied, then the whole revenues of the general estate are to be paid over annually by the commissioners of the general estate to the commissioners of public free schools, in equal shares, and to be devoted to the support of such schools.

In various parts of his will, the testator suggests the incorporation of the several funds and institutions which he desired to create, accompanied by minute instructions respecting the mode of leasing his lots and lands, and administering the general estate.

He seems to have contemplated an ideal being, the General Estate as the true recipient of all his property, to be held for the purposes of the will. He recommends to the commissioners of the General Estate to sue out an act of incorporation of it, and in his instructions he observes, "the great object I have in view (as may be plainly seen,) is the gradual augmentation in value of the real estate, WHICH WILL BELONG TO AND BE OWNED BY THE GENERAL ESTATE FOR CENTURIES TO COME."

The will also contains the following clause, which, from its vital importance in the decision of this case, it is proper to insert *verbatim*:

"No compromise shall ever take place between the Mayor, Aldermen and inhabitants of the City of Baltimore, in the State of Maryland, and the Mayor,

Aldermen and inhabitants of the City of New Orleans, in the State of Louisiana, and their successors, in relation to their respective rights in said general estate ; nor shall one party receive from the other party, by agreement, a certain sum of money annually, or otherways, for their respective proportions in said general estate, nor shall either party sell their respective rights, under this will, in the said general estate, to one another, or to others; but said general estate shall forever remain and be managed, as I have herein pointed out, ordered and directed. And should the Mayor and Aldermen of the City of Baltimore, in the State of Maryland, and the Mayor and Aldermen of the City of New Orleans, in the State of Louisiana, or their successors in office, combine together, and knowingly and willfully violate any of the conditions hereinbefore and hereinafter directed, for the management of the general estate, and the application of the revenue arising therefrom, then, and in that event, I give and bequeath the rest, residue, remainder and accumulations of my said general estate, (subject always, however, to the payment of the aforementioned annuities,) to the States of Louisiana and of Maryland, in equal proportions to each of said States, of half and half, for the purpose of educating the poor of said States, under such a general system of education as their respective Legislatures shall establish by law. (Always understood and provided, however, that the real estate thus destined by me for said purpose of education, shall never be sold or alienated, but shall be kept and managed as they, the said Legislatures of said States, shall establish by law, as a fund yielding rents forever, the rents only of which general estate shall be taken and expended for said purpose of educating the poor of said respective States, and for no other.) And it is furthermore my wish and desire, and I hereby will, that in case there should be a lapse of both the legacies to the cities of New Orleans, in the State of Louisiana, and Baltimore, in the State of Maryland, or either of them, wholly or in part, by refusal to accept, or any other cause or means whatsoever, then both or either of said legacies, wholly or partially so lapsed, shall inure, as far as it relates to the City of New Orleans, to the State of Louisiana, and as far as it relates to the City of Baltimore, to the State of Maryland, that the Legislatures of those States respectively may carry my intentions, as expressed and set forth in this, my last will and testament, into effect, as far, and in the manner which will appear to them most proper."

When the provisions of this will are considered as a whole, it appears to me impossible to regard the Cities of New Orleans and Baltimore as invested by it with any title known to our laws. It is asserted by the counsel for the defendants that the Cities are, in legal contemplation, the owners of the property devised. But I am unable to conceive, under our system, an ownership stripped forever of the right of possession, use, administration and disposal. Such an estate has no warrant in our Code, nor precedence in our jurisprudence.

The law, from wise motives, permits men to exercise a last act of volition over their estate, by disposing of its ownership. But when they exercise this just privilege, they must exercise it under the law. They have no right to invent new tenures of property. I think there is much wisdom in what was said by the Chief Justice in *Harper* v. *Stanbrough:* "The modifications of the right of property under our laws are few and easily understood, and answer all the purposes of reasonable use. . It is incumbent on the Courts to maintain them in their simplicity."

STATE OF
LOUISIANA, &C.,
*v.*
EXECUTORS OF
McDONOGH.

STATE OF
LOUISIANA, &C.,
v.
EXECUTORS OF
McDONOGH.

The defendants seek to escape this difficulty by first assuming that the testator intended to confer the ownership upon the Cities, and then contending that those subsequent provisions which regard the possession, administration and disposing power, are to be considered as conditions illegal, or contrary to public policy, and consequently as not written; and so, they. argue, the bequest to the two Cities must be reduced to a pure and simple legacy, or to a legacy modified only by the conditions found compatible with public policy and the laws.

In assuming that the right of ownership in favor of the Cities results from the express terms of the will, the counsel for the defendants appear to me to err. The language is. not, I give and bequeath to the Cities, but, I give and bequeath to the Cities to and for the several intents and purposes hereinafter mentioned. Those intents and· purposes are fully expressed in subsequent clauses of the will; being thus referred to, they must be considered as embodied in the devising clause, and clearly qualify and limit it. The argument, therefore, starts from erroneous premises, when it assumes that there was a devise to the Cities of the ownership.

No one can peruse the will without a clear conviction that *McDonogh* was unwilling to trust the city governments, and believed that to invest them with the dominion of an owner, would jeopardize the security of the estate, and the success of the scheme which he had devised. No one was more familiar than the testator with the history of our city government, and the disastrous financial results of its administration. Hence it is that he entrusts the possession and administration to other hands, forbids the city ever to sell a single item of property, and prohibits the passage of a single dollar into their hands. The intention of the testator to withhold from the cities the *ownership* of his estate, in any sense of that term known to our law, seems to me to admit of no doubt. It is interwoven with the whole theory of the will, and speaks unmistakeably through its. entire context.

The truth is, that the real legatee intended and preferred by *McDonogh*, was the ideal being which he designates as his General Estate. The cities were intended to be the mere supervisors of the perpetual trust which he desired to create, and which, in its turn, was to be the source of the other trusts contemplated in the will.

But while on the one hand the title proposed to be vested in the cities is unknown to our laws, on the other, the ideal being which the will contemplates has no legal existence, and is consequently incapable of taking.

And here it is proper to observe that the aid which the testator expected from legislation is now manifestly hopeless. The States of Louisiana and Maryland have both spoken through their proper organs, and by ratifying upon their statute books the institution of the present suit, have clearly disapproved the scheme of future incorporations contemplated by the will. See Statute of Louisiana, March 12, 1852, and Statute of Maryland, January, 1852.

Moreover, the purposes which the testator desired to accomplish through this ideal being, are in part manifestly unlawful. It was his ambition to effect a huge accumulation by a protracted system of investment and re-investment. Not only was any sale of the real estate existing at the time of his death forbidden, but his personal property was ordered to be invested in real estate, interest was to be accumulated on interest, leases were to be so effected that the improvements were to fall into the estate at the end of the terms; in short, the·

fortune of the testator, so administered as if possible to increase it more and more during a long distant future. That such a scheme is inconsistent with public policy, no one will deny. It would withdraw large masses of property from commerce; it would put the administration of a great landed estate into the hands of agents having no personal interest in its well-being; it would be a check upon improvement wherever these lots and lands are situate, and in fact become a huge nuisance, whose evils would be aggravated from year to year. No unbiassed mind will regret the defeat of projects so unreasonable and pernicious.

Yet these evils are so interwoven with the scheme devised by the testator, that an attempt to purify it of them would involve a destruction of the scheme itself, which the testator desired should be accomplished in it its entirety, declaring a violation of *any* of his conditions by the cities a cause of forfeiture.

But if the system thus elaborately planned by the testator, and by which, through the instrumentality of mere nominal devisees, he sought to create an ideal being as the recipient of his estate, the engine of a vast accumulation, and the founder in a far-off future of magnificent charities, must fail, because it creates a tenure of property unknown to our laws, because it exceeds the power granted by law to testators, and because it would violate public policy, what other disposition is to be made of his estate?

This question is fully answered by the testator himself. It is to go, not to his natural heirs, whom by the clearest implication he intended under all circumstances to exclude, but to the States of Louisiana and Maryland, as absolute owners, leaving it to them to employ his fortune in the accomplishment of his philanthropic intentions, " as far and in the manner which will appear to them most proper."

Unquestionably the testator's preference was for the extraordinary scheme which he had so elaborately prepared, and over which he had no doubt brooded for years with a morbid delight. He desired it to be carried out in its *entirety*, and forbade the cities to violate *any* of its conditions. But still an apprehension existed in his mind that the scheme might fail; and from " whatsoever cause " this failure might arise, by " whatsoever means " it might come to pass, his desire was that there should then be recipients of his fortune, who, by virtue of their sovereign power, could accomplish the substantial execution of such of his wishes as they might consider lawful, and to whose discretion and fidelity he was willing to leave that execution. The great object of the testator was the education of the poor. " I can make no disposition of those worldly goods which the Most High has been pleased so bountifully to place under my stewardship, that will be so pleasing to Him as that by means of which the poor will be instructed in wisdom, and led into the path of virtue and holiness."

That paramount object, with other wishes of the testator, so far as they may be deemed practicable and politic, the States can, and no doubt would, in good faith, and with a just discretion, endeavor to accomplish, and thus the charitable object of the testator would be disappointed only as to the preferred mode of its fulfillment, an alternative of his own choice being adopted.

The above opinion necessarily involves the proposition that the natural heirs of the testator have no right to his succession beyond the specific legacies left to a portion of them. For we could not render a decree in favor of the plaintiffs in this action as owners of the succession, if a valid title were outstanding in others. The heirs have thought proper to appear in another forum; avoiding

34

the State tribunal in which the succession of the testator was opened. Still, although they are not before us, and our decree may not be technically binding upon them, I deem it my duty briefly to notice the grounds upon which I understand their claims to be predicated.

In considering the controversy between the Cities and the States, I was controlled by what I believed to be the intention of the testator, as gathered from a reasonable interpetration of the entire will. The same course of investigation seems to me decisive of the pretensions of the heirs.

The intention of the testator to cut off his natural heirs, beyond the specific legacies left to them, seems to me irresistibly manifest from the whole scope and purport of his will, and is peculiarly deducible from the scantiness of the legacy left to his sister and her children, and his declaration, "had I children (which I have not,) and a fortune to leave behind me at my death, I would bequeath (after a virtuous education, to effect which nothing should be spared,) a very small amount to each, merely sufficient to excite them to habits of industry and frugality, and no more." And again, that other declaration : "The first, principal and chief object I have at heart, ( the object which has actuated and filled my soul from early boyhood with a desire to acquire a fortune,) is the education of the poor (without the cost of a cent to them,) in the Cities of New Orleans and Baltimore, and their respective suburbs, in such a manner that every poor child, and youth of every color, in those places, may receive a common English education, (based however, be it particularly understood, on a moral and religious one, that is, the pupils shall, on particular days, be instructed in morality and religion, and school shall be opened and closed daily with prayer.) And in time, when the general estate will yield the necessary funds, ( for in time its revenue will be very large,) over and above what will be necessary to the education of the poor of those two cities and their respective suburbs, it is my desire, and I request that the blessing of education may be extended to the poor throughout every town, village and hamlet in the respective States of Louisiana and Maryland, and, was it possible, through the whole of the United States of America. For this purpose, and this only, my desire being that one dollar shall never be expended to any other purpose, I destine the whole of my general estate (excepting only my black people, the legacy bequeathed the children of my sister *Jane*, and that to herself,) to form a fund in real estate which shall never be sold or alienated, but be held and remain forever sacred to it alone."

In the face of these declarations, and of the entire scope and purpose of the will, it would be monstrous to say that *McDonogh* did not intend to exclude, at all events, his heirs at law. Indeed, the counsel for the heirs expressly concede that point in their printed argument, a copy of which was submitted to this Court in the recent case of *Franklin's* heirs. "The testator," they acknowledge, " certainly intended to exclude his heirs at law forever, and they do not claim one cent under the will or the intention of the testator."

Their hopes rest upon the proposition " that the testator did not dispose of the title and ownership of his estate. He attempted to build up magnificent trusts and charities out of the future revenues, but he kept the ownership for himself. As to the ownership, he died intestate, and it passed to his heirs at law."

I have carefully considered the ingenious argument by which counsel have endeavored to support this startling proposition, but it has brought no favorable

convictions to my mind. It is narrow and technical. It asks from an unprofessional mind the nice accuracy of an expert conveyancer. This is contrary to the received theory of the interpretation of wills. The law is indulgent to testators who are regarded as *inopes consilii.* It exempts the phraseology of wills from technical restraint, and obeys the clear intention of the testator, however informal the language in which it may be announced. If that intention be even obscured by conflicting expressions, it seeks the intention rather in a rational and consistent, than an irrational and inconsistent purpose. Of two modes of construction, it prefers that which will prevent a total intestacy. Such is the spirit of our Code, and the teaching of the commentators.

Approaching the interpretation of the will in this spirit, looking to the language used in the devise to the States with reference to the surrounding provisions, and the general scope and purpose of the will, which is the work of an unprofessional mind, I have, from the first, experienced little difficulty in appreciating the intention and meaning of the testator.

By the lapse of the legacies to the cities, I am clearly of opinion that he meant their failure to take effect from any cause whatever.

By the expression, " said legacies wholly or partially so lapsed shall enure," &c., he evidently meant the property embraced in those legacies.

To say that under the clause in question he simply intended to place the States in the stead of the Cities—their actions fettered by the same restrictions —their title qualified and limited by the same anomalous provisions as to possession, use and management—is to obliterate from that clause its closing words, which commit to the States respectively a dominion controlled only by their own discretion.

[ The judgment of the Court will be found at page 252.]